*In re* PEDRO COLTON FONTÁN, OSVALDO VILLANUEVA DÍAZ, AURELIO MIRÓ CARRIÓN, ÁNGEL FIGUEROA VIVAS y JUAN E. BRUNET JUSTINIANO, querellados.

*Número:* CE-86-666 *Resuelto:* 21 de febrero de 1991

1

2

4

*Alejandro Salgado Rivera, Fiscal Especial Independiente,* y *Maricarmen Ramos de Szendrey, Fiscal Delegada,* abogados de los querellantes; *José A. Feliciano* y *Héctor Santiago Rivera,* abogados de Juan E. Brunet Justiniano; *Wilfredo R. Picorelli Osorio* y *Enrique Ludovico Belén Trujillo,* abogados de Aurelio Miró Carrión; *Wilfredo Figueroa Vélez* y *Luis A. Amorós,* abogados de Osvaldo Villanueva Díaz; *Elí B. Arroyo, Eugenio Ramos Ortiz* y *Felipe Benicio Sánchez,* abogados de Pedro Colton Fontán, y *Jesús Luis Maldonado,* abogado de Ángel Figueroa Vivas, querellados.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

*Marco conceptual deontológico*

Este caso es *único* en el ámbito de nuestra jurisdicción disciplinaria. No sólo porque descorre el velo en torno a la conducta antiética de abogados en su función de fiscales, sino porque pone de manifiesto cómo la fortaleza o debilidad de las instituciones gubernamentales en una democracia guarda estricta correspondencia con la integridad o flaqueza de cada uno de sus funcionarios. Sobre todo, depende de lo que el gran maestro Hostos denominó "el órgano del derecho: la *conciencia*". E.M. De Hostos, *Moral Social*, Barcelona, Ed. Vosgos, 1974, pág. 123. Al final, más que los sucesos, estamos ante la gran tragedia humana del Cerro Maravilla.

Se impone una sucinta reflexión en cuanto al marco conceptual deontológico pertinente. El descargo de la función social de los miembros de la profesión jurídica está atado inexorablemente al sistema democrático puertorriqueño, "fundamental para la vida de la comunidad y donde la fe de la justicia se considera factor determinante en la convivencia social, [por lo cual] es de primordial importancia instituir y mantener un orden jurídico íntegro y eficaz, que goce de la completa confianza y apoyo de la ciudadanía". Preámbulo del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 1n.

La consecución de ese fin implica "el deber de desempeñar su alto ministerio con la mayor y más excelsa competencia, responsabilidad e integridad". Preámbulo, *supra*. Este mandato de moral profesional aplica siempre a todo "juez, *fiscal*, abogado postulante, asesor o en cualquier otro carácter". (Énfasis suplido.) Íd. Exige del abogado una clara conciencia de que su función, como jurista, ha de guiarse por el respeto a la inviolabilidad de la dignidad del ser humano. Conlleva que ha contraído un compro-

miso solemne e inquebrantable que trasciende su persona e implica "velar po[r q]ue la conducta de sus compañeros de profesión se rija igualmente por dichas exigencias". Íd. "Consustancial a[l] cargo de fiscal, y como miembro de la clase togada [está] comprometido al esclarecimiento de la verdad y a procurar que se haga justicia . . . ." *In re Pacheco Nieves*, 104 D.P.R. 566, 567 (1976), voto concurrente y disidente. Véase, además, *Pueblo v. Arreche Holdun*, 114 D.P.R. 99, 115 (1983).

El Ministerio Fiscal se vincula "al problema de las libertades fundamentales de la persona frente al Estado". C.A. Ayarragaray, *El Ministerio Público y la libertad*, XXXII (Núm. 3) Rev. C. Abo. Buenos Aires 208 (1954). Esa misión de gran prestigio, aunque espiritualmente grata, es difícil y compleja. Si bien el Fiscal tiene amplia discreción, muchas veces su labor no es públicamente comprendida. Por esa razón se ha dicho que el "Fiscal no puede realizar un buen trabajo sin provocar enojos y, tarde o temprano, la demanda de algún ciudadano (*a citizen suit*)". (Traducción nuestra.) W.P. Keeton, *Prosser and Keeton on Torts*, 5ta ed., Minnesota, Ed. West Publishing Co., 1984, Sec. 132, pág. 1065. Esta realidad sirve de ancla para la *inmunidad condicionada* que cobija las actuaciones del Ministerio Fiscal en sus investigaciones y presentación de causas criminales. En el fondo, existe una política pública de permitirles a los fiscales ejercer sus funciones sin temor a represalias o a consecuencias pecuniarias. *Romero Arroyo v. E.L.A.*, 127 D.P.R. 724 (1991).

A manera de recordatorio, en *Imbler v. Pachtman*, 424 U.S. 409, 423–424 (1976), el más alto Foro federal reprodujo los pronunciamientos siguientes:

> "La oficina del Ministerio Fiscal debe ser administrada con valentía e independencia. ¿Cómo lograrse esto si el Fiscal está sujeto a ser demandado por aquellos a quienes acusó sin lograr su convicción? Permitirlo abriría el camino a ilimitadas situaciones embarazosas y persecuciones contra los más escrupulosos funcionarios por otros que lograrían así su propio beneficio. Cada caso conllevaría las consecuencias posibles del fracaso al intentar lograr una convicción. Si el Fiscal estima apropiado solicitar el archivo y

sobreseimiento del posible caso . . . siempre existiría la interrogante de un posible pleito civil. La aprehensión ante estas consecuencias propiciaría mucha inseguridad y debilitaría la política de imparcialidad y libre de temores que debería caracterizar la administración de esta Oficina. Se vería obstaculizada así la labor del Fiscal y nos estaríamos alejando del objetivo deseado de la más justa y rigurosa ejecución de la ley." (Traducción nuestra.)

Aclaramos, no obstante, que esta *inmunidad condicionada* no cubre "actuaciones dolosas, fraudulentas, maliciosas o delictivas en que puedan incurrir los fiscales, y el Secretario de Justicia, en la [investigación,] radicación y procesamiento de causas criminales". *Romero Arroyo v. E.L.A.*, supra, pág. 743.

A los fiscales les "aplican incuestionablemente los principios deontológicos que regulan la profesión de abogado, con las modificaciones aceptables y cognocibles resultantes de las peculiaridades inherentes que conlleva esa compleja gestión pública". *In re Secretario de Justicia*, 118 D.P.R. 827, 849 (1987). Véanse, además: *In re Secretario de Justicia*, 126 D.P.R. 463 (1990); *In re Calderón Marrero*, 122 D.P.R. 557 (1988). Pues, entre el abogado y el Fiscal las "diferencias en funciones nunca deben obscurecer la verdad básica de que aunque sus papeles son distintos, cada uno está atado por los cánones y una tradición de buena conducta". (Traducción nuestra.) *ABA The Prosecution Function and the Defense Function* (Approved Draft 1971), pág. 1.[1]

Hemos de destacar que si bien el Fiscal "en las investigaciones de alegados actos criminales, de ordinario confía en la policía y otras agencias investigativas para la investigación de alegados actos criminales, [y] tiene la responsabilidad afirmativa de investigar actividades sospechadas ilegales cuando éstas no han sido adecuadamente atendidas por otras agencias". (Traducción nuestra.) ABA, *supra*, Sec. 3.1(a). También cabe notar que

---

[1] Sin mucha elaboración, la casuística norteamericana ha extendido a los fiscales el Código de Ética de la Asociación de Abogados Norteamericanos (ABA). Véanse: *In re Wilson*, 258 P.2d 433 (1953); *In re Friedman*, 392 N.E.2d 133 (1979); *In re Burrows*, 629 P.2d 820 (1981).

constituye "conducta profesional impropia en un fiscal utilizar medios ilegales para obtener evidencia o emplear, instruir o estimular su uso por terceros". (Traducción nuestra.) Íd., Sec. 3.1(b).

En *resumen*, al Fiscal, como a todo abogado, ha de animarle el esclarecimiento de la verdad y el procurar que se haga justicia. Los requisitos de honestidad y probidad, al igual que los de competencia, destreza jurídica y diligencia, se han exigido en todos los tiempos. Esos atributos se manifiestan desde la etapa de la investigación y se extienden hasta el procesamiento de causas ante los tribunales.(2) No obstante, reconocemos que no existen "investigaciones perfectas" y que en el descargo de esa función el Ministerio Fiscal no está exento de incurrir en errores. *Ciertamente, aquellos errores en los que se ha incurrido de buena fe (bona fide), sin mediar negligencia o incompetencia profesional crasa, no son susceptibles de generar sanciones disciplinarias en la esfera deontológica.* Aun así, la intervención del Ministerio Fiscal en la fase de una investigación no puede subestimarse. Puede afirmarse que esa es la etapa más importante de un proceso criminal, ya que servirá de fundamento a todo lo que puede acontecer posteriormente. "Una investigación deficientemente realizada puede dar lugar a que se cometan las injusticias de enviar a un inocente a la cárcel o *evitar que el autor de unos hechos delictivos sea debidamente encausado*." (Énfasis suplido.) Informe sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por la Comisión para el Estudio de la Fiscalía y

---

(2) Es abundante la literatura que versa sobre la importante función del Ministerio Fiscal. Anotamos que la misma más bien se concentra en comentar y analizar la conducta impropia de este funcionario en causas judiciales. Entre las más sobresalientes, consúltense: J.F. Lawless, *Prosecutorial Misconduct*, Nueva York, Kluwer Law Book Pubs., 1985; B.A. Schwartz, *The Limits of Prosecutorial Vindictiveness*, 69 Iowa L. Rev. 127, 127–208 (1983); C.F. Pinkele y W.C. Louthan, *Discretion, Justice & Democracy*, Iowa State U. Press, 1985; L. Friedman, *Discretion and Public Prosecution*, compilado en *The Invisible Justice System: Discretion & The Law*, eds. B. Atkins y M. Pogrebin, 2da ed., Ohio, Anderson Pub. Co., 1982, págs. 69–73; J.A. Trowbridge, *Restraining the Prosecutor: Restrictions on Threatening Prosecutor for Civil Ends*, 37 (Núm. 1) Maine L. Rev. 41–62 (1985); R. Feinberg, *The Second Circuit Reacts to Prosecutorial Misconduct*, 49 (Núm. 4) Brooklyn L. Rev. 1245–1264, (1983); H.R. Uviller, *The Virtuous Prosecutor in Quest of an Ethical Standard: Guidance from the ABA*, 71 Mich. L. Rev. 1145 (1973).

Representación del Estado de 26 de septiembre de 1974, pág. 114-S. Sobre todo, no podemos olvidar la realidad de que el "Ministerio Público en el descarg[o] de esta responsabilidad entra en una interacción contínua con la policía . . .". Íd., pág. 109.

Teniendo en mente estos conceptos, expongamos el trasfondo procesal.

## II

*Trasfondo procesal*

El 10 de octubre de 1986 el Fiscal Especial Independiente (F.E.I.), Lcdo. Alejandro Salgado Rivera, presentó ante este Foro una querella jurada contra los abogados Pedro Colton Fontán, Osvaldo Villanueva Díaz, Aurelio Miró Carrión, Ángel Figueroa Vivas y Juan E. Brunet Justiniano. En síntesis, les imputó numerosos cargos por alegada conducta profesional impropia mientras se desempeñaban como fiscales durante las investigaciones relacionadas con los notorios sucesos del Cerro Maravilla donde murieron Arnaldo Darío Rosado y Carlos Soto Arriví.[3]

Previas prórrogas al efecto, los querellados contestaron separadamente. Todos negaron los cargos y levantaron y expusieron distintas defensas y argumentos en abono de sus respectivas posiciones.

El 15 de diciembre de 1986 designamos Comisionado Especial al Juez Superior, Hon. Abner Limardo, con la encomienda de recibir la prueba de las partes, en presencia de éstas, y oportunamente certificarla y presentarla ante nos con sus conclusiones de hecho.

---

[3] Aparte de este proceso disciplinario, hasta el presente esos hechos han suscitado ante este Foro las controversias judiciales siguientes: *Pueblo v. Pérez Casillas*, 126 D.P.R. 702 (1990); *Pueblo v. Pérez Casillas*, 117 D.P.R. 380 (1986); *Pueblo v. González Malavé*, 116 D.P.R. 578 (1985); *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368 (1984); *Peña Clós v. Cartagena Ortiz*, 114 D.P.R. 576 (1983); *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982).

El Comisionado Especial, Juez Limardo, celebró las vistas necesarias.(4) Participaron el propio Fiscal Especial Independiente, licenciado Salgado Rivera, y sus delegados, la Lcda. Maricarmen Ramos de Szendrey, el Lcdo. Manlio Arraiza, la Lcda. Norma Acosta y el Lcdo. Efraín Meléndez. El querellado Colton Fontán fue representado por los Lcdos. Eugenio Ramos Ortiz, Elí B. Arroyo y Felipe Benicio Sánchez; Villanueva Díaz fue asistido por los Lcdos. Wilfredo Figueroa Vélez y Luis A. Amorós; Miró Carrión por los Lcdos. Wilfredo R. Picorelli Osorio, Enrique L. Belén Trujillo y Víctor Ramos Acevedo; Figueroa Vivas por el Lcdo. Jesús Luis Maldonado, y Brunet Justiniano por conducto del Lcdo. Héctor Santiago Rivera.

Luego de desfilar toda la prueba y ser presentada por escrito la exposición argumentativa de las partes, el 13 de abril de 1987 el caso quedó finalmente sometido al Comisionado Especial.

Con extrema diligencia, el 27 de mayo de 1987 el Comisionado Especial, Juez Limardo, formuló y nos rindió un elaborado y detallado informe escrito de sus conclusiones de hecho y anejos. Lo hizo en sobre *cerrado y sellado*, sin notificar a las partes, por estimar en conciencia que sus conclusiones podrían estar relacionadas con prueba a ser presentada en un caso criminal por asesinato iniciado en el Tribunal Superior, Sala de San Juan, contra varios agentes policíacos que alegadamente intervinieron en los sucesos del Cerro Maravilla. Expresó que en tales circunstancias la notificación de sus determinaciones fácticas, "con la divulgación que ello representaría, podría interpretarse como una interferencia por parte de este Comisionado con derechos de las partes y la autoridad del tribunal en el referido caso criminal . . . . De otro lado, no es deseable que retengamos la rendición al Tribunal Supremo del Informe conteniendo dichas conclusiones de hecho hasta que concluya el caso criminal indi-

---

(4) Se celebraron los días 10, 11, 12, 17, 18, 19, 23, 24, 25 y 26 de febrero y 2, 3, 4, 5, 9, 10, 11, 12, 16, 17, 20, 24, 25 y 26 de marzo de 1987.

Conforme nuestra autorización de 23 de diciembre, se llevaron a cabo en la Sala 902 del Centro Judicial de San Juan y fueron grabadas con la asistencia administrativa del personal de dicha sala.

cado, alternativa que hemos contemplado como medio para garantizar los derechos de todas las partes en el citado caso criminal y de respetar la autoridad del tribunal en el mismo; especialmente cuando dicho proceso puede tener una larga duración y esa retención podría afectar también los derechos de los querellados en el presente procedimiento". Caso Núm. CE-86-666, Parte III, Informe Comisionado Especial, Vol. II, Cap. X, págs. 1-2. Nos sometió, pues, "la decisión de cuándo efectuar la notificación de [é]stas a la consideración del mismo". Íd., pág. 2.

El 30 de junio autorizamos la remisión del informe a las partes. (5) Previas prórrogas, les concedimos términos iniciales para que nos sometieran sus objeciones y comentarios al informe. Después, el 22 de octubre de 1987 autorizamos la transcripción de la evidencia testifical presentada por el F.E.I., excepto la correspondiente al Sr. Manny Suárez. Oportunamente, referimos a la atención del Comisionado Especial unas solicitudes de determinaciones de hecho adicionales, las cuales declaró sin lugar. Terminados los trámites iniciales en torno a la transcripción de evidencia, nuevamente concedimos términos a las partes para exponer sus conclusiones, objeciones y argumentos.

Sin embargo, durante este trámite, el 10 de junio de 1988 el F.E.I. formuló denuncias y acusaciones criminales por perjurio contra *los querellados* Colton Fontán, Figueroa Vivas y Miró Carrión. *Ante esa nueva situación, este Foro acordó posponer toda decisión hasta que finalizaran esos procedimientos en el Tribunal Superior, Sala de San Juan.* Las acusaciones contra Colton Fontán y Figueroa Vivas fueron desestimadas, *y el 6 de marzo de 1990* se ordenó el archivo y sobreseimiento de la causa contra Miró Carrión.

Subsiguientemente, *suà sponte*, ampliamos nuestra orden previa y autorizamos la transcripción del remanente de los testimonios de los testigos presentados por los querellados.

_____

(5) Con esa resolución, el Juez Asociado Señor Hernández Denton emitió un voto concurrente, al cual se unió el Juez Asociado Señor Alonso Alonso. El Juez Asociado Señor Rebollo López disintió mediante opinión escrita.

Cumplido ese trámite y elevada la última transcripción el 25 de septiembre de 1990, resolvemos.

## III

*Metodología adjudicativa*

En buena metodología adjudicativa, la presente decisión ha requerido la paciente lectura y evaluación de una transcripción de evidencia en exceso de tres mil (3,000) folios y el análisis concienzudo y cuidadoso de la evidencia documental consistente en doscientos treinta y tres (233) *exhibits* correspondientes a múltiples declaraciones juradas, fotografías, notas, recortes de periódico, video-cassettes, etc. *Esta monumental tarea la simplificó el elaborado y razonado informe del Comisionado Especial, Juez Limardo, que incluyó una aquilatación cronológica de todos los hechos cruciales e incidentes pertinentes.*

Nuestro enjuiciamiento de la conducta ética, actuaciones y omisiones de los querellados es producto exclusivo de ese análisis. Descansa fundamentalmente en los hechos que consideramos diáfanamente demostrados. *Como técnica expositiva, las determinaciones de hecho del Comisionado Especial han sido punto de partida para nuestro marco decisorio.* Parte sustancial de las mismas se fundamentó en prueba documental, lo cual nos permitió confrontarla directamente y verificar su corrección. *Acudir a y reproducir íntegramente el texto de sus determinaciones ha sido un imperativo.* En aquellas contadas situaciones en que hemos considerado válidas las objeciones del F.E.I. o de algunos de los querellados, o que fue menester apartarnos de las determinaciones de hecho, así lo expresamos en el texto principal o por vía de corchetes o escolios.

## IV

*Hechos*

El *Lcdo. Pedro Colton Fontán* fue admitido al ejercicio de la abogacía el 14 de diciembre de 1967. Para el primer trimestre de

1978 ocupaba el cargo de Fiscal Especial General III y dirigía la División de Investigación Criminal del Departamento de Justicia. El *Lcdo. Ángel Figueroa Vivas* fue admitido a la profesión el 26 de junio de 1973. Para el 25 de julio de 1978 era el Director del Negociado de Investigaciones Especiales del Departamento de Justicia (N.I.E.). El *Lcdo. Juan E. Brunet Justiniano* quedó admitido a la profesión el 11 de junio de 1969 e ingresó en el Departamento de Justicia en 1970. En 1972 "pasó a ocupar el cargo de Fiscal Auxiliar en la División de Investigaciones Criminales de ese departamento. En este mismo año trabajó para la Unidad de Terrorismo del Departamento de Justicia. Estuvo fuera de dicho departamento durante el período del 15 de abril de 1976 al 11 de julio de 1977 en que regresó. Para julio de 1978 ocupaba la plaza de Fiscal Especial I. (Exh. 22 FEI, págs. 182–83)". Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, pág. 4. El *Lcdo. Aurelio Miró Carrión* fue admitido a la abogacía el 5 de junio de 1974. "[I]nició su profesión legal como Asesor Legal de la Policía de Puerto Rico, cargo que ocupó por espacio de 9 meses; después trabajó como Fiscal del Tribunal de Distrito desempeñándose en Humacao." Íd., pág. 32. El *Lcdo. Osvaldo Villanueva Díaz* fue admitido a la profesión el 18 de noviembre de 1965. Para octubre de 1978 ocupaba el puesto de Fiscal Especial en el Tribunal Superior, Sala de Carolina.

Todos, como veremos, intervinieron en calidad de fiscales en el episodio conocido como los sucesos del Cerro Maravilla de 25 de julio de 1978, en el cual murieron Arnaldo Darío Rosado y Carlos Soto Arriví. Este drama no comenzó en esa fecha; fue precedido por

. . . las actividades subversivas llevadas a cabo por dos grupos infiltrados por el agente encubierto de la Policía de Puerto Rico Alejandro González Malavé bajo el suedónimo de "Fraile". Uno de ellos (Fuerzas Anti-imperialistas) compuesto por John Edward Sanders Maldonado, Leoncio Figueroa y William o Guillermo Segarra Rivera y el otro (Movimiento Revolucionario Armado) por Arnaldo Darío Rosado, Carlos Soto Arriví, Erich Rodríguez, Ramón Rosado Ruiz y Enrique Escalona Marrero.

González Malavé se desempeñó como confidente para la Policía por espacio de 4 años; luego el 9 de marzo de 1977 ingresó a la misma como agente de la División de Inteligencia en carácter de encubierto en dichas agrupaciones subversivas, labor que desempeñó hasta el 25 de julio de 1978. *Como tal formó parte de las agrupaciones descritas en las que se desempeñó en forma sumamente activa al punto de ser protagonista en ambas.* Por ejemplo, en relación a la colocación de una bomba el 30 de abril de 1978 en el correo de la Avenida 65 de Infantería, dicho artefacto explosivo se confeccionó en su presencia en su hogar y [se] transportó para su colocación en el vehículo de su propiedad conducido por él, Volkswagen 1971, tablill[a] 12F'876. As[i]mismo, cuando el mismo grupo intentó un acto de sabotaje lanzando cadenas contra líneas de la Autoridad de las Fuentes Fluviales (AFF) en Hato Rey el 15 de enero de 1978, se trasladó en el mismo vehículo conducido por González Malavé, en esta ocasión utilizando tablillas de otro vehículo que habían hurtado el 2 de enero de 1978. En otra ocasión, el 4 de julio de 1978, González Malavé y el grupo Movimiento Revolucionario Armado, a través de Darío Rosado, Soto Arriví, Rosado Ruiz, Escalona Marrero y Erich Rodríguez asaltaron, mediante el uso de armas de fuego, el cuartel de la guardia universitaria del Recinto de la Universidad de Puerto Rico en Río Piedras. Llegaron a ese lugar en el vehículo de González Malavé, conducido por éste. Como resultado de este asalto se apoderaron de varios radios ([*walkie talkies*]) después de mantener encañonado a un sargento de dicha guardia. González Malavé tuvo participación activa en este asalto. En este ataque uno de los asaltantes agredió

y disparó a un guardia universitario acostado en el piso en ese cuartel. Otra situación se relaciona con la expresada intención del Movimiento Revolucionario Armado para llevar a cabo el secuestro a un hijo de la Juez Blanca I. Bonilla. Por razones que no están claramente establecidas en la prueba, esto no llegó a verificarse. Otra actividad subversiva en que participó activamente González Malavé se refiere a un tiroteo efectuado por el grupo perteneciente a las Fuerzas Anti-imperialistas contra la residencia del ex-gobernador Luis Muñoz Marín en Trujillo Alto. Los participantes de este acto fueron trasladados hasta ese lugar en el automóvil de González Malavé, conducido por éste. (Énfasis suplido.) Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, págs. 3–4.

El Fiscal Brunet Justiniano intervino en la Unidad Terrorista y estuvo "a cargo del agente encubierto Luis Daniel Erazo Félix, infiltrado en grupos subversivos similares, hasta el momento en que este agente fue quemado o puesto al descubierto como miembro de la Policía. Para esta época dirigía la Oficina de Inteligencia de la Policía, el oficial Desiderio Cartagena". Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, págs. 4–5.

Durante el primer trimestre de 1978, el Fiscal Colton Fontán requirió del Fiscal Especial General, Lcdo. Gerardo Méndez Correa, funcionario de amplia experiencia en dicha división

. . . que tuviese a cargo la toma de declaraciones juradas del agente encubierto que entonces se desenvolvía y estaba infiltrado en los grupos expresados. Estaba vigente entonces un movimiento obrero huelgario contra la AFF. El indicado requerimiento surgió con motivo de un acto de sabotaje contra propiedad de dicha autoridad gubernamental mediante el lanzamiento de cocteles molotov contra una planta eléctrica en Hato Rey en que intervino dicho agente encubierto. El Fiscal Méndez Correa impuso como condición a la ejecución de la referida encomienda la norma de que se perpetuase de inmediato el testimonio del agente encubierto mediante la toma de su declaración jurada de lo ocurrido. Esta condición no pareció tener la acogida del Lcdo. Colton quien convino con el Teniente Jaime Quiles, de la División de Inteligencia de la Policía y supervisor del agente encubierto, que no se le tomase la declaración jurada por *no haber hecho efecto los cocteles molotov lanzados en el acto de sabotaje*. El Fiscal Méndez Correa no llegó siquiera a conocer la identidad del agente encubierto y en forma inexplicable aparentemente se desistió del requerimiento héchole en vista que nunca más se le llamó para el propósito expresado.

Posteriormente, a solicitud del oficial Desiderio Cartagena y con la aprobación del Lcdo. Colton se designó al Lcdo. Brunet para que tuviese a su cargo la toma de declaraciones juradas al agente encubierto González Malavé.

Como resultado de dicha designación el Lcdo. Brunet le tomó declaraciones juradas al agente encubierto González Malavé en forma confidencial en Isla de Cabras con la intervención de una mecanógrafa de la Policía y la presencia adicional del Teniente Jaime Quiles, los días 20 y 27 de junio y 12 de julio de 1978. En esas

declaraciones juradas dicho agente encubierto *informó con lujo de detalles las actividades subversivas en las que participó,* ya mencionadas, de la colocación de la bomba en el Correo de la Avenida 65 de Infantería, el tiroteo a la residencia del e[x g]obernador Luis Muñoz Marín, el asalto al cuartel de la guardia universitaria y los actos de sabotaje contra propiedades de la AFF mediante lanzamientos de cadenas y cocteles molotov a una planta eléctrica de Hato Rey y a líneas eléctricas; as[i]mismo el propuesto secuestro al hijo de la Juez Blanca I. Bonilla[,] además de la compra de una escopeta. (Exh. 19 y 20 FEI). (Énfasis suplido.) Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, págs. 5–6.

El "Lcdo. Brunet [era] consciente, como fiscal, de su obligación de procurar la conducción del proceso criminal correspondiente en el caso de la comisión de un delito mediante la acumulación de la prueba necesaria y la sumisión del caso ante un tribunal . . . ". Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, pág. 6. Las circunstancias que le fueron relatadas por González Malavé comprendían la comisión de delitos. Brunet concibió procedente "la acción para quemar a dicho agente encubierto y así evitar la comisión de delitos ulteriores y la protección de la vida y la propiedad". Íd. A tales efectos así se lo recomendó al Teniente Quiles el 12 de julio de 1978. Esa recomendación no se siguió. El Lcdo. Brunet no prosiguió el asunto y el 14 de julio comenzó a disfrutar sus vacaciones regulares. El licenciado Brunet

. . . entendía que la función del agente encubierto quedaba bajo el entero control de la Policía y que nada podía hacer para evitar los riesgos descritos; que en aquellos casos en los que intervenía con el agente encubierto, a diferencia de otros, a pesar que su investigación determinara la comisión de un delito grave, no tenía la responsabilidad y obligación de tomar declaraciones juradas y citar testigos en la acumulación de la prueba necesaria y someterla ante un magistrado para la determinación de causa probable, ya que entendía que la ley no le autorizaba a "darle órdenes" a la Policía. (Exh. 21 FEI, págs. 109–112). En adición a haber actuado bajo ese entendimiento, se amparó también en una experiencia previa cuando trabajó para la antigua Unidad de Terrorismo del Departa-

mento de Justicia, la cual cesó en 1974, donde su recomendación para quemar un agente encubierto fue rechazada por el Superintendente de la Policía. (Exh. 21 FEI, págs. 26–30).

La expresada actitud del Lcdo. Brunet en relación a la información que recibía a través de esas declaraciones juradas llegó al punto que hizo entrega del documento original de las mismas al funcionario de la Policía allí presente para su archivo en la [O]ficina de Inteligencia de la Policía, sin siquiera conservar copia de [é]stas. (Exh. 83 FEI, págs. 35–40 y 52–56).

6) La inacción o falta de gestión por parte del Lcdo. Brunet para iniciar el proceso o los procesos criminales correspondientes con motivo de las actividades subversivas y delictivas descritas por el agente encubierto González Malavé en las citadas declaraciones juradas prestadas ante él, propició para que la División de Inteligencia de la Policía mantuviese a dicho agente encubierto en la planificación de gestiones constitutivas de delitos; *comportándose más bien como un incitador delictivo que como un agente encubierto dirigido a la persecución de ese tipo de actividad.* El grado y la naturaleza de la intervención de dic[h]o agente encubierto, unido a la inacción oficial descrita del Lcdo. Brunet, *sentaron la base y permitieron la comisión de aquellos otros actos contrarios a la ley que describen estos hechos y que pusieron en serio riesgo la seguridad de otras personas*:

González Malavé y los integrantes del grupo Movimiento Revolucionario Armado, Darío Rosado, Soto Arriví y Rosado Ruiz, discutieron sobre un asalto antes del mediodía del 25 de julio de 1978 a las torres o antenas de la emisora WRIK-TV del Canal 7 de Rikavisión ubicado en el Cerro Maravilla del sector Toro Negro del Municipio de Jayuya con el propósito de lanzar unos comunicados. La División de Inteligencia de la Policía se mantuvo al tanto de dicho plan a través de la comunicación que trasmitía González Malavé al agente de dicha división Carmelo Cruz, quien era la persona de la Policía que servía como agente de contacto del referido agente encubierto.

La prueba no establece con toda precisión cómo y de quién nació la idea de asaltar esas torres. Las declaraciones juradas de Ramón Rosado Ruiz y González Malavé del 27 y 31 de julio de 1978, respectivamente, informan que se originó el 21 de julio de 1978 en casa de Darío Rosado. (Exhs. 30 FEI y 73 FEI, pág. 5). Sin embargo, informa también que el 20 de julio de 1978 el fotógrafo y agente de la División de Inteligencia, acompañado por el Teniente Jaime Quiles fotografió el área del Cerro Maravilla. Las fotos

fueron entregadas al Comandante [Á]ngel L. Pérez Casillas. (Exh. 24 FEI, parte II).

El Comandante [Á]ngel Luis Pérez Casillas, que dirigía entonces la División de Inteligencia de la Policía, tuvo a su cargo la organización de un operativo policiaco de alrededor de 20 agentes en el Cerro Maravilla y área adyacente para emboscar en las facilidades de Rikavisión a ese grupo de tres personas que conduciría allí el referido agente encubierto. Esperaban que el asalto se produciría el 24 de julio y desde esta fecha diversos agentes fueron apostados en varios puntos de esa área. Al conocerse finalmente que el mismo se llevaría a cabo el día siguiente, algunos de los agentes regresaron a San Juan, pernoctando otros hasta el día siguiente.

La última comunicación con González Malavé en relación a la actividad de subversión planificada tuvo lugar entre las 2:00 y 2:30 AM del 25 de julio de 1978 frente al edificio donde antes ubicaba la tienda Sears de Hato Rey. En este momento el Teniente Jaime Quiles y [el] agente Carmelo Cruz conversaron con González Malavé impartiéndole las instrucciones de llevar a cabo el acto terrorista según se había establecido. Era ya de conocimiento entre ellos que se tomaría un reh[é]n, preferiblemente un porteador público, en cuyo vehículo se trasladarían hasta las facilidades de Rikavisión en el Cerro Maravilla.

Carmelo Cruz y el agente Antonio Méndez de la División de Inteligencia se mantuvieron muy cerca del portón principal de la Universidad de Puerto Rico en Río Piedras cerca de las 8:00 A.M. de ese 25 de julio para observar y seguir a González Malavé y los integrantes del grupo que se reunirían muy cerca de allí para iniciar su viaje hasta Ponce. Llegaron primeramente González Malavé y Darío Rosado y luego se integró Soto Arriví. Rosado Ruiz desistió de acompañarles. Habían pensado en abordar una guagua de la Liga Socialista que saldría hacia el pueblo de Guánica esa mañana para una celebración propia del día 25 de julio, la que les dejaría en Ponce. Sin embargo, la guagua de esa agrupación había partido y decidieron salir hasta Ponce en un carro público mediante paga que abordaron frente a la Plaza de Recreo de Río Piedras. Carmelo Cruz, conduciendo un Ford Granada sin rotular de la Policía de Puerto Rico, y el agente Méndez, les siguieron en su travesía a pi[e] hasta la Plaza de Recreo de Río Piedras viéndoles abordar el referido vehículo. Dichos agentes de la División de Inteligencia siguieron a los tres jóvenes hasta Ponce en el Ford Granada.

Mientras esto ocurría, entre 7:00 y 8:00 A.M. salieron en avión desde el Aeropuerto de Isla Grande hasta el Aeropuerto Mercedita

de Ponce en un primer viaje, el Comandante Pérez Casillas y el Teniente Quiles y en un segundo viaje el Sargento José M. Montañez Ort[i]z y el agente Nelson González Pérez de la División de Inteligencia de la Policía. En Mercedita les esperaban los agentes de la División de Inteligencia correspondiente al área de Ponce Nazario Mateo Espada y Miguel Cartagena Flores. Desde ahí salieron en vehículos separados hacia el sector Toro Negro; llegaron un poco antes del mediodía a la torre de la Policía donde mantiene radios trasmisores; [é]sta queda a unos 600 metros del lugar donde ubican las facilidades de Rikavisión. *En el lugar de la torre de la Policía ya se encontraba en su turno como vigilante el policía uniformado Jesús Quiñones Quiñones de la Policía de Puerto Rico, adscrito al Cuartel de [Villalba]. El policía Quiñones no era parte del operativo de agentes descrito.* A ese lugar habían llegado desde el día anterior todos los agentes asignados a dicho operativo policiaco para el recibo de las instrucciones de rigor que les impartió el Comandante Pérez Casillas. *Algunos de los agentes asignados a ese operativo pertenecían a la Unidad de Arrestos Especiales comandada por el Teniente Julio César Andrades que estaba dando apoyo en el mismo a la División de Inteligencia.* Todos esos agentes vestían ropa civil. Muchos portaban armas largas y contaban además con otros instrumentos propios del trabajo como binoculares, radio transmisores portátiles y chalecos a prueba de balas.

*Desde el día anterior ya se encontraban los agentes José Ríos Polanco y Rafael Torres Marrero dentro de la estructura localizada en los terrenos de Rikavisión, acompañando al operador o técnico de radiotrasmisión de dicha empresa, Miguel Marte Ruiz. Ambos agentes portaban armas largas.* Al llegar el grupo de agentes expresado procedentes del Aeropuerto Mercedita a la torre de la Policía ya se encontraban en [é]sta varios agentes quienes desde este lugar se trasladaron al área de los terrenos o facilidades de Rikavisión en espera de las personas que vendrían a asaltar esa propiedad: Rafael Moreno Morales, Montañez Ort[i]z, quien portaba su revólver de reglamento y un rifle AR15, William Colón Berríos, [quien portaba] un rifle AR15[,] y Juan Bruno González, [quien portaba] una escopeta.

De otro lado, González Malavé, Darío Rosado y Soto Arriví dejaron el vehículo público que les transportaba en un punto frente al Tribunal Superior de Ponce y continuaron a pi[e] hasta llegar a la Carretera 14 que conduce de Ponce a Juana Díaz. Los agentes Carmelo Cruz y Méndez les mantenían vigilados desde el Ford

Granada. Poco después de pasar el Hospital de Distrito los tres jóvenes asaltaron mediante el uso de armas de fuego un vehículo público al que antes habían hecho señales para que se detuviese. Era el vehículo público conducido por Julio Ortiz Molina, quien a esa hora —muy cerca de las 11:00 A.M. — conducía su vehículo en busca de pasaje. Se detuvo ante la señal de los jóvenes pensando que se trataba de pasajeros. Al detenerse, uno de los jóvenes que entró al automóvil por la puerta delantera derecha (Darío Rosado) le encañonó con un revólver expresándole que se trataba de un asalto; hizo lo mismo encañonándole también otro (Soto Arriví) que se acomodó en el asiento trasero por la puerta del lado derecho del vehículo. El tercero (González Malavé) dio vuelta al carro por la parte de atrás, abrió la puerta de conductor, encañonó a [é]ste con una pistola y lo empujó hacia el centro del asiento delantero a la vez que hizo un movimiento para cargarla en clara señal de su intención de usarla. Los ocupantes le hicieron saber a Ort[i]z Molina que necesitarían el carro a lo que replicó [é]ste que podían tomarlo pero que le dejaran bajar. González Malavé rápidamente tomó el guía y asumió la conducción del vehículo; al llegar al lugar en que se encuentra la Lechonera El Porvenir dobló para tomar la Carretera 139. Los ocupantes hicieron saber a Don Julio que si se portaba bien no pasaría nada. Prosiguieron la marcha hasta llegar a la intersección con la Carretera 143 que conduce hacia Villalba. Los agentes Carmelo Cruz y Méndez que se mantuvieron a corta distancia y observaron desde el Ford Granada el acto del asalto al conductor Ortiz Molina y la toma del vehículo público, siguieron a este vehículo en su ruta al Cerro Maravilla. Los tres jóvenes y su rehén prosiguieron marcha hasta internarse por la Carretera 577 que les llevaría hasta las facilidades de Rikavisión en el Cerro Maravilla. González Malavé continuaba en la conducción del vehículo.

Antes que ese automóvil arribase a las facilidades de Rikavisión ya estaban apostados en diferentes lugares dentro y fuera de la estructura de Rikavisión el grupo de los agentes de la División de Inteligencia y la Unidad de Arrestos Especiales. El Sargento Montañez Ort[i]z en unión a otros agentes se encontraba oculto muy cerca de la intersección del camino de tierra y la carretera asfaltada para el paso de los vehículos que se dirigían a Rikavisión y a las facilidades de Radio Zar, otra trasmisora radial localizada después de Rikavisión. Mientras el vehículo público con el rehén subía por la Carretera 577 en dirección a las facilidades de Rikavisión a eso de las 12:30 P.M., fue avistado por el agente Torres Marrero quien se mantuvo observando hacia afuera a través de una de las ventanas

laterales de la edificación, dentro de la cual se encontraba con Ríos Polanco y Marte Ruiz. Al advertir dicho vehículo, Torres Marrero le gritó a Ríos Polanco "carro sospechoso se acerca". Ríos Polanco expresó a Marte que se protegiese porque los que llegaban venían a matarle. Marte, algo incrédulo, se protegió detrás de una consola de transmisión. Unos dos minutos más tarde, cuando ya el vehículo se encontraba muy cerca de dichas facilidades, Torres Marrero salió portando arma larga hacia afuera por la puerta principal de la estructura que da hacia el frente de la misma en que se estacionaría dicho vehículo. Enseguida, Ríos Polanco se colocó frente a la ventana que da hacia el frente de la edificación o los portones de Rikavisión, rompió con el cañ[ó]n de su fusil la tela metálica de la ventana frente a él, colocó la parte del cañ[ó]n hacia afuera y comenzó a disparar, iniciándose una ráfaga de múltiples disparos en el exterior de dicha edificación por espacio de varios segundos.

Antes de iniciarse los disparos el vehículo público que continuaba conduciendo González Malavé dejó la carretera asfaltada 577 y se internó en reversa por un camino de tierra que da frente a las facilidades de Rikavisión hasta quedar estacionado en línea paralela con la verja y portón de entrada de dicha empresa de modo que todo su lado izquierdo quedó mirando hacia la parte del frente de la misma. Una vez estacionado se bajaron del vehículo por el lado derecho delantero Darío Rosado y por la puerta derecha trasera Soto Arriví, haciendo lo mismo González Malavé por la puerta del conductor, y se ubicaron los tres con sus armas en la parte detrás del vehículo que les situaba frente al portón de entrada de Rikavisión que se encontraba cerrado. Darío Rosado llevaba una máscara de tela cubriéndole su rostro. A una distancia de unos 60 pies, Montañez, que había comenzado a moverse con sus hombres hacia el vehículo, le dio un alto a los jóvenes indicándoles "alto, es la Policía". Ortiz Molina observó el grupo de agentes que se adelantaba hacia el vehículo portando armas largas y se metió agachado debajo del panel de instrumentos del vehículo buscando protección. Seguidamente después se iniciaron los disparos. *Montañez Ortiz y los agentes que estaban con él se lanzaron al piso y comenzaron a disparar desde el piso ·contra los asaltantes, intercambiándose disparos.* En medio de los disparos González Malavé gritó "no disparen que soy policía"; cayó herido en la parte de atrás del vehículo público, no sin antes haber hecho cuatro disparos. Darío Rosado y Soto Arriví dispararon sus armas y corrieron hacia el frente del vehículo, resguardándose u ocultándose detrás de unos arbustos allí cerca. Esa ráfaga de múltiples disparos, calculados en

unos 50 aproxim[a]damente, ocurrió en forma rápida y contínua por espacio de varios segundos. Al cesar la misma Montañez apuntó su arma hacia los arbustos mientras observó que los dos jóvenes que acompañaron a González Malavé, Darío Rosado y Soto Arriví[,] lanzaron sus armas al aire en señal de entrega. *Salieron ilesos del tiroteo.* Se les acostó en el piso frente al vehículo y [se] les mantuvo así vigilados por Bruno González en lo que atendían al agente encubierto herido en el piso, detrás del vehículo. Tenía heridas en el área del abd[o]men y en un dedo de la mano del que prácticamente tenía desprendida una parte. Montañez Ortiz fue por el lado derecho del vehículo y ordenó al porteador público Ort[i]z Molina que saliese del vehículo. [É]ste salió por la puerta izquierda delantera y cuando lo hacía William Colón Berríos le lanzó un golpe con la culata del rifle sin alcanzarlo y lo llevó frente al carro con las otras dos personas detenidas. Uno de los jóvenes exclamó "el señor es inocente, por favor, no le hagan daño al señor, no tiene que ver". Una expresión similar hizo González Malavé.

Montañez Ortiz se encontraba deprimido porque pensaba que había herido de forma mortal al agente encubierto y descendió a pi[e] por la carretera asfaltada, encontrándose con el Comandante Pérez Casillas que subía al lugar. Ambos subieron juntos a pi[e] hasta el sitio en que se encontraba el vehículo y los dos jóvenes detenidos y el agente encubierto herido. Habían transcurrido muy pocos minutos y se encontraban en ese lugar alrededor de 15 agentes polic[i]acos. El Comandante Pérez Casillas colocó esposas a Soto Arriví con las manos en la espalda. *La mayoría de los agentes que allí se encontraban agredía de diferente forma a ambos jóvenes detenidos: les golpeaban con las manos, con las armas y daban patadas.* (Así lo testificó en sala Ort[i]z Molina por lo que observó al respecto mientras estuvo allí junto a ellos; as[i]mismo el agente Montañez Ortiz que incluso admitió que él empujó y golpeó a uno de ellos con un zapato en un momento de indignación; Marte Ruiz testificó que observó a través de una de las ventanas de la edificación a un grupo de personas que agarraba al señor adulto, refiriéndose a Ort[i]z Molina, y a uno de los jóvenes como llorando y recibiendo golpes en la cara). Los agentes policíacos estaban de frente a ambos, Darío Rosado en el pavimento y Soto Arriví arrodillado, esposado como se ha dicho. (Véase el testimonio de Carmelo Cruz en sala). Entre el grupo de agentes que estaba en ese momento en el sitio descrito se encontraban Colón Berríos, Bruno González, Torres Marrero, Antonio Méndez, Reverón Martínez, Montañez Ort[i]z, Moreno Morales, González Pérez, Ríos Polanco,

Cartagena Flores, Carmelo Cruz, el Teniente Quiles y el Comandante Pérez Casillas. Carmelo Cruz y el Teniente Quiles condujeron a González Malavé al Hospital de Jayuya en un vehículo conducido por el Teniente Quiles. Ort[i]z Molina fue llevado hasta la torre de la Policía en un vehículo conducido por el agente Cartagena Flores.

Montañez Ort[i]z volvió a retirarse del lugar brevemente. Prevalecía su condición anímica expresada que le hizo llorar. Se movió de nuevo hacia el camino asfaltado acompañándole a pie Pérez Casillas y Antonio Méndez, quienes le consolaban indicándole que el agente encubierto no se encontraba tan mal herido. En adición, Montañez Ort[i]z sentía que la situación que se estaba produciendo en ese momento en ese lugar estaba fuera de control y que el único que podía controlarla era Pérez Casillas. Sin embargo, en vista de una expresión que le hiciera Pérez Casillas a él el día anterior de que a las personas que esperaban "había que darle un tiro o un tirito", para él era iluso entender que allí no ocurriría una desgracia. Conocía que todo aquello era ilegal y no deseaba mezclarse con lo que podía ocurrir, como en efecto así se lo expresó más tarde a Pérez Casillas. Mientras esto ocurría se di[o] muerte a los jóvenes que tenían detenidos en la forma expresada mediante un disparo de escopeta contra Darío Rosado en el centro del pecho y cuatro disparos de un revólver Magnum 357 en distintas partes del cuerpo de Soto Arriví. Esta serie de cinco disparos a un intérvalo mucho más lento que aquellos de la primera serie ocurrida unos 15 minutos antes, al llegar los jóvenes a aquel lugar, fue escuchada en diferentes puntos cercanos al Cerro Maravilla. Seguidamente de esta segunda serie de disparos bajó el agente González Pérez a buscar las llaves de las esposas, entregándoselas Montañez a él. Poco después salió de ese lugar el vehículo conducido por Cartagena Flores en compañía de Moreno Morales con el cadáver de Soto Arriví. Montañez Ortiz volvió a subir al sitio en que se encontraban los jóvenes y observó tendido el cadáver de Darío Rosado, boca arriba, con una gran mancha de sangre en el pecho.

Posteriormente durante es[a] tarde, Montañez Ortiz le expresó [a] Pérez Casillas su interés [de] que no se le hiciese formar parte de lo ocurrido allí; que no quería aparecer en todo aquello. Pérez Casillas le expresó que no se preocupara que él no estaría allí y que no habría problema.

Arribó también a ese lugar poco después el Teniente Julio César Andrades. Más tarde llegó Modesto Delgado, oficial del Canal 7 que supervisaba directamente a Marte Ruiz y quien fue avisado por [é]ste mediante radioteléfono a su hogar en Ponce de la situación

ocurrida. Marte había avisado en forma similar en San Juan a Adolfo Flores Monge, Gerente de Ventas de Rikavisión. Al llegar Modesto Delgado, Marte Ru[i]z le enteró de lo ocurrido ese día y el día anterior en las facilidades de Rikavisión. Ambos se detuvieron esa tarde frente al cadáver de Darío Rosado que permanecía allí tirado, acercándose uno de los agentes de la Policía —uno flaco y alto— y comenzó a darle puntapies a dicho cadáver, estremeciéndolo, a la vez que decía, "So hijo de la gran puta ya tu no volverás a hacer ninguna fechoría". Marte Ruiz reaccionó a esta persona exclamándole, "Chico, por qué tú haces eso". La respuesta del agente fue, "Este hijo de la gran puta mató a un guardia y no volverá a hacerlo". Durante su estancia esa tarde allí [tanto] Pérez Casillas como Ríos Polanco advirtieron a Marte Ruiz y a Delgado por separado y conjuntamente a ambos que "en ningún momento digan que desde aquí se ha disparado". Por la forma en que se hizo, constituyó una seria advertencia y amenaza. Pérez Casillas le expresó a Delgado en otra ocasión esa tarde que no hablara con nadie sobre lo sucedido y que no mencionara la existencia de las dos ráfagas de disparos, añadiéndole que "en boca cerrada no entran moscas". Ríos Polanco le hizo una advertencia similar al mismo tiempo que presionaba uno de sus dedos sobre la frente de Marte Ruiz en forma impositiva y amenazante. En otra ocasión, estando con Delgado, Ríos Polanco se dirigió a Marte expresándole en un tono bien serio y amenazante, "Acuérdate Marte, de aquí nadie ha disparado, de aquí nadie disparó un solo tiro", refiriéndose a que no podía decir que se hubiese disparado desde adentro de la edificación; 'Aquí sólo hubo una sola ráfaga', le recalcó Ríos Polanco. Esta expresión se la hizo Ríos Polanco en forma amenazante, con el arma larga que portaba en las manos a nivel de la cintura.

7) A sus muertes Soto Arriví y Darío Rosado tenían unos 20 y 26 años de edad, respectivamente. El patólogo Dr. Rafael Criado concluyó que de las cuatro heridas de bala recibidas por Soto Arriví, la que se produjera al nivel del pecho intervino en la muerte únicamente "por posibles laceraciones del corazón, grandes vasos intratorá[x]icos y pulmón izquierdo que tuvieron que originar una severa hemorragia interna". (Exh. 67 FEI). Concluyó, además, que Darío Rosado murió por "el impacto de un s[o]lo disparo de escopeta, de perdigones de calibre 00 y la acción de un taco de fieltro; que debido a la localización de los orificios de entrada por el pecho y de salida en la espalda la acción traumática de estos perdigones y el taco de fieltro recuperados así como los trozos de hueso recuperados de las fracturas costales de la 5ta. y 6ta. costillas

pudieron lacerar severamente el corazón y el pulmón derecho originando una gran hemorragia que estimamos fuera esta la causa fundamental de la muerte". (Exh. 68 FEI).

8) Con motivo del tiroteo de la primera serie de disparos descrita, el vehículo de Ort[i]z Molina resultó con varias perforaciones e impactos por los efectos de las balas, principalmente por su lado izquierdo, es decir, el que daba hacia el frente de las facilidades y edificación de Rikavisión al ser estacionado por los jóvenes cuando llegaron a dicho lugar. Por ese lado demuestra una perforación de un proyectil de alto calibre al centro del guardalodo izquierdo trasero y un poco más arriba del mismo, un impacto de bala, sin penetración. (Exh. 2 FEI). La puerta izquierda delantera presenta dos perforaciones de bala localizadas un poco más abajo del centro de la misma y más arriba de esa puerta marcas de perdigones. (Exh. 3(c) FEI). Presenta además perforaciones por impactos de bala por el frente y por la parte trasera del vehículo. (Exh. 4 y 5 FEI). El cristal de la puerta delantera izquierda quedó completamente roto.

El vehículo de la empresa de Rikavisión marca Volkswagen, tablilla 12F301, que estaba estacionado dentro del solar de las facilidades, muy cerca de una estructura pequeña de cemento utilizada para almacén, también sufrió los efectos de las balas. Este vehículo estaba estacionado en forma paralela a la verja frente a la entrada de esa planta trasmisora. Recibió dos impactos, sin perforación, cerca del guardalodo izquierdo delantero y otra en la parte del techo donde corre el agua. (Exh. 33(a), (b) y (c) FEI).

Los portones de entrada a las facilidades de Rikavisión también recibieron impactos de bala con gran probabilidad desde dentro de dichas facilidades en vista que se encontraban cerrados al ocurrir la primera serie de disparos. Estos portones consisten de dos hojas, edificados de tubos de material galvanizado de dos pulgadas y alambre eslabonado; demuestran dos impactos localizados uno en cada tubo central que corren en línea horizontal en cada hoja del mismo. Por el diámetro de esos impactos, es muy probable que hayan sido ocasionados con proyectiles de alto calibre. (Exh. 34(a), (b), (c) y (d) FEI).

9) Posteriormente a los sucesos relatados llegó a las facilidades de Rikavisión el Fiscal Santos Nigaglioni de la Fiscalía de Distrito de Ponce en unión a otro personal de la Policía de Ponce. Como resultado de su intervención [é]ste no tomó declaración jurada a ninguno de los agentes participantes de esos hechos.

*Se tomó fotografías del cadáver de Darío Rosado, boca arriba tirado en el piso. (Exh. 32(a), (b) y (c) FEI). Estas muestran el*

*pecho completamente ensangrentado y la presencia de mucha
sangre en las áreas de la nariz y la boca. Su rostro evidencia en
forma claramente visible marcas de traumas, laceraciones,
abrasiones múltiples y partes inflamadas. Se observan esas mar-
cas sobre la parte alta de la frente, sobre la ceja derecha cubriendo
parte del párpado; sobre el pómulo izquierdo y el labio superior
derecho.* El cadáver de Soto Arriví también fue fotografiado mien-
tras permanecía en el Hospital de Jayuya. (Exhibit 70 (a) y (b)
FEI). *Estas fotos evidencian de igual manera la presencia de efecto
de traumas y laceraciones múltiples en diferentes partes del rostro,
con edema —debajo de la ceja derecha, muy cerca del párpado; en
ambos pómulos, debajo de la ceja izquierda, sobre la barbilla y en
la parte inferior de ésta, el área del pecho y el brazo izquierdo.
Todas las marcas descritas en los rostros y cuerpos de Darío
Rosado y Soto Arriví son claramente compatibles con golpes
contundentes recibidos.*

10) El Policía Jesús Quiñones comenzó su turno regular de
trabajo de 11:00 A.M. a 7:00 P.M. y llegó al área de la torre de la
Policía como de costumbre a eso de las 11:30 A.M. Ya se encontraba
allí un grupo de los agentes de la Policía que participarían en dicho
operativo.

En los momentos de producirse la primera serie de disparos
señalada el policía Jesús Quiñones se encontraba trepado a una
altura de 15 a 20 escalones de la torre de la Policía como parte de su
labor de vigilancia rutinaria. Desde ahí [é]l observaba gran parte
del área circundante y sin dificultad aquella donde están localizadas
las facilidades de Rikavisión. Al escuchar las detonaciones de armas
de fuego de la primera serie de disparos a eso de las 12:30 P.M. y
percatarse que provenían del área de Rikavisión, así lo avisó a los
agentes que se mantenían abajo, quienes salieron de inmediato
hasta dicho lugar. Jesús Quiñones permaneció un breve rato
adicional arriba en la torre hasta que observa el vehículo que llevó
a ese lugar a Ortiz Molina. A su conductor, Cartagena Flores, él le
conocía de vista mientras [é]ste servía en la zona de Juana Díaz
donde Jesús Quiñones estuvo estacionado. Al llegar Cartagena
Flores hizo al policía Jesús Quiñones una señal colocándose el dedo
índice en su boca cerrada indicativa de que se mantuviese callado; *le
informó que había un policía herido y dos personas muertas,
replicándole Ortiz Molina que los dos jóvenes se encontraban vivos
y haciendo mención de las muchas patadas que la policía le había
dado a esos "muchachos".* Ortiz Molina relató también en ese
momento, haber observado allí cuando uno de los agentes golpeó a

uno de los jóvenes diciéndole, "Hijo de la gran puta, ¿t[ú] no querías matar un guardia?, mátalo ahora"; *también de la experiencia que sufrió cuando fue asaltado por los jóvenes.* Se refirió también a lo expresado por dichos secuestradores mientras le mantenían como rehén en la travesía hacia el Cerro Maravilla al efecto de que después se atacarían otros lugares. En relación a esto último el Policía Quiñones advirtió a Cartagena de la importancia de dar aviso al oficial correspondiente y se ofreció a hacerlo él mismo. Cartagena Flores le respondió que se quedara con Ortiz Molina que él lo haría. Luego de eso Cartagena Flores regresó al área de las facilidades de Rikavisión, dejando a Ort[i]z Molina con el Policía Quiñones. *Ortiz Molina continuó narrando al Policía Quiñones gran parte de la experiencia que acababa de pasar. Le explicó con lujo de detalles lo ocurrido previo al tiroteo cuando se escondió debajo del panel de instrumentos de su vehículo y el culatazo que le tiró uno de los agentes al salir del vehículo; as[i]mismo del pedido de los jóvenes para que no le hicieran nada a él porque nada tenía que ver con eso.* Quiñones aprovechó y atendió una pequeña herida que vio en el dedo de Julio Ortiz Molina poniéndole una curita mediante el·uso de un equipo de primera ayuda que tenía allí disponible. *Muy poco después se volvió a escu[ch]ar la segunda serie de disparos ya mencionados. Ortiz Molina y el Policía Quiñones la escucharon percibiéndola de una frecuencia mucho más lenta que la primera; consistiendo de unas cinco detonaciones que provenían de las facilidades de Rikavisión.*

11) González Malavé llegó al Centro de Salud de Jayuya entre la 1:00 a 1:30 P.M. Fue atendido por el Dr. José Ramos Rivera, médico de dicho centro, quien lo refirió al Hospital de Ponce donde fue llevado enseguida.

El cadáver de Soto Arriví arribó a ese centro de salud unos 45 minutos más tarde en el asiento de atrás del vehículo conducido por Cartagena Flores. El Dr. Ramos Rivera le colocó en el depósito de cadáveres de dicho hospital.

Durante la última parte de la tarde de ese día los agentes de la División de Inteligencia y de la Unidad de Arrestos Especiales de la Policía abandonaron paulatinamente el área del Cerro Maravilla, unos hacia Ponce y otros al Cuartel General en San Juan.

12) Julio Ortiz Molina cuenta actualmente 66 años de edad; estudió hasta el tercer grado de escuela primaria; es veterano de la segunda guerra mundial, habiendo servido para una unidad del ejército de los Estados Unidos en calidad de riflero; pasó su entrenamiento básico en el manejo de armas durante su estadía en

el ejército. Se licenció en 1946; después de eso trabajó en una fábrica de tela por espacio de dos años como operador de engomadora; luego administró un negocio de colmado y posteriormente operó otro negocio pequeño de es[a] clase de su propiedad por dos años. En 1962 comenzó como porteador público, labor que desempe[ñ]ó durante 17 años. Fue delegado por mucho tiempo de la Unión Choferil de Ponce, la cual llegó a presidir. En la actualidad está retirado y reside en la ciudad de Ponce.

Ortiz Molina fue llevado a Ponce en un vehículo en compañía del Fiscal Nigaglioni, *el agente de la [P]olicía de Ponce Félix Santiago* y dos personas que portaban cámaras fotográficas. Su vehículo público fue trasladado al Cuartel de la Policía de Ponce por uno de los agentes policíacos del mismo. En la ruta de regreso a Ponce se detuvieron en un restorán a tomar unos refrescos. *En este sitio Ortiz Molina tuvo la oportunidad de conversar con Félix Santiago acerca de lo que le había ocurrido.* [É]l le conocía hacía varios años y lo consideraba como una buena persona. *Llegó a expresarle el hecho de haber escuchado dos ráfagas de disparos.* Sin embargo, lo hizo cuidándose de no ser escuchado por el Fiscal Nigaglioni. *Ortiz Molina se había percatado que la Policía estaba mezclada en lo ocurrido, temía por su vida y en ese momento no sabía lo que se encontraría al llegar al Cuartel de la Policía en Ponce.*

Finalmente llegaron a Ponce yendo el Fiscal Nigaglioni primeramente al hospital donde se encontraba el agente encubierto. Después se trasladaron al Cuartel de la Policía de la Calle Molina donde se quedaron las dos personas descritas como los fotógrafos y de ahí hasta el Cuartel de la Calle Hostos de esa ciudad. En este Cuartel el Fiscal Nigaglioni le tomaría una declaración jurada a Ort[i]z Molina. *Prevalecía su temor para narrarle espontáneamente todo lo que vio y escuchó en el Cerro Maravilla, particularmente la agresión a los jóvenes y el hecho de las dos ráfagas de disparos;* en especial cuando la declaración jurada que le tomaba el Fiscal Nigaglioni era *mecanografiada por el Capitán Leonardo Ortiz de la Policía en ese cuartel.* Esa declaración jurada se le tomaba en un tercer piso del cuartel en circunstancias en que entraban y salían personas que en ocasiones se acercaban lo suficiente para escuchar lo que él declaraba al Fiscal Nigaglioni y transcribía a maquinilla el Capitán Ortiz. A continuación la declaración jurada expresada prestada esa noche del 25 de julio de 1978 por Ortiz Molina ante el Fiscal Nigaglioni en el Cuartel de la Policía de la Calle Hostos de Ponce:

"P. ¿A qué usted se dedica señor?

R. Soy porteador público y trabajo en la ruta de Ponce a Juana Díaz.

P. Dígame si hoy 25 de julio de 1978, a eso de las 11:00 de la mañana usted se dirigía hacia Juana Díaz[.]

R. S[í] señor.

P. Dígame si en el trayecto de Ponce a Juana Díaz le ocurrió algo[.]

R. Cuando yo iba frente al Centro de R[eh]abilitación y Tratamiento Social tres individuos me hicieron señas para que me parara. Ellos aparentaban ser muchachos Bo[y] Scouts, ya que uno de ellos llevaba un bolso colgando del hombro como los que usan los Bo[y] Scouts, además tenían ropa de fatiga. Yo pensé que eran tres pasajeros, me detuve y entonces uno de ellos se montó en el asiento delantero, otro se montó en el asiento trasero y el tercero dio la vuelta por el lado m[í]o, me abrió la puerta y encañonándome con un[a] pistola me dijo que me echara para el lado y le dejara el guía. Ahí yo me dí cuenta que la cosa era seria y los obedecí. El individuo cogió el guía, le dio marcha al carró y cogió por la carretera de Maragüez.

P. ¿Después que esos tres individuos se·montaron al carro, dígame qu[é] hicieron y qu[é] le dijeron?

R. Ellos me dijeron que me [es]tuviera tranquilo, que no fuera listo e hiciera resistencia si no quería perder la vida. Además me dijeron que ellos no me iban a hacer nada, ya que ellos pertenecían al RD o RA, no recuerdo bien cu[á]l de las dos era que me decían. Que ellos lo que querían era que Puerto Rico fuera libre. Que ellos se proponían coger el primer carro que se parara, pero yo había tenido la mala suerte de ser el primero que pasé. Por el camino comentaban que si yo me estaba . . . tranquilo ellos iban [a] hacer lo que iban [a] hacer ligero y luego me dejarían en un sitio a salvo, pero que el carro se lo llev[ar]ían y lo dejarían en un sitio a salvo.

P. ¿Le dijeron qu[é] era lo que ellos iban [a] hacer?

R. Me dijeron que iban para la Torre a destruir algo, no me dijeron qu[é] Torre era.

P. Mientras estaban en el automóvil estas personas[, ¿]lo golpearon a usted?

R. No señor, me amenazaban nada más para que me estuviera tranquilo.

P. ¿Pudo usted observar qu[é] armas llevaban estos individuos?

R. El que se sentó a mi lado por la puerta derecha llevaba un revólver cañón largo, negro. El que se montó en el asiento trasero

tenía una pistola y me apuntaba con ella por la parte de atrás de la cabeza. El que cogió el guía tenía también una pistola negra grande, tenía un cañón como de 3 a 4 pulgadas.

P. ¿Se dio cuenta usted si ellos llevaban alguna otra arma o algún otro equipo[?]

R. Yo oí que ellos hablaban de que tenían granadas y cartuchos de dinamita, más hablaban que tenían otro revólver calibre 38.

P. ¿Durante el camino, vio usted lo que ellos tenían dentro del bolso parecido al que usan los Bo[y] Scouts?

R. No señor, no lo v[i].

P. Cuando llegaron a la Torre, ¿qué hicieron esos tres individuos?

R. Paramos el carro y dieron r[e]versa y se pararon frente a una Torre. Entonces se desmontaron del carro y dijeron vamos [a] actuar rápido. Entonces intercambiaron armas entre s[í] antes de en[t]rar para [a]dentro y en ese momento v[i] que salieron unas personas armadas tratando de detenerlos y cuando yo v[i] que podía haber tiroteo me metí debajo del dash del carro y oí el tiroteo.

P. Testigo, por la posición en que estaban los tres individuos que le quitaron el carro y por la posición donde estaban las personas que salieron con las armas de frente al carro, ¿cuál de los dos bandos usted diría que disparó primero?

R. Los tres individuos que me quitaron el carro.

P. ¿Por qué usted dice que fueron los tres individuos que le quitaron el carro?

R. Porque las detonaciones salieron primero de la parte de atrás del carro mío, que era donde estaban los que me quitaron el carro.

P. ¿Dígame si el carro suyo sufrió algún daño?

R. S[í] señor, tiene tres balazos en el lado izquierdo, dos en la puerta delantera izquierda y una en el guard[a]lodo de ese lado y otros que salieron por la tápa del baúl. Los balazos de la puerta destrozaron el cristal.

P. ¿Dígame si usted vio las personas que resultaron heridas allí?

R. N[o] los ví porque como a mí me detuvieron también, no los pude ver.

P. ¿Las personas que le quitaron el automóvil, usted las había visto antes?

R. No señor, nunca las había visto antes.

P. ¿Sabe usted a qué Torre específicamente fue que ustedes llegaron?

R. Bueno es la Torre del Canal 7 de Televisión y otra Torre que está al lado que creo es de la Telefónica.

32

P. ¿Se dio usted cuenta si ellos cuando llegaron a la Torre, antes de bajarse del vehículo sacaron algún equipo del maletín o bolso que llevaban?

R. Bueno como ellos durante todo el camino no me dejaban mirar para atrás y también al llegar me dijeron que no mirara para atrás, ni para los lados, yo sentía que hacían algo pero no veía.

P. ¿Estas personas eran personas jóvenes o personas mayores?

R. Eran personas jovencit[a]s, como alrededor de 20 años.

P. ¿Escuchó a estas personas hacer algún otro comentario durante el trayecto?

R. Ellos decían que tenían que seguir ruta a Mayagüez para reunirse con el grupo en Mayagüez.

(firmado) JULIO ORTIZ MOLINA"

(Exh. 6 FEI)

Después de prestada dicha declaración a Ortiz Molina le fue entregado su vehículo *esa misma noche* y regresó a su hogar.

13) En la tarde de ese 25 de julio el Comandante Pérez Casillas, ya de regreso en el Cuartel General, solicitó la presencia del Lcdo. Brunet. Ordenó buscarle en su hogar donde [é]ste se encontraba disfrutando de vacaciones regulares. El Lcdo. Brunet llegó al Cuartel General a eso de las 6:00 P.M. Muy cerca de su arribo se percató de la presencia del Sargento Montañez Ortiz mientras [é]ste descargaba tres armas largas de un furgón gris de la Policía *que las trasladaba del Cerro Maravilla a dicho cuartel.* El Lcdo. Brunet conocía a Montañez Ortiz cuando intervenía como fiscal a cargo del agente encubierto Luis Daniel Erazo Félix, ya que Montañez Ortiz actuaba entonces como supervisor de agentes encubiertos bajo la Unidad de Servicios Estratégicos de la División de Inteligencia de la Policía. *Por el encuentro que tuvo con Montañez el Lcdo. Brunet percibió que en efecto venía del operativo del Cerro Maravilla.* (Exh. 21 FEI, págs. 26, [56], [66] y 77; Exh. 22 FEI, págs. 237 [y] 241; Exh. 83 FEI, pág[.] 11).

El Lcdo. Brunet se reunió esa noche con Pérez Casillas en el Cuartel de la Policía; [é]ste le explicó acerca de lo sucedido en el Cerro Maravilla y su versión de que los jóvenes habían muerto como parte de un tiroteo e intercambio de disparos que allí se desarrolló entre ellos y los agentes de la Policía. (Exh. 22 FEI, págs. 240 [y] 241)[.] En vista que se había conclu[i]do con la función de González Malavé como agente encubierto, el requerimiento de Pérez Casillas al Lcdo. Brunet fue con el propósito de que [é]ste iniciara los pasos necesarios para procurar la acumulación de la prueba correspondiente y *para someter a los tribunales los casos en los que había*

*intervenido González Malavé como encubierto.* El Lcdo. Brunet examinó en el cuartel el expediente donde estaban consignados los diferentes informes de González Malavé por sus intervenciones. Concluyó su labor a las 9:[0]0 P.M. (Exh. 17 FEI, pág. [44]). Obtuvo la autorización del Lcdo. Colton al siguiente día para proseguir la acción criminal relacionada con los casos del agente encubierto. En su comunicación con el Lcdo. Colton no le informó de su observación en el Cuartel de la Policía la noche del 25 de julio de *haber visto a Montañez Ort[i]z procedente del Cerro Maravilla* ni de su conversación con Pérez Casillas en que [é]ste le ofrece la citada versión de lo sucedido a los jóvenes. *El Lcdo. Brunet no consideró que era importante trasmitir esa información al Lcdo. Colton* [ni subsiguientemente al Fiscal Villanueva Díaz]. (Exh. 26 FEI, págs. 142 [y] 187).

14) El Lcdo. Brunet fue requerido por el Lcdo. Colton como uno de los fiscales que participaría en la investigación de los sucesos del 25 de julio de 1978 en el Cerro Maravilla. Su *primera* gestión consistió en tomarle . . . una declaración jurada al agente encubierto González Malavé el 31 de julio de 1978. *El Lcdo. Colton estaría ese día interviniendo en la toma de una segunda declaración jurada del Fiscal Nigaglioni a Julio Ortiz Molina, como resultado de la situación surgida por las informaciones periodísticas en la prensa del país en que se citaba al porteador público haciéndole imputaciones de asesinos a los policías y de la existencia de una nueva versión de éste de lo ocurrido en el Cerro Maravilla, en comparación con lo que le declarara el 25 de julio al Fiscal Nigaglioni.*

15) El Lcdo. Brunet no obtuvo el debido trasfondo y la preparación suficiente para la declaración jurada que le tomó a González Malavé en la fecha citada. Por el contrario, las circunstancias en que llevó a cabo esa función indican que por la falta de ese trasfondo y debida preparación *no actuó con la suspicacia investigativa* que le permitiera constatar, cuestionar o corroborar los diferentes extremos de la versión ofrecida en dicha declaración por González Malavé; as[i]mismo que le capacitara para evitar ser un mero receptor de su declaración y de consignar en la misma únicamente lo que le pareciere relevante al declarante. *En efecto antes de tomarle su declaración jurada el Lcdo. Brunet no llegó a ir al lugar de los hechos ni a ver las fotos de los cadáveres de los jóvenes muertos ni examinar los protocolos de autopsias.* (Exh. 22 FEI, págs. 256 y 257). El Lcdo. Brunet tomó la declaración jurada expresada a González Malavé el 31 de julio de 1978 en el Hospital

Industrial del Centro Médico de Río Piedras, donde estaba reclu[i]-do dicho agente. (Exh. 30 FEI). *A pesar que para esa fecha había cobrado notoriedad el caso de esas muertes en el Cerro Maravilla por las informaciones periodísticas que ponían en entredicho la actuación de los agentes de la Policía en las mismas,* el Lcdo. Brunet tomó esa declaración a dicho agente en *presencia del Teniente Quiles* que a su vez *había participado* en los hechos bajo investigación. No utilizó los servicios del Departamento de Justicia para tomarla, sino que la misma se llevó a cabo mediante la invervención de una *taquígrafa* de la División de Inteligencia de la Policía. Esta taquígrafa era una persona a quien el Lcdo. Brunet no conocía y quien *retuvo consigo las notas taquigráficas de la declaración tomada para su transcripción subsiguiente.* (Exh. 83 FEI, págs. 48 y 49). De esta manera el Lcdo. Brunet *no conservó* el resultado de la declaración tomada. Para esa fecha *ninguno* de los agentes policíacos que intervinieron en los sucesos del Cerro Maravilla *había prestado declaración jurada de modo que por este medio se allegaba a la División de Inteligencia de la Policía la versión de González Malavé, testigo presencial de los hechos que declaraba.* Esta actuación del Lcdo. Brunet tuvo lugar a pesar de que no correspondía a la mejor práctica, *especialmente en esta etapa de la investigación, en que la información suministrada a la Policía de Puerto Rico de esa manera podía desvirtuar los propósitos para descubrir la verdad de lo ocurrido en el Cerro Maravilla.* (Exh. [83] FEI, págs. 49, 55 [y] 56–60); especialmente, *en ese instante que la actuación de los agentes policíacos era cuestionada públicamente.* (Exh. 83 FEI, págs. 37–52).

16) Mediante la declaración jurada prestada por González Malavé el 31 de julio de 1978 el Lcdo. Brunet advino en conocimiento directo a través del testimonio de este testigo presencial de los hechos que relataba en la misma, el haberse escuchado *un alto proveniente del interior de las facilidades de Rikavisión* y el hecho de haber identificado Soto Arriví, la presencia de una persona allí *dentro antes de iniciarse los disparos.* (Exh. 22 FEI, págs. 257–259).

17) En los días siguientes al 25 de julio de 1978 Ortiz Molina *ofreció a los medios informativos de la prensa del país una versión de los hechos ocurridos en el Cerro Maravilla que incluyó su afirmación de que los jóvenes no habían sido heridos después de una primera ráfaga de disparos sino detenidos, agredidos luego y la existencia de una segunda ráfaga de disparos vinculada a las muertes allí habidas.* [É]l prestó además *una declaración jurada*

ante el Lcdo. Julio Alvarado Ginorio el 28 de julio de 1978 *en la que cubre estos aspectos.* (Exh. 7 FEI).

18) En vista de la situación pública surgida por las subsiguientes declaraciones de Ortiz Molina, [é]ste fue llamado por la Fiscalía de Ponce para la toma de una *nueva declaración jurada* ante el Lcdo. Nigaglioni para el 31 de julio de 1978. [É]l compareció en la mañana de ese día a la Fiscalía de Ponce ante la presencia del Fiscal Nigaglioni y el *Lcdo. Colton.* Con esta intervención del Lcdo. Colton y la que en ese mismo día realizaba el Lcdo. Brunet mediante la toma de una declaración jurada a Alejandro González Malavé, *era evidente que la División de Investigación y Procesamiento Criminal del Departamento de Justicia había asumido la dirección de la investigación de los sucesos del 25 de julio de 1978 del Cerro Maravilla.*

En la toma de esta nueva declaración a Ortiz Molina se destacó el *trato duro y fuerte por parte del Lcdo. Colton a este testigo.* El Lcdo. Colton *le recriminó y maltrató mediante la utilización de un lenguaje en alta voz y con tono violento por el hecho de las declaraciones emitidas por él a la prensa,* las que el Lcdo. Colton señaló que representaban una *desviación* de lo manifestado por dicho testigo al Fiscal Nigaglioni en su declaración jurada del 25 de julio de 1978. El Lcdo. Colton le expresó en esa ocasión a Ortiz Molina que aunque le consideraba "buena gente" iba a tener que acusarle *por perjurio* por haber hecho declaraciones a la prensa que no hiciera originalmente al Fiscal Nigaglioni. Ortiz Molina reaccionó a esto insistiendo que lo que él había dicho a la prensa era *la verdad* de lo ocurrido en el Cerro Maravilla, y que entendía *que no existía contradicción de su parte entre lo declarado a la prensa y lo que declarara al Fiscal Nigaglioni en la citada declaración jurada el 25 de julio de 1978. El Lcdo. Colton insistió en su posición y amenazó en que lo metería a la cárcel por perjurio, exigiéndole que tenía que cambiar la declaración prestada a la prensa.* El Fiscal Nigaglioni que le acompañaba, no le trató con palabras duras pero se *hizo eco de Lcdo. Colton* en este requerimiento expresándole que debía cambiar esa declaración ya que no concordaba con lo que había declarado en el cuartel de la Policía el 25 de julio. *El Lcdo. Colton le requirió, además, que tenía que descontinuar sus declaraciones a la prensa. La situación llegó al punto en que Ortiz Molina reclamó que no se le presionara. Cuando esto ocurre, el Lcdo. Colton se levantó en actitud violenta y salió del lugar tirando la puerta con gran fuerza. Ortiz Molina permaneció con el Lcdo.*

*Nigaglioni y concluyó su segunda declaración jurada ante él.* (Exh. 8 FEI).

El incidente descrito en el que el Lcdo. Colton increpó duramente a Julio Ortiz Molina fue *observado* por el Fiscal Julio León Ríos del Tribunal Superior de Ponce, quien compartía oficinas en la Fiscalía de Ponce con el Fiscal Nigaglioni. El Fiscal León Ríos expresó haber escuchado cuando el Lcdo. Colton, *en una actitud bastante violenta, se levantó molesto y le dijo a Molina* "viejo embustero"; *expuso además que mientras esto sucedía Ortiz Molina se veía nervioso y llorando.*

(Como cuestión de hecho, independientemente de la actitud asumida por el Lcdo. Colton ante Ortiz Molina ya descrita, las expresiones atribu[i]das a dicho testigo por los medios de prensa de que éste escuchase dos ráfagas de disparos y observara vivos y detenidos a los jóvenes después del tiroteo, *no confligen ni reflejan contradicción con su declaración original del 25 de julio ante el Fiscal Nigaglioni.* Ninguna de las preguntas y respuestas de su declaración del 25 de julio específicamente *requirió o expuso* acerca de lo sucedido *después* del tiroteo a los jóvenes que le secuestraron; por tanto, lo que Ort[i]z Molina realmente hizo a través de sus nuevas declaraciones fue expresarse sobre *algo que no se le había preguntado antes por el Fiscal Nigaglioni en su interrogatorio del 25 de julio de 1978.* (Exh. 6 FEI). La única pregunta de dicho interrogatorio cercana a ese tema consistió en requerirle que dijera si *vio las personas que resultaron heridas allí.* Su respuesta de no haberlos visto porque fuera detenido "también", *llevó la clara implicación de que los jóvenes fueron, al igual que él, detenidos, y por tanto, la de que permanecieron vivos después del tiroteo.* Igualmente, sus nuevas declaraciones eran compatibles con lo percibido por él en el Cerro Maravilla y en el área de la torre de la [P]olicía, *con la versión que le ofreció poco después al [p]olicía Jesús Quiñones en este lugar y con su posición ante el Fiscal Nigaglioni y el Lcdo. Colton cuando [é]stos le llamaron a prestar nueva declaración el 31 de julio en la Fiscalía de Ponce de que no se estaba contradiciendo en su declaración del 25 de julio.* Así lo reafirmó él expresamente al Fiscal Nigaglioni en su declaración del 31 de julio en la que se sostuvo en su declaración del 25 de julio y *de que no estaba mintiendo*[.] (Exh. 8 FEI, pág. 1)[.] Como similar cuestión de hecho, tampoco representó una contradicción su respuesta de haber escuchado "un solo tiroteo" a la pregunta de cuántos disparos hubo "desde que se desmontaron las tres personas que le quitaron el carro (a usted) hasta que (usted) salió del lugar

específico de los hechos". (Exh. 8 FEI, pág. 3). Lo ocurrido, a lo cual se ajusta su versión de lo que percibiera, demuestra que *mientras Ortiz Molina estuvo en el lugar específico de los hechos, es decir, frente a las facilidades de Rikavisión donde ocurrieron, hubo un solo tiroteo.* La prueba estableció la ocurrencia de un segundo tiroteo, unos 15 minutos más tarde cuando ya Ort[i]z Molina se encontraba fuera de ese lugar[,] en el lugar de la torre de la Policía en unión al policía Quiñones. As[i]mismo, su otra respuesta de "No señor, no s[é] decirle cuál de las tres" a la pregunta de si "después del tiroteo allí y en el momento en que usted estaba allí después del tiroteo [¿]se dio usted cuenta de cuáles de las tres personas que le quitaron el carro resultaron heridas?", representó la reafirmación de su versión de lo que percibiera de lo occurrido allí al efecto que *sólo una* de las personas que le quitaron el vehículo resultó herida, la cual él desconocía (Exh. 8 FEI, pág. 3). *Esta respuesta es significativa en la evaluación que nos corresponde hacer de las reacciones o manifestaciones de los querellados contra los cuales se ofreció en evidencia esa prueba en vista de lo requerido por los propios términos de la pregunta:* en ambas declaraciones juradas que prestara Julio Ort[i]z Molina ante el Fiscal Nigaglioni —las del 25 y 31 de julio de 1978— *esa pregunta constituye la primera y única que específicamente se le formula para que declare acerca de cuáles de los tres jóvenes que le secuestraron resultaron heridos por efecto del tiroteo.* El hecho de haberse formulado en *plural* (cuáles) y respondido en *singular* no permitía inferencia o interpretación alguna de que Ortiz Molina estuviese declarando en ese momento haber visto más de una persona herida después del tiroteo y "en el momento en que (él) estaba allí aún", es decir, en el sitio específico en que ocurrió el tiroteo. *Por tanto, estaba respondiendo en forma compatible con la versión que de las tres personas, una sola resultó herida en el tiroteo*[.] Para una mejor comprensión de esta explicación que hacemos al evaluar esta prueba, transcribimos la declaración jurada prestada por Ortiz Molina ante el Fiscal Nigaglioni el 31 de julio de 1978 ya expresada:

(La declaración que transcribimos constituye una transcripción literal del Exh. 8 del FEI sometido en evidencia. *La misma contiene palabras incompletas sin que haya sido posible al Comisionado Especial sustituir el documento*[.)]

"Que soy de las circunstancias personales antes expresadas.
P. Don Julio, usted recordará que el día 25 de julio de 1978 después de o[curri]dos los sucesos en el Monte Maravilla de Villalba donde resultaron muerto[s dos] j[ó]venes yo le tomé una

declaración jurada para que usted expusiera lo que [us]ted había observado allí. En la declaración jurada que usted me prest[ó] u[sted] declaró que las tres personas que le quitaron el carro fueron los primero[s] que dispararon y declaró además usted que después del tiroteo usted no vi[o] a las personas heridas. Por los medios de comunicación usted ha dicho y [ha] informado [a] los medios de comunicación que usted ha declarado lo contrario. [Le] pregunto ahora si usted se reafirma en la declaración que me prestó el d[ía 25] d[e j]ulio de 1978?

R. Sí señor, sostengo lo que le dije.

P. [¿]Puede explicar por qué usted dijo a los medios de comunicación que los agentes habían disparado primero?

R. Yo lo que dije a los medios de comunicación [fue] que yo había o[í]do unas det[onac]iones detrás del automóvil mío que era donde estaban los tres que me asa[ltaron] pero qu[e n]o podía precisar el momento de los disparos.

P. O sea, que los agentes no fueron los primeros que dispararon, diría u[sted].

R. De acuer[d]o a como oí los disparos salieron de atrás del carro y no de [. . . . ]

P. ¿Usted vio personas esposadas allí?

R. N[o] los ví.

P. Testigo[, ¿]usted ha prestado alguna otra declaración jurada después de prestar la que usted prestó ante mí, el día 25 de julio de 1978?

R. Sí señor ante el Licdo. Julio Alvarado Ginorio, el viernes 28 de julio de 1978.

P. [¿]Quién lo llevó a prestar esa declaración allí?

R. Yo fu[i] por mi cuenta a hablar con él a ver si tenía derecho a reclamar por los daños que yo había recibido en el carro, en cuanto a mi trabajo [y] en cuanto a mi condición física.

P. [¿]Le pidieron que informara eso mediante declaración jurada?

R. Sí señor.

P. [¿]Quién se lo pidió?

R. El Lcdo. Ginorio.

P. Usted le ha dicho a los medios de comunicación que los agentes que inte[r]vinieron en el Monte Maravilla en el caso [é]ste son unos asesinos, [¿]usted le dijo eso a los medios de comunicación?

R. No señor, no dije eso, por lo menos no fue mi intención decir eso.

P. [¿]Usted resultó con algún golpe visible?

R. *Tengo un rasguño en el dedo del corazón, mano izquierda.*

P. [¿]Cuántos agentes fueron los que usted vio venir de frente?

R. Como diez agentes.

P. Dígame si usted escuchó alguna ex[c]lamación de alguien durante el [. . . .]

R. Escuché, 'no me tire que soy agente.'

P. [¿]Eso fue todo lo que usted escuchó?

R. Sí señor. Y casi enseguida escuché una voz de auxilio que no sé [si fue] la misma voz del agente.

P. Desde que se desmontaron las tres personas que le quitaron el ca[rro us]ted h[a]sta que usted salió del lugar específico de los hechos, [¿]cuánt[os dis]paros hubo?

R. Un solo tiroteo.

P. Testigo[, ¿]quién fue, cuál de l[a]s tres personas le hizo la señal pa[ra que] se detuviera?

R. El que se montó [de]lante al lado derecho mío.

P. [¿]Cómo era ese que se montó en el asiento delantero al lado derec[ho?]

R. Trigueño claro. No puedo, no pude captarlo bien porque no me dej[aron mi]rar ni para el lado ni para atrás.

P. [¿]Alguno de los tres se destacó en la dirección de lo que iban a ha[cer, o] sea en el comando de lo que iban a ejecutar?

R. Los tres actuaban igual. Cuando estábamos cerca, llegando a la To[rre] que estaba al frente al lado derecho dijo 'de ahora pa[']lante se hace [lo que] yo diga'.

P. Durante el camino[, ¿]sabía usted cu[á]l de los tres era el Agente Enc[ubierto?]

R. No señor y no podría decir todavía cu[á]l de los tres era el Agente Encubierto.

P. Después del tiroteo allí y en el momento en que usted estaba all[í] . . . del tiroteo[, ¿]se di[o] usted cuenta de *cuáles de las tres personas que l[o asalta]ron [en] el carro resultaron heridas?*

R. *No señor, no sé decirle cu[á]l de los tres.*

P. [¿]Usted sabe cuál de las tres personas fue [la] que dirigió el asalto [en el] carro?

R. Los tres a la vez me encañonaron.

P. [¿]Usted escuchó si la Policía le dio el Alto a los tres jóvenes?

R. Si lo dijo no lo oí.

P. Dígame don Julio[, ¿]usted se siente mentalmente bien?

R. Sí señor.

(firmado) JULIO ORTIZ MOLINA"

. . . .Al 2 de agosto de 1978 [el Fiscal Miró Carrión] fue llamado por el Lcdo. Colton para que participase como fiscal *adicional* en la

investigación . . . . (Énfasis suplido.) Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, págs. 6–32.

Con nombramiento reciente de Fiscal Auxiliar en Humacao, comenzando el mismo 2 de agosto, fue

. . . transferido a la División de Investigación y Procesamiento Criminal del Departamento de Justicia a partir de esa fecha y su *primera gestión* bajo el cargo de Fiscal Auxiliar del Tribunal Superior vino a ser su intervención en la investigación de los sucesos del Cerro Maravilla desde el primer día de su traslado de Humacao al Departamento de Justicia en San Juan.

Antes de iniciar su investigación al Lcdo. Miró *no le fue entregado ni él examinó ningún documento o prueba que se hubiera levantado relacionada con los sucesos del Cerro Maravilla que le permitiera conocer el trasfondo del caso a investigar. [É]l conocía únicamente de las informaciones periodísticas hasta esa fecha publicadas. Tampoco él efectuó ningún tipo de examen de documento o prueba alguna que le pusiese en condiciones de poder iniciar una investigación efectiva. [Ni a]ntes de realizar su primera* gestión en dicha investigación ni durante el tiempo que intervino en la misma *examinó las fotografías de los cadáveres ni los protocolos de las autopsias de Darío Rosado y Soto Arriví. Conocía [lo] que la prensa publicaba de las manifestaciones de Ortiz Molina sobre que a él le habían agredido y que los jóvenes que le secuestraron habían quedado vivos al él abandonar el lugar de los hechos. [É]l no* procuró examinar las declaraciones juradas que al inicio de su gestión había prestado Ortiz Molina ni la que había prestado el agente encubierto González Malavé, no obstante que él conocía de su participación directa en los hechos. *CONOCÍA TAMBIÉN QUE LA PRENSA TAMBIÉN MENCIONABA QUE LA AUTOPSIA DE SOTO ARRIVÍ DEMOSTRABA ABRASIONES EN SU ROSTRO, EVIDENCIADO EN LAS FOTOGRAFÍAS DE LOS CADÁVERES.* (Exh. 9 FEI, págs. 102–105, 108 y 117).

Sin tener la preparación del conocimiento previo de ese trasfondo, el Lcdo. Miró se trasladó el mismo día en que le fue hecha la encomienda al *Cerro Maravilla con los agentes que proveyó el Cuartel General de la Policía como que fueron los participantes en los sucesos que culminó en las muertes de Darío Rosado y Soto Arriví.* Estos fueron los agentes José Ríos Polanco, William Colón Berríos, Luis Reverón Martínez, Juan Bruno González y Rafael Torres Marrero. Se reunió con estas personas en unión al Teniente

*Jaime Quiles* y en compañía de los *Lcdos. Colton y Brunet, el Lcdo. William Rodríguez Suárez y el agente del NIE José Romo Matienzo en el Cerro Maravilla cerca del mediodía de ese día.* Esos agentes conjuntamente con el Teniente Quiles, y en presencia de las restantes personas mencionadas procedieron a *recrear o simular* la escena de lo que a juicio de ellos ocurrió en el Cerro Maravilla poco después del mediodía del 25 de julio de 1978. A pesar que el Lcdo. Miró consideraba que Ortiz Molina constituía un testigo "importantísimo" por tratarse de una persona que "estaba en . . . el meollo del incidente" (Exh. 28 FEI, pág. 38), [é]ste *no procuró su intervención* en esta "recreación" de la escena de los hechos. Los cinco agentes recrearon la escena en *forma conjunta* ocupando las posiciones de los participantes, incluyendo la de Ortiz Molina y el agente encubierto; *a la vez que ofrecían en forma conjunta su versión de los hechos.* Todo esto tuvo lugar en el sitio de los hechos, fuera de la estructura o edificación de Rikavisión y en presencia de los Lcdos. *Colton, Miró y Brunet,* del Lcdo. Rodríguez Suárez y del agente Romo Matienzo.

Una vez conclu[i]da esa tarea de recreación de la escena el Lcdo. Colton pidió del técnico de transmisión de Rikavisión, Modesto Delgado, que allí se encontraba, que le permitiese entrar a la estructura para llevar *a cabo la prestación de las declaraciones juradas ante el Lcdo. Miró.* En esa primera instancia Delgado se negó explicando que había recibido instrucciones de la "gerencia" de Rikavisión para no dejar entrar a nadie. El Lcdo. Colton, allí con los agentes policíacos y el resto del grupo mencionado, le respondió: "Ave María . . . después que le hemos defendido esto aquí ustedes se van a portar de esa manera". Delgado se comunicó inmediatamente con uno de los funcionarios de la gerencia en San Juan, quien le indicó que usara su criterio, les dejase entrar, *anotando sus nombres,* aunque sin permitir la toma de fotografías dentro de la estructura. Delgado accedió a dejarles entrar bajo la instrucción expresada. El grupo de personas que componían los agentes entraron a dicha edificación proveyéndoseles un espacio para que el *Lcdo. Miró pudiese llevar a cabo la toma de las declaraciones juradas.* Mientras prestaban declaración jurada individualmente el resto del grupo permaneció separado *dentro* de la estructura a unos 23 pies, aproxim[a]damente. *Esta separación fue realmente académica o innecesaria en vista que dichos agentes ofrecieron su versión frente a los demás en forma conjunta en la recreación de la escena unos minutos antes; además, las declaraciones juradas que luego prestaron consistieron en vaciar lo que afuera de la estruc-*

*tura habían expuesto como parte de la simulación de la escena expresada.* (Exh. 11 FEI, pág. 93).

En la recreación de la escena descrita la versión de los agentes policíacos discrepaba en *dos extremos importantes* con la descripción de los hechos que el 31 de julio de 1978 le había ofrecido González Malavé al *Lcdo. Brunet*, a saber: establecían que el "alto" a los jóvenes provino del agente W. Colón Berríos que se encontraba *fuera* de la planta de Rikavisión; *no contemplaban la posibilidad que hubiese algún agente en el interior de las facilidades*, situándose ellos —Colón Berríos, Torres Marrero, Reverón Martínez y Bruno González— en un lugar escondidos *fuera* de la planta de Rikavisión como los únicos agentes que esperaban e hicieron frente a los que llegaron con el rehén. *Aun examinada aisladamente la declaración jurada prestada por Ríos Polanco que se encontraba dentro de la estructura con Marte Ruiz, no existe la posibilidad que [é]ste se encontrara en el patio de Rikavisión, fuera de la estructura.* Esto es así ya que él informó en su declaración jurada de los hechos que al ocurrir las detonaciones *se encontraba observando a Marte,* sugiriendo que le fueron sorpresivos los disparos que se produjeron. De otro lado, en la versión de González Malavé al Lcdo. Brunet el 31 de julio de 1978, anteriormente expuesta, [é]ste describe que el alto se escuchó *desde la puerta de adentro de dichas facilidades; además, el hecho de haberse visto a una persona allí [a]dentro.* (Exh. 83 FEI, págs. 67–75). Esos extremos de la declaración de González Malavé al Lcdo. Brunet establecieron una *seria discrepancia* con la versión de los agentes policíacos y *la posibilidad de que la versión de dichos agentes no estuviese respondiendo a la verdad de lo ocurrido allí.* A pesar del conocimiento que tenía el *Lcdo. Brunet* que esas declaraciones *confligían* con lo que le declaró González Malavé al respecto, *no tomó ninguna acción con dichos agentes o con los demás fiscales* en la citada recreación de la escena, o en algún otro momento, con esos agentes o con los fiscales que participaban en la investigación de esos hechos, para procurar el descubrimiento de la verdad sobre los hechos bajo investigación mediante el esclarecimiento de ese conflicto en la prueba. (Exh. 83 FEI, págs. 70–75). Advino en conocimiento también durante la tarde del 2 de agosto de 1978 en el Cerro Maravilla de la *presencia de marcas de impactos en el lado interior de los tubos del portón de entrada de Rikavisión y la gran probabilidad que fueran el resultado de los disparos habidos en ese sitio el 25 de julio de 1978.* La presencia de estas huellas de impactos en el portón sugirieron fuertemente la posibilidad que se

*hubiese disparado desde el interior de las facilidades de Rikavisión.* Esta circunstancia, unida a su conocimiento previo de la versión de los hechos que le ofreciera González Malavé el 31 de julio de 1978 que señalaron la presencia de *algún agente en el interior de las facilidades al momento de los disparos,* aumentó la discrepancia habida en esa versión con la de los agentes; asimismo la posibilidad que [é]stos no estuviesen ofreciendo una versión verídica de lo ocurrido. *No obstante, no hizo gestión alguna para resolver esa grave discrepancia.*

20) En la versión de los agentes policíacos [é]stos se ubican a sí mismos como los *únicos participantes* de dichos hechos, estando ocultos en un lugar fuera de Rikavisión en dirección al frente del vehículo que llegó con el rehén. Informaron encontrarse juntos Colón Berríos y Torres Marrero portando rifle AR-15 y revólver Magnum 357, respectivamente, y Bruno González con Reverón Martínez en otro lugar muy cerca. Declaran que al llegar el vehículo con el rehén, estacionarse frente a los portones y bajarse del mismo los tres jóvenes, Colón Berríos les dio un alto [y se] identificó como policía, respondiendo Soto Arriví con disparo, tirándose los agentes al suelo y contestando con múltiples disparos que ocasionaron la muerte de Darío Rosado; resultando heridos Soto Arriví y el agente encubierto, quienes fueron conducidos al hospital, llegando muerto el primero. Según esa versión, el único otro agente, Ríos Polanco, se mantuvo dentro de la edificación con Marte Ruiz durante el tiroteo.

La toma de las declaraciones juradas expresadas demoró el espacio comprendido de 12:30 a 1:00 P.M. Al salir el grupo de dicha estructura y en los momentos en que se retiraban, estando el grupo de las personas mencionadas frente al portón de salida, Delgado llamó la atención de Colton de los dos impactos en los tubos del portón de entrada, indicativos [de] que se había disparado desde adentro, inquiriéndole expresamente que si deseaba que los "tapara". El Lcdo. Colton respondió al efecto que eso carecía de importancia. Nunca hubo reacción alguna por parte de los Lcdos. Brunet y Miró presentes acerca de esta observación y comentario de Delgado.

21) El 8 de agosto de 1978 se requirió la presencia del [p]olicía Jesús Quiñones en el Cuartel General de la Policía en San Juan, conduciéndole al mismo en dicha fecha su supervisor, el Sargento Santos del Cuartel de la Policía de Villalba. Fue informado por dicho supervisor que un alto oficial en el Cuartel General de la Policía de apellido González interesaba verle. En el Cuartel se le condujo realmente ante el Comandante Pérez Casillas quien le interrogó

acerca de su conocimiento de los sucesos del Cerro Maravilla. El resultado del diálogo con Pérez Casillas no le inspiró confianza a Quiñones y el mismo no tuvo ningún resultado.

Posteriormente —el 10 de agosto de 1978— recibió una llamada telefónica en su hogar de parte del Lcdo. Miró. El Lcdo. Miró le expresó que meditara la situación de los policías que participaron en los sucesos del Cerro Maravilla que produjo la muerte de los jóvenes Darío Rosado y Soto Arriví; le requirió para que prestase declaración jurada de su conocimiento sobre esos hechos. No fue posible que lo hiciera en vista de la intervención quirúrgica a que sería sometido para la extracción de un quiste sebáceo en su espalda, como en efecto lo fue en esa misma fecha ante el Dr. Freddie A. Nazario, lic. 4306, de Ponce. (Exh. 5 Miró). Tampoco respondió al Lcdo. Miró en llamarle en otra fecha para ese propósito después que concluyera dicha intervención quirúrgica.

A requerimiento posterior Quiñones compareció la mañana del 17 de agosto de 1978 ante el Lcdo. Colton en la División de Investigación y Procesamiento Criminal del Departamento de Justicia en San Juan. A esta fecha el Fiscal Nigaglioni nunca le había citado ni compareció ante él en forma alguna. En esta oficina se encontraban presentes los Lcdos. Colton, Figueroa y William Rodríguez Suárez, el agente del Negociado de Investigaciones Especiales (NIE) José Romo Matienzo y el agente policíaco Julio César Andrades. Inicialmente Quiñones objetó por incorrecta la forma en que se le tomaba declaración jurada en relación a su conocimiento de los sucesos del Cerro Maravilla, ante la presencia de varias personas. *Se le explicó por el Lcdo. Colton que era necesario saber primeramente su conocimiento sobre los hechos para luego proseguir con la declaración jurada.* Por tanto, se continuó en la forma de entrevista. Entre *varios incidentes* surgidos en esta comparecencia, Quiñones aclaró que había presentado recientemente su renuncia a la Policía de *Puerto Rico* por lo cual su comparecencia *no era hecha en su carácter de policía. El Lcdo. Colton le hizo comentarios al efecto que personas con su preparación podían estar trabajando con él por un sueldo mucho mayor [(]durante los 13 años que había servido en la Policía, Quiñones tenía completado su Bachillerato en Ciencias con concentración en biología de Educación Secundaria y un Grado Asociado en Artes con concentración en Criminología de la Universidad Interamericana[)]. El Lcdo. Colton requirió en ese momento una solicitud de empleo, la que fue extendida por el Lcdo. Rodríguez Suárez al Lcdo. Figueroa y por*

éste a Quiñones, quien la rechazó indicando que había comparecido a prestar una declaración jurada.

La entrevista prosiguió sin obstáculo hasta *un punto* en que *Quiñones se refirió al hecho de haber escuchado dos ráfagas de disparos de armas de fuego*. Aquí surgió una *discrepancia entre el Lcdo. Colton y él acerca de su certeza o la veracidad* con que él hacía esta afirmación, insistiendo Quiñones en que había *escuchado dos ráfagas de disparos provenientes de las facilidades de Rikavisión*. Esa discrepancia *no* permitió proseguir la entrevista y la situación *llegó al extremo que el Lcdo. Colton dio instrucciones para que se le condujese a la oficina del NIE, lo que hizo Rodríguez Suárez enseguida.*

La Oficina del NIE se encontraba en *otra edificación* bastante separada de la Oficina del Lcdo. Colton de la División de Investigaciones y Procesamiento [C]riminal. Esta última estaba localizada frente a la YMCA y aqu[é]lla dentro del casco del Viejo San Juan al lado del antiguo edificio Intendente Ramírez. En la oficina del NIE, Quiñones fue interrogado adicionalmente por el Lcdo. Rodríguez Suárez. Se pospuso ese interrogatorio durante la hora de almuerzo. Rodríguez Suárez le llevó a almorzar a un restaurante en el Viejo San Juan de nombre Palm Beach. Durante la tarde se prosiguió el interrogatorio e inició luego la toma de su declaración jurada en la oficina del NIE por el *Lcdo. Figueroa,* con la intervención como mecanógrafa de Carmen Aledo, secretaria de dicha oficina, esposa entonces del agente del NIE José Romo Matienzo, quien al igual que el Lcdo. Rodríguez Suárez *entraban esporádicamente* a la oficina del Lcdo. Figueroa donde se desarrollaba el interrogatorio.

De la misma manera que lo ocurrido durante la mañana, la declaración jurada de Quiñones se desarrolló sin aparente dificultad hasta su *testimonio de haber escuchado dos series o ráfagas de disparos separadas. El tono y el ambiente del interrogatorio comenzó entonces a variar y el Lcdo. Figueroa a tornarse molesto con ademanes de disgusto en su rostro y la elevación del tono de su voz.* Primeramente el Lcdo. Figueroa *reaccionó* expresando a Quiñones que *él no podía afirmar* con certeza que fueran armas de fuego las que escuchara en la segunda ráfaga de disparos, lo que negó Quiñones, reafirmando su certeza de lo que declaraba. *Surgió una polémica entre estas personas.* El testigo comenzó a sentirse mal y solicitó permiso para ir al servicio sanitario; al *reiniciar la declaración ocurrió lo mismo. Mientras el Lcdo. Figueroa dictaba a la secretaria para que [anotase] que Quiñones no podía decir con certeza que fueran armas de fuego las que escuchó en la segunda*

46

detonación, [é]ste insistía que había escuchado 4 [ó] 5 disparos en esa segunda ráfaga provenientes de las facilidades de Rikavisión. Esta situación se *prolongó por bastante tiempo* hasta que el Lcdo. Figueroa, en *tono molesto*, expresó a Quiñones, "Haga lo que le dé la gana, that's your business", a la vez que "tiró los papeles". *Quiñones entonces reclamó que se le estaba presionando y que había comparecido a declarar lo que sabía. Siguió sintiéndose mal, comenzó a sudar y a sentir opresión y dolor en el pecho "como una especie de ardor" y a faltarle el aire*. Pidió que se le permitiese llamar por teléfono a su residencia en Ponce, a lo que se accedió. En este momento llegó el *Lcdo. Colton* a esa oficina y *preguntó a Quiñones cómo se sentía, respondiendo [é]ste que se sentía mal* y explicándole, "quieren que diga cosas que no he dicho" y añadió *su deseo de retirarse de ese lugar. El Lcdo. Colton respondió en la negativa y le expresó, "Nos estás haciendo perder el tiempo"*. El Lcdo. Rodríguez Suárez también le expresó que no se podía ir. Quiñones logró comunicarse con su esposa en Ponce y le explicó lo que le estaba sucediendo. Era alrededor de las *7:00 P.M.* Como resultado de esa llamada su esposa Betzaida Velázquez pudo hablar con Romo Matienzo a quien le requirió que debían llevarlo a un hospital. Se esperó a una subsiguiente llamada que haría ella para indicar el hospital que interesaba se le llevase, lo que hizo luego sugiriendo que fuera llevado a la Clínica Pavía de Santurce.

Por efecto de esa llamada la esposa de Quiñones localizó también al Lcdo. Miguel Alvarado Santos ante quien Quiñones había comparecido el día anterior para que le asesorara legalmente y le acompañara a la cita en la División de Investigación y Procesamiento Criminal. [É]l tenía otro compromiso y no le fue posible acompañarle, sin embargo, respondió al requerimiento de la llamada telefónica de la esposa de Quiñones y se comunicó con la oficina del NIE donde se encontraba éste, *requiriendo garantías para que su cliente estuviese en Ponce dentro de una hora y media.* Luego recibió una comunicación de la oficina del NIE que le solicitaba la ampliación del tiempo por él requerido para que Quiñones pudiese retornar a Ponce. El Lcdo. Alvardo advirtió que se movería a la residencia de Quiñones en espera de su llegada.

Quiñones fue llevado de la oficina de Figueroa a la sala de emergencia del Hospital Pavía a eso de las 8:30 P.M. Proseguían los síntomas de dolor en el pecho y sudoración fría. Se le tomó la presión e indicaba 150/90; la temperatura estaba normal. Se le aconsejó hospitalización para la toma de un electrocardiograma pero Quiñones insistió en su interés en regresar a Ponce esa noche.

Fue dado de alta a las 10:35 P.M., previa la firma de un documento de relevo de responsabilidad requerido por las autoridades del hospital. Toda vez que se le había administrado un medicamento que no hacía aconsejable que condujese vehículos de motor, el Lcdo. Rodríguez Suárez pudo convencerle de llevarle hasta Ponce él conduciendo su vehículo; Romo Matienzo les siguió hasta Ponce para regresar a San Juan con el Lcdo. Rodríguez Suárez. Arribaron a la residencia de Quiñones en Ponce cerca de la medianoche de ese 17 de agosto. El Lcdo. Alvarado Santos se encontraba presente a su llegada.

22) *Hasta el momento en que quedó interrumpida la declaración jurada que prestaba Jesús Quiñones el 17 de agosto, Carmen Aledo había transcrito a maquinilla ["dos o tres"] páginas de dicha declaración que venía prestando bajo juramento Quiñones. Ella hizo entrega de las mismas al Lcdo. Figueroa ese día. El Lcdo. Figueroa las destruyó a pesar de constarle que consignaban lo que bajo juramento había declarado hasta ese momento Jesús Quiñones.* (Exh. 12 FEI, Pág[s]. 177[–179]).

23) A eso de las 7:00 A.M. del sábado *26 de agosto de 1978* los *Lcdos. Colton y Figueroa,* en unión a la empleada del NIE Teresita García, viajaron en helicóptero desde San Juan hasta el Aeropuerto Mercedita de Ponce donde le esperaban el Lcdo. William Rodríguez Suárez y el agente José Romo Matienzo, quienes se trasladarían conjuntamente hasta la residencia de Jesús Quiñones en la Urb. Glenview Gardens de Ponce. Teresita García era secretaria del NIE, aunque no lo era del Lcdo. Colton ni del Lcdo. Figueroa. (La prueba tampoco demuestra que lo fuera del Lcdo. Rodríguez Suárez ni de Romo Matienzo[.)] El propósito de ese viaje era tomarle otra declaración jurada a Jesús Quiñones.

Este grupo de personas llegó a la residencia de Quiñones a eso de las 8:00 A.M. de ese día, hora en que [é]ste y su esposa no se habían aún levantado de la cama. Residían en esa propiedad en unión a sus tres hijas de 6, 12 y 14 años de edad entonces. *Esa visita no le había sido previamente avisada a los esposos Quiñones[,] por lo que resultó inesperada y sorpresiva. Al llegar allí se desarrolló un argumento entre el Lcdo. Colton y Quiñones.* Al Quiñones invitarles a entrar, junto a ellos en el portón de entrada de la residencia, *el Lcdo. Colton le respondió que no entraría "si te pones como te pusistes allá",* refiriéndose a la situación de discrepancia surgida el 17 de agosto en las oficinas de la División de Investigación y Procesamiento Criminal y del NIE. *Añadió, "t[ú] estás buscando que te meta una obstrucción a la justicia o un desacato".* Quiñones

les respondió: "Uds. no quieren aceptar lo que estoy diciendo". *En estas circunstancias Quiñones se sintió molesto porque veía que estaba ocurriendo en su propia casa una situación similar a lo ocurrido en esas oficinas el 17 de agosto. El Lcdo. Colton insistió* en el argumento expresándole "Mira lo que dice aquí", a la vez que le señalaba hacia unos papeles que llevaba en los que sostenía expresaban lo que Ortiz Molina le había dicho cuando se encontraban solos en la torre de la Policía el 25 de julio de 1978. Quiñones indicó entonces que llamaría a su abogado, lo que trató sin poder localizarlo. A su regreso al portón su esposa ya había salido de su habitación y atendía a esas personas. Prevalecía la situación. Su esposa les expresó "Ya él fue allá a decirles la verdad y ustedes no quieren aceptar". Finalmente, la intervención de ella permitió que el grupo de personas entrara. *El [impasse] fue resuelto cuando la esposa de Quiñones le indicó a [é]ste que como ellos eran representantes de la ley les dejase pasar y que declarase lo que ellos le pedían para que pudieran irse. Ella realmente sintió miedo por su esposo y sus hijas y por ello instó a que les dejase entrar. Contrario a sus deseos, Quiñones accedió a la petición de su esposa.*

Teresita García se había mantenido en el vehículo en espera que concluyese la argumentación y decidiese si podían entrar a la casa. Al decidirse, entró con una maquinilla manual portátil de su propiedad particular que llevó allí para transcribir la declaración. Ella colocó la maquinilla en la mesa del comedor y el Lcdo. [Figueroa] procedió a tomarle la declaración jurada a Quiñones. *[É]ste había percibido las dos ráfaga de disparos: estaba absolutamente seguro que la primera ráfaga de disparos provenía de la torre de Rikavisión ya que los escuchó cuando estaba trepado en lo alto de la torre de la Policía mirando hacia esas facilidades en que sucedían los disparos.* La segunda ráfaga de disparos él la escuchó estando abajo con Ort[i]z Molina y aunque podía razonablemente decir que provenían de la torre de Rikavisión, no podía verificarlo con exactitud; tan categóricamente o con la absoluta certeza de la primera ráfaga de detonaciones ya que no podía dirigir la vista de la misma manera. Dentro de esta percepción, a la pregunta que se le hizo en esta declaración de "[c]uántas series de disparos provenientes de la torre de Rikavisión, Canal 7 (usted) escuch[ó]?", Quiñones respondió, "[u]na serie". (Exh. 59 FEI).

24) En subsiguientes investigaciones realizadas de los sucesos del Cerro Maravilla el *Lcdo. Miró prestó declaraciones . . . falsas o que no responden a la verdad de sus actuaciones o su conocimiento, a saber:*

A. El Lcdo. Miró tenía conocimiento de la presencia del Teniente Quiles en el Cerro Maravilla el 2 de agosto de·1978 según así lo declaró . . . en declaración jurada el 13 de enero de 1983 ante el Lcdo. Agustín Mangual Hernández, investigador designado por el Departamento de Justicia para investigar los funcionarios y exfuncionarios que participaron en la investigación de los sucesos del Cerro Maravilla así como en sus declaraciones del 29 de junio de 1983 y 2 de mayo de 1984 ante la Comisión de lo Jurídico del Senado de Puerto Rico que llevó a cabo la investigación de esos sucesos. (Exh. 9 FEI, pág. 96; Exh. 11 FEI, págs. 80, 93 y 94)[.] Sin embargo, en la declaración jurada que prestara el 5 de diciembre de 1980 ante el Lcdo. Villanueva designado fiscal investigador de los sucesos del Cerro Maravilla, luego que se le preguntara si conocía al Teniente Quiles y haber respondido en la afirmativa se le preguntó adicionalmente si recordaba haberlo visto el 2 de agosto en el sitio de los hechos, a lo que éste respondió: "Negativo. No lo v[i]". La siguiente pregunta fue: "Dígame[, ¿]cu[á]ndo fue que usted lo vio?", respondiendo "Lo v[i] por primera vez en una V.P. de hechos ocurridos en la Universidad de Puerto Rico y en la casa del Hon. ex-gobernador de Puerto Rico Luis Muñoz Marín." (Exh. 27 FEI, pág. 3).

B. Las declaraciones juradas de los cinco agentes de la Policía fueron tomadas por el Lcdo. Miró *dentro de la estructura* de Rikavisión el 2 de agosto de 1978 y en *notas taquigráficas* por la secretaria Ana Celia Cintrón Lema. En su comparecencia a la Comisión de lo Jurídico del Senado el 29 de junio de 1983 y a preguntas del Lcdo. Rivera Cruz[,] él declaró bajo juramento que dichas declaraciones fueron tomadas a *maquinilla*. (Exh. 9 FEI, págs. 102–105).

Al día siguiente de haber prestado la citada declaración ante la Comisión de lo Jurídico del Senado[,] el Lcdo. Miró llamó por vía telefónica a Ana Celia Cintrón Lema a la oficina de la Fiscalía de Arecibo donde [é]sta se desempeñaba; hizo referencia a su comparecencia el día anterior ante dicha comisión y de haber declarado que las declaraciones juradas prestadas por los cinco agentes el 2 de agosto de 1978 en la estructura de Rikavisión fueron tomadas a maquinilla. Le expuso, "A lo mejor a t[i] te van a citar; para que digas que fuimos con maquinilla". Ana Celia Cintrón Lema respondió que no podía complacerlo ya .que esas declaraciones fueron tomadas con signos taquigráficos. *El Lcdo. Miró insistió en que lo hiciera para que las cosas pudieran "cuadrar". Hubo nueva negativa de parte de ella. Varios días después Ana Celia Cintrón*

*Lema informó de lo sucedido acerca de esa llamada telefónica al Lcdo. Brunet y a instancia de [é]ste ella prestó una declaración jurada ante el Fiscal Félix Daniel Torres consignando lo ocurrido.*

En una declaración jurada prestada posteriormente ante el Lcdo. Rivera Cruz del 3 de noviembre de 1983, el Lcdo. Miró expuso que de la contestación que le diera Ana Celia Cintrón Lema él aclaró una duda que tenía bajo la cual entendía que las declaraciones juradas prestadas por los cinco agentes fueron tomadas a maquinilla. (Exh. 40 F[EI], pág. 5).

C. El Lcdo. Miró declaró bajo juramento ante la Comisión de lo Jurídico del Senado en su testimonio del 29 de junio de 1983 *que los Lcdos. Colton y Brunet se encontraban fuera de la estructura de Rikavisión mientras se llevaba a cabo el interrogatorio de los cinco agentes policíacos* —(Exh. 9 F[EI], pág. 100 y 102; Exh. [2]8 FEI, pág[.] 18; Exh. 11 FEI, págs. 85–86)— cuando lo cierto fue que mientras se interrogaba a dichos agentes en la prestación de sus declaraciones juradas, *los Lcdos. Colton y Brunet esta[ba]n dentro de esa estructura.*

D. Como parte de la labor investigativa expresada que realizaba el Lcdo. Miró, [é]ste compareció a Jayuya el 10 de agosto de 1978 a tomarle una declaración jurada al Dr. José Ramos Rivera quien intervino en el recibo del cadáver de Carlos Soto Arriví el 25 de julio de 1978. En su testimonio bajo juramento ante la Comisión de lo Jurídico del Senado y a preguntas del Senador Rolando Silva el 29 de junio de 1983, el Lcdo. Miró relacionó como sigue parte del testimonio que según él prestara el Dr. José Ramos Rivera en la declaración jurada que le tomara el 10 de agosto de 1978 en el Cuartel de la Policía de Jayuya:

> "LCDO. MIRO: Le pregunté también, si esta persona presentaba golpes externos que se pudieran notar. Me dijo que no, que aquellos golpes que representa una persona cuando se hiere con un arma de fuego o cuando se da una caída, algo así por el estilo, pero golpes que se vieran que fueran causados por otro instrumento o con el puño o con, no, no tuvo esa evidencia . . . [.]
>
> HON. SILVA: O sea, el doctor en Jayuya, claramente le dice a usted que el cadáver que [é]l examina no tiene golpes contundentes.
>
> LCDO. MIRO: Eso es así." (Exh. 9 F[EI], págs. 137 y 138)[.]

En otro extremo de la declaración jurada indicada expresó el Lcdo. Miró a preguntas del Senador Santiago:

"Le hice la pregunta de si estas personas tenían algún otro golpe externo que se pudiera notar, y me dijo que aquello que normal y corriente, que una persona cuando le hacen unos disparos, pues, el golpe que puede recibir al caer y esa[s] cosas, pero golpes contundentes que no fueran como consecuencia de los disparos, me dijo que no tenía ninguno." (Exh. 9 FEI, pág. 160)[.]

Sin embargo, en relación a lo. anterior, *la única pregunta que realmente le formulara* el Lcdo. Miró al Dr. Ramos Rivera en la declaración que [é]ste le prestara en Jayuya el 10 de agosto de 1978 sobre la posible causa que originó las contusiones y laceraciones que presentaba el cadáver de Soto Arriví, tuvo una respuesta que no responde a la que diera ante la Comisión de lo Jurídico según se ha expuesto. Véase, la pregunta y respuesta que aparece de la declaración del Dr. Ramos Rivera, a la página 2, pregunta número cinco, en orden descendente [(]Exh. 71 FEI, pág. 2):

"P– Testigo con la experiencia que usted tiene como médico le pregunto si las marcas que tenía en la frente, las contusiones y laceraciones, podían haber sido causadas al esta persona caer de frente o que se la causara alguna otra persona con algún cuerpo extraño como un zapato[,] una bota o la culata de un arma.

R– Esta pregunta tiene que ser contestada por un anatomapatólogo[.]"

25) Para tomarle .la indicada declaración jurada al Dr. Ramos Rivera en Jayuya el 10 de agosto de 1978 el Lcdo. Miró se trasladó desde San Juan a ese lugar en un vehículo oficial de la Policía de Puerto Rico, conducido por un agente de la Policía. Allí el Lcdo. Miró requirió del Dr. Ramos Rivera que en vista que no existía espacio disponible en dicho hospital, le acompañase al Cuartel de la Policía para tomarle declaración jurada. El citado galeno accedió y se trasladó con el Lcdo. Miró a pi[e] al Cuartel de la Policía a unos 4 minutos de distancia del hospital. Mientras se le tom[ó] dicha declaración s[ó]lo se encontraban en ese lugar el Dr. Ramos Rivera, una empleada del Cuartel de la Policía que sirvió de mecanógrafa y el Lcdo. Miró que interrogaba; con la excepción del agente que le condujo a Jayuya que entraba y salía al salón en que se tomaba la declaración, sin que interviniese oralmente con la misma.

26) La semana siguiente al 2 de agosto de 1978 el Lcdo. Miró fue informado por el Fiscal Nigaglioni que Julio Ortiz Molina se encontraba en vías de radicar una demanda contra el [E]stado por

52

los hechos ocurridos en el Cerro Maravilla. En vista de ello él consideró llamar al Lcdo. Colton para que le diese instrucciones al respecto, lo cual hizo informándole de esta situación. Al [responderle el Lcdo. Colton] "no lo toques", decidió no entrevistarle ni tomarle declaración jurada a Julio Ortiz Molina. (Exh. 11 FEI, págs. 49–52). Esto fue así, no obstante que el Lcdo. Miró conocía que Ortiz Molina era un testigo de suma importancia en la investigación que realizaba. (Exh. 28 FEI, pág. 38).

27) Miguel Marte Ruiz prestó una declaración jurada ante el Fiscal Nigaglioni el 26 de julio de 1978 acerca de su conocimiento sobre los sucesos del 25 de julio de 1978 en el Cerro Maravilla. En adelante él prestó otras declaraciones juradas en varios foros, incluyendo sus testimonios ante la Comisión de lo Jurídico del Senado en 1983. *Durante todo ese tiempo él ha estado bajo la vigilancia y el control de la División de Inteligencia de la Policía de Ponce en relación a sus distintas comparecencias y testimonios.* De acuerdo con instrucciones de dicha división, particularmente del Teniente Roberto Santiago Cartagena que la ha dirigido, *Marte Ruiz ha venido obligado a mantener informado a la misma de sus declaraciones en los distintos foros.* Ha tenido que comparecer a informar verbalmente a ese efecto en cada ocasión que ha declarado, comunicándose para ello con el Teniente Santiago Cartagena y el agente Nazario Mateo Espada. As[i]mismo siempre que ha tenido que comparecer a prestar declaraciones ha sido transportado y acompañado por distintos agentes de la División de Inteligencia de la Policía de Ponce.

El 3 de agosto de 1978, *el Lcdo. Figueroa expidió una citación* dirigida a Marte requiriéndole su comparecencia ante él, a las 5:00 P.M. de ese mismo día, *en la oficina del Fiscal Colton* de la División de Investigación y Procedimiento Criminal localizada en la Parada 1, frente a la YMCA en San Juan. Esa citación le fue notificada personal[m]ente esa mañana a Marte Ruiz a través del agente de la División de Inteligencia de Ponce Félix Santiago. Este agente condujo a Marte desde Ponce hasta la oficina del Lcdo. Colton en San Juan en la mañana del 3 de agosto. Le expresó que aunque la citación era para las 5:00 de la tarde, él debía comparecer a entregar cierta evidencia a la oficina del Negociado de Investigaciones Especiales por lo que aprovecharía para conducirle durante la mañana y así adelantar su comparecencia a la oficina del Lcdo. Colton.

Luego que el agente Santiago entregase dicha evidencia en el Negociado de Investigaciones Especiales, *condujo esa mañana a*

*Marte Ruiz a la oficina del Lcdo. Colton. En esta oficina se*
*encontraban únicamente el Lcdo. Colton y otro fiscal cuya identi-*
*dad no puede recordar con precisión Marte.* Sin embargo, su
fisonomía, según descrita por él, descarta que lo fuera el Lcdo. Miró.
Estaba presente, además, la taquígrafa Ana Celia Cintrón Lema.

(En la evaluación de esta parte de la prueba el Comisionado ha
examinado con sumo detenimiento toda la evidencia relacionada,
que comprende el testimonio en sala de Marte, el de Ana Celia
Cintrón Lema y de otros testigos así como la prueba documental
admitida en evidencia de alguna manera asociada a este extremo.
En varias partes de su testimonio Marte se refirió a ese otro fiscal
como el Lcdo. Figueroa, querellado en este caso, sin ocultar su
inseguridad acerca de su recuerdo preciso de su cara. Al final de su
testimonio, sin evidencia de otro efecto o ánimo que su falta de
precisar ese recuerdo, llanamente expresó al Comisionado que tenía
dudas que ese otro fiscal que acompañara en esa oficina al Lcdo.
Colton lo fuera el Lcdo. Figueroa. No obstante, durante su testi-
monio aseguró, sin duda alguna, que con ese otro fiscal *actuaba el*
*Lcdo. Colton.* De otro lado, Ana Celia Cintrón Lema, independien-
temente de haber expresado en su testimonio en sala no recordar
algunos extremos relevantes de esta parte de la prueba, aseguró su
recuerdo de haber visto a Marte con el Lcdo. Colton en una
entrevista en la oficina de [é]ste [(]la prueba no demostró que Marte
acudiese en alguna otra ocasión a dicha oficina o a cualquier otra
dependencia en el Departamento de Justicia alrededor de esa
fecha[)]. Anotamos que la evidencia recibida, cuyas conclusiones
relacionadas completaremos más adelante, *nos ha producido la*
*certeza y la convicción que el Lcdo. Colton era uno de los dos*
*fiscales que se encontraba e intervino en dicha oficina en el*
*interrogatorio a Marte.* Igual seguridad tenemos que no fue el
*Lcdo. Miró* quien intervino con el Lcdo. Colton en ese interrogato-
rio y declaración, a pesar que su nombre aparece como el fiscal ante
quien, con fecha *4 de agosto de 1978,* Marte prestó la declaración
jurada que se produjo en esa ocasión. (Exh. 46 FEI). De otro lado,
la duda finalmente expresada por el propio Marte, *no nos permite*
*concluir que el Lcdo. Figueroa fuera el otro fiscal que acompañó al*
*Lcdo. Colton en esa gestión*[.)]

*En dicha oficina el 3 de agosto de 1978 Marte fue objeto de un*
*interrogatorio producto de la intervención de ambos fiscales ya*
*expresados. El mismo se desarrolló en forma tal que las distintas*
*respuestas que ofrecía Marte a las preguntas que le formulaba el*
*fiscal que acompañaba al Lcdo. Colton eran varias veces cuestio-*

54

nadas por ambos fiscales, quienes luego de consultar entre sí dictaban a la taquígrafa las respuestas, haciendo prevalecer sus criterios o conclusiones por sobre lo que consistían las respuestas dadas por Marte. La forma del interrogatorio siguió como patrón la instrucción a la taquígrafa para que se "aguantara" cuando la respuesta era cuestionada; ella esperaba mientras el Lcdo. Colton y el otro fiscal conversaban entre sí y luego le dictaban lo que pasaba a ser la respuesta de aquellos puntos del interrogatorio que eran cuestionados. Por ejemplo, en una ocasión Marte les declaró haber escuchado dos ráfagas de disparos en el Cerro Maravilla y el Lcdo. Colton le replicó, "No, eso no puede ser, fue s[ó]lo un[a]"; as[i]mismo al preguntársele que si hubiese habido más de un tiroteo lo hubiese escuchado, respondió en la afirmativa. Esta respuesta fue alterada a insistencia del Lcdo. Colton quien determinaba "si se copiaba o no", es decir, si debía o no formar parte de la declaración. Al preguntársele si vio que se agrediera a alguien, declaró haber visto a una persona flaca y alta patear el cadáver, a lo que el Lcdo. Colton replicó que esto perjudicaba a la Policía de Puerto Rico. Igualmente, el Lcdo. Colton le quiso hacer ver que era un agente la persona joven que había identificado allí como llorando y siendo golpeado. Otra forma utilizada por el Lcdo. Colton para cuestionar las respuestas que ofrecía el testigo consistió en rechazarlas por considerarlas "muy fuertes" y que les afectaba a todos.

En otro incidente surgido en esa comparecencia de Marte a dicha oficina, [é]ste comunicó al Lcdo. Colton del acercamiento que le hiciera en Ponce un representante de la Unión laboral UTIER para entrevistarle sobre su conocimiento de los sucesos del Cerro Maravilla. El Lcdo. Colton le respondió indicándole que le informara quién era esa persona "para ponerlo fuera de circulación". A Marte esta afirmación le preocupó e infundió temor por su propia vida y la de sus familiares.

28) (Estrechamente vinculada a la parte de la prueba anteriormente reseñada en la que determinamos que no fue el Lcdo. Miró el otro fiscal que intervino en unión al Lcdo. Colton en el interrogatorio a Marte el 3 de agosto de 1978, se encuentra aquella otra por la que debemos determinar qué participación, si alguna, como cuestión de hecho, es atribuible al Lcdo. Miró en la toma de la declaración jurada a Marte en esa ocasión en vista de lo que informa el Exhibit 46 del FEI consistente de una transcripción de las notas taquigráficas de la declaración jurada que prestara en la misma Marte, fechada 4 de agosto de 1978 y bajo el encabezamiento

*del Fiscal Miró.* Para la evaluación de este extremo de la prueba hemos atendido, en adición a la prueba ya señalada en la conclusión precedente, la que resulta de la prueba documental que se expondrá en adelante como parte integrante de la conclusión a la que llegaremos.)

Ana Celia Cintrón Lema, conocida comúnmente por "Toñita" entre sus compañeros de trabajo, es una empleada de 24 años de servici[o] en el [G]obierno de Puerto Rico. Para la fecha de los sucesos del Cerro Maravilla se desempeñaba como secretaria del Lcdo. Brunet en el Departamento de Justicia. Su nombre aparece como la transcriptora de catorce de las diecis[é]is declaraciones juradas que se informan como tomadas por el Lcdo. Miró, a saber: las prestadas el 2 de agosto de 1978 en las facilidades de Rikavisión en el Cerro Maravilla por los agentes José Ríos Polanco, Rafael Torres Marrero, Juan Bruno González, Luis Reverón Martínez y William Colón Berríos (Exh. 31 FEI); la declaración de Miguel Marte Ruiz que es objeto de nuestro actual examen y que aparece como prestada ante el Lcdo. Miró con fecha 4 de agosto de 1978 (Exh. 46 FEI); las que se informan como prestadas el 7 de agosto de 1978 por los agentes Carmelo Cruz, Rafael Moreno, Eugene Ríos Santiago, [Á]ngel Luis Pérez Casillas y Miguel Cartagena Flores (Exh. 18 FEI); las de Emilio Rodríguez Esteban y Tomás de Jesús Mangual del 8 de agosto de 1978 (Exh. 80 FEI) y finalmente la del agente Carlos Rivera Falú del 16 de agosto de 1978 (Exh. 85 FEI). Ana Celia Cintrón Lema no intervino como taquígrafa en las dos restantes declaraciones que se informan prestadas ante el Lcdo. Miró del Dr. José Ramos Rivera y el agente Franciso Santiago Guzmán del 10 y 14 de agosto de 1978, respectivamente (Exh. 71 y 84 FEI).

De las 16 declaraciones juradas anteriormente relacionadas que aparecen prestadas ante el Lcdo. Miró, *en la que se refiere a la prestada por Marte Ruiz ante él con fecha 4 de agosto de 1978 (Exh. 46 FEI) [é]ste no tuvo ninguna intervención ya que la misma fue realmente prestada ante el Lcdo. Colton* y otro fiscal el día anterior en su oficina de la División de Investigación y Procesamiento Criminal en la forma descrita. Con relación a esta declaración jurada el *Lcdo. Colton instruyó específicamente a Ana Celia Cintrón Lema para que en su certificación de la transcripción de sus notas taquigráficas de la misma no lo incluyese a él como que la estaba tomando o fuera prestada ante él.* Según el testimonio de Ana Celia Cintrón Lema en sala, la siguiente fue la instrucción que recibió literalmente del Lcdo. Colton: "Toñita, cuando vayas a

transcribir no pongas mi nombre ahí". El documento que consigna dicha declaración jurada no aparece firmado por el testigo declarante, por los fiscales que intervinieron en la misma ni por el Lcdo. Miró[,] y esa instrucción del Lcdo. Colton se refirió a que ella excluyese su nombre del encabezamiento ("heading") del documento, de modo que el mismo no demostrara que la declaración fuera prestada ante él. Dicha taquígrafa procedió a actuar según la instrucción dada.

(Hubo por parte de Ana Celia Cintrón Lema en su testimonio en sala un manifiesto y evidente ánimo y propósito de no expresar al Comisionado el resultado de su mejor recuerdo sobre los demás pormenores relacionados con la citada instrucción que recibiera del L[c]do. Colton para que su nombre no apareciese en el documento. Actuó de manera similar a como lo hizo en relación a los pormenores del interrogatorio a Marte cuando se presentó la prueba para identificar la persona del otro fiscal que actuó conjuntamente con el Lcdo. Colton. En este incidente que ahora tratamos, ella insistentemente afirmó no recordar en relación a para cuál de las declaraciones tuvo lugar la instrucción del Lcdo. Colton ya expuesta; limitándose a mantener su afirmación de haber ocurrido en relación a una en las que ella participó que aparece como prestada ante el Lcdo. Miró. *Admitió su preferencia de que se produzca en este caso un fallo favorable a los querellados por razones de amistad y camaradería en relación a ellos.* Fue confrontada por el FEI para que catalogase esa actuación del Lcdo. Colton en comparación con la de la llamada telefónica a ella del Lcdo. Miró para que ajustase su testimonio ante la Comisión de l[o] Jurídico informando que las declaraciones tomadas en las facilidades de Rikavisión fueron transcritas a maquinilla en lugar de mediante notas taquigráficas. Primeramente expresó que no veía en la actuación del Lcdo. Miró una petición para que mintiera, sino que la interpretó como una ayuda que él le pedía. *A insistencia del FEI admitió que con su actuación expresada el Lcdo. Miró le estaba pidiendo que mintiese*; sin embargo, se mantuvo en su estimación de que no era el requerimiento para la expresión de una mentira lo que estuvo comprendido en la instrucción del Lcdo. Colton ya expresada[.)]

(El FEI recabó en esta testigo para que .hiciese un esfuerzo y precisase a cuál de las declaraciones se refirió el Lcdo. Colton en dicho requerimiento. Ante la insistente afirmación de que no recordaba, el Fiscal volvió a insistir trayendo a la atención de la testigo una relación detallada de cada una de las declaraciones juradas que aparecen como prestadas ante el Lcdo. Miró en relación

a los sucesos del Cerro Maravilla y en las que ella fue transcriptora. En una manifiesta y clara actitud de *falta de cooperación* en lo que se le requería, dicha testigo *repitió en forma contínua y poco usual la ausencia de su recuerdo al punto de adelantarse en su respuesta a la pregunta que se le formulaba sin evidencia de reflexión de clase alguna o de una buena actitud o ánimo de efectuar un esfuerzo mínimo para traer a su memoria el hecho sobre el que se le interrogaba. A juicio del Comisionado Especial, puso de manifiesto su esfuerzo para no recordar*[.)]

(La prueba demostró las gestiones independientes para localizar en el Departamento de Justicia la libreta utilizada por Ana Celia Cintrón Lema en la transcripción de sus notas taquigráficas de la referida entrevista o interrogatorio a Marte Ruiz. La respuesta del Lcdo. Pierre Vivoni, Jefe Interino de la División de Investigación y Procesamiento Criminal del Departamento de Justicia al Lcdo. Héctor Rivera Cruz del 15 de noviembre de 1983 se refiere a la búsqueda hecha por dicha división para localizar las libretas de taquigrafía relacionadas con el caso del Cerro Maravilla con relación a la taquígrafa Ana Celia Cintrón Lema. Esa búsqueda comprendió el antiguo edificio de la División Criminal (como comúnmente se le conoce) y dos almacenes que tiene el Departamento de Justicia en Buchanan. Informó el Lcdo. Vivoni que como resultado de esa gestión no se encontró "libreta alguna" de las "libretas de taquigrafía relacionadas con el caso del Cerro Maravilla, con relación a la taquígrafa Celia Cintrón". (Exh. 14 FEI).[)]

(Durante su intervención en la investigación de los sucesos del Cerro Maravilla el *Lcdo. Miró no vio otras declaraciones que las que él tomó*; ya se hubiesen tomado antes o después del 2 de agosto de 1978 (Exh. 9 FEI, págs[.] 177[-]118). Igualmente durante su investigación él nunca vio fotografías de los cadáveres de los jóvenes que murieron en el Cerro Maravilla ni foto otra alguna relacionada con los hechos de esas muertes, con la sola excepción de unas fotos que le mostró el reportero del periódico El Vocero, Tomás de Jesús Mangual, de Julio Ortiz Molina y su vehículo el 14 de agosto de 1978. (Exh. 27 FEI, pág. 4; Exh. [11] FEI, pág[s]. 109[-110]). En contraste con esto, aparece de la declaración jurada como prestada por Marte el 4 de agosto de 1978 ante el *Lcdo. Miró* (Exh. 46 FEI), que el interrogatorio incluyó la presentación a él una copia de la declaración jurada que prestara el 26 de julio de 1978 ante el Fiscal Nigaglioni; as[i]mismo la referencia a porciones específicas de dicha declaración. El referido interrogatorio a Marte también comprendió la presentación a éste de una *foto de uno de los cadáveres*

[(]presuntivamente, el de Arnaldo Darío Rosado en vista que se refiere a la *máscara con éste*[)]. Por tanto, no pudo ser el Lcdo. Miró el fiscal que intervino en la declaración jurada prestada por Marte el 3 de agosto de 1978 ya que no habiendo él visto la declaración jurada que [é]ste prestara ante el Fiscal Nigaglioni el 26 de julio de 1978 ni foto alguna de los cadáveres de Darío Rosado y Soto Arriví, no fue él, como no pudo serlo, quien le mostró a Marte copia de la declaración ante el Fiscal Nigaglioni ni le refirió porciones de la misma; ni quien le mostró una foto de uno de los cadáveres, condiciones de hecho que acompañan el acto de la declaración prestada por Marte, expresada. En estas circunstancias la sola indicación de su nombre en el encabezamiento del documento que la consigna, (Exh. 46 FEI) única prueba de que la misma fuera prestada ante él, es insuficiente para que concluyamos que dicha declaración se prestó ante el Lcdo. Miró[.)]

(En adición, en la evaluación de este extremo de la prueba, de la totalidad de las declaraciones juradas que aparecen tomadas por el Lcdo. Miró, es preciso excluir las cinco que fueran prestadas en las facilidades de Rikavisión en el Cerro Maravilla que fueron indiscutiblemente tomadas ante él[;] as[i]mismo las prestadas por el Dr. José Ramos Rivera en Jayuya y el agente Francisco Santiago Guzmán en las que no intervino como transcriptora Ana Celia Cintrón Lema, recipiente de la instrucción dada por el Lcdo. Colton. La prueba no demuestra que exista en las siete restantes declaraciones la indicación de algún hecho o factor que sugiera que alguna de ellas pudo ser objeto del requerimiento o instrucción indicada del Lcdo. Colton a Ana Celia Cintrón Lema[.)]

29) En la visita que hicieran los fiscales, agentes de NIE y agentes policíacos al Cerro Maravilla el 2 de agosto de 1978, José Romo Matienzo tomó alrededor de 200 fotografías de distintos lugares de las facilidades de Rikavisión y su área adyacente. Las tomó a requerimiento de su supervisor inmediato el Lcdo. Rodríguez Suárez, mediante consulta con éste o bajo su entera discreción. El Lcdo. Rodríguez Suárez fue informado ese día por el Técnico de Rikavisión Modesto Delgado de varias huellas o marcas de impactos que recibiera el vehículo Volkswagen propiedad de dicha empresa que se encontraba estacionado en el patio de la misma, en la parte interior del portón o la verja, durante el tiroteo del 25 de julio de 1978. As[i]mismo, le llamó la atención de las marcas o huellas de impactos en los tubos del portón de la entrada, el cual se encontraba cerrado en el momento del tiroteo. Le informó la circunstancia de que esas marcas no se encontraban con anterio-

ridad a dichos sucesos sino que surgieron después del tiroteo. La forma de las mismas y los puntos o lugares en que se encontraban señalaron con fuerte probabilidad que fueron el producto de impactos de bala del tiroteo ocurrido allí el 25 de julio de 1978 de disparos provenientes de la parte interior de las facilidades de Rikavisión, o sea, del patio o del interior de la edificación. De conformidad con esa información y la instrucción del Lcdo. Rodríguez Suárez para que retratase esos objetos, Romo Matienzo tomó fotografías tanto del vehículo Volkswagen como de los tubos del portón donde aparecían a simple vista huellas compatibles con impactos de bala. (Exhs. 33 y 34 FEI).

Los Lcdos. Miró y Brunet encontraron el 2 de agosto de 1978 en el piso frente al portón de Rikavisión, cuatro casquillos de pistola entregados por este último al Lcdo. Rodríguez Suárez para que [é]ste procediese de conformidad con la investigación realizándose. (Exh. 27 FEI, pág. 3). Al lado de los portones se encontró también en esa fecha un casquillo de revólver calibre 38. Además, el Lcdo. Rodríguez Suárez recibió en el curso de su investigación, de Marte Ruiz de 12 a 15 casquillos de armas largas que encontrara dentro de la verja o [d]el patio de Rikavisión y en otros lugares de esas facilidades. El Lcdo. Rodríguez Suárez levantó como evidencia adicional de la investigación otra prueba recibida del agente de la División de Inteligencia de Ponce Félix Santiago Guzmán: varias pertenencias de los jóvenes muertos en el Cerro Maravilla, unas botas de Darío Rosado, una máscara, un pantalón ensangrentado con marcas de sucio en las rodillas con evidencia de arena y tierra, ropa interior y los zapatos (tenis) de Soto Arriví.

Como parte de su función de estar a cargo de la acumulación de la evidencia el Lcdo. Rodríguez Suárez y el agente Romo Matienzo *pusieron en conocimiento de la prueba recibida y acumulada al Lcdo. Figueroa, quien como Director del Negociado de Investigaciones Especiales le correspondía ordenar los análisis de la evidencia. Al Lcdo. Colton le correspondía lo propio por la División de Investigación y Procesamiento Criminal.* El Lcdo. Rodríguez Suárez y el agente Romo Matienzo tenían experiencia en el campo de la investigación criminal. El Lcdo. Rodríguez Suárez venía de la antigua División de Investigaciones Especiales que suplantó el NIE; era ya abogado admitido a la práctica. Romo Matienzo tenía cuatro años de experiencia en la investigación criminal; había estado en el ejército de los Estados Unidos de Norteam[é]rica y participado en seminario del Servicio Secreto en E.U. A la fecha de la vista de este proceso era ya abogado admitido

a la práctica, carrera que completara para la fecha de los hechos de este caso. *Ambos funcionarios informaron al Lcdo. Figueroa del resultado de la prueba acumulada en su intervención de la investigación para que ordenase los análisis corre[s]pondientes.* A ese efecto le mostraron de la misma, entre otras, la prueba de las fotografías indicando los impactos en el vehículo Volkswagen y en el portón de entrada de Rikavisión. Le expresaron además la información recibida del técnico Modesto Delgado al efecto de que esas marcas de impactos no estaban presentes en el vehículo Volkswagen ni en el portón de entrada de Rikavisión *con anterioridad* al tiroteo habido en dichas facilidades el 25 de julio de 1978, *sino que se observaron por primera vez después del mismo.* Junto con esta prueba estaba *ante el conocimiento del Lcdo. Figueroa* la prueba de los casquillos de bala encontrados en el interior de la verja o el portón de entrada de Rikavisión. Toda esa prueba, particularmente por las circunstancias de la posición que se encontraba el Volkswagen, el lugar de las marcas de los impactos y la naturaleza de [é]stos tanto en el vehículo como en los tubos del portón, el momento en que aparecieron esas marcas, el lugar en que aparecieron los casquillos de armas largas, unido a la prueba que ya se tenía de los impactos de bala recibidos por el vehículo de Ortiz Molina en el tiroteo, *tendía a señalar de haberse disparado desde [a]dentro del portón de Rikavisión, ya fuera del patio o del interior de la edificación.* Sin embargo, el *Lcdo. Figueroa* consideró innecesario someterla a análisis bajo el fundamento de que no podía determinarse que esos impactos ocurrieran en el momento de los hechos. Por esta razón no se realizó análisis de tipo alguno en relación a las marcas o huellas de impactos en el Volkswagen ni en los portones. Tampoco aparece que sustentara esa razón para no realizarlos.

La realización de los análisis o las pruebas de balística necesarios para determinar la presencia de huellas de impactos de bala en dicho vehículo y portón y en el caso de haberse hecho esta comprobación, la determinación de la dirección o procedencia de los disparos de las armas y posiblemente de los agentes que los efectuaron, *hubiese con gran probabilidad producido una nueva versión de la manera como ocurrieron los hechos que produjeron las muertes de los jóvenes Darío Rosado y Soto Arriví en el Cerro Maravilla el 25 de julio de 1978*; versión que hubiese desvirtuado aquella de los agentes policíacos consignada en las declaraciones juradas de cinco de ellos prestadas el 2 de agosto de 1978 ante el Lcdo. Miró y que descartaba absolutamente que se disparara desde

el interior de los portones, o la verja de Rikavisión o siquiera que hubiese habido algún agente apostado en dicho interior. *Todo este efecto hubiese también representado la necesidad de investigar con una mayor consideración y profundidad la versión de aquellos testigos presenciales de esos hechos que sostenían el haber tenido lugar la detención de los jóvenes después de una primera ráfaga de disparos, su agresión, la presencia de una segunda ráfaga de disparos vinculada a sus muertes y la agresión a uno de los cadáveres.* La realización de esas pruebas constituía un aspecto de gran importancia en la investigación de dichos sucesos y con la omisión de llevarla a cabo dejó de resolverse una parte relevante de la investigación que se conducía.

Tampoco se efectuó análisis de clase alguna al casquillo de revólver calibre 38 hallado al lado de los portones. Por dicho medio hubiese sido posible hacer la importante determinación de a cuál de las armas de las que portaban los agentes que intervinieron en el operativo del Cerro Maravilla, correspondía el mismo. El Lcdo. Colton, por su parte, expresó acerca de la falta de ordenar el análisis de dicho casquillo: "Es posible que se me haya pasado eso", a preguntas del Lcdo. Rivera Cruz en su comparecencia bajo juramento ante la Comisión de lo Jurídico del Senado el 16 de junio de 1983. (Exh. 65 FEI, págs. 150[–]151). Igualmente, no fueron sometidos a análisis de laboratorio el pantalón de uno de los jóvenes muertos que se recibiese lleno de sangre y sucio a nivel de las rodillas con evidencia de arena y tierra; la máscara, las botas de Darío Rosado, la ropa interior y los zapatos ("tenis") de Soto Arriví.

*Al no someterse a análisis de laboratorio la máscara, no fue posible determinar la presencia de sangre en la misma, a pesar de la extremada importancia que esa información hubiese aportado a la investigación de esos sucesos en vista de la versión expuesta de los agentes policíacos de que Darío Rosado llevaba puesta dicha máscara en el momento del tiroteo al caer muerto. Debido a la estrecha relación entre la condición en que se observó el rostro del cadáver de Darío Rosado, que demostraba la presencia de gran profusión de sangre, y las versiones de los testigos presenciales de los hechos de la existencia de la agresión física por parte de los agentes a los jóvenes mientras estaban detenidos y posteriormente a los cadáveres, la ausencia de sangre en dicha máscara pudo representar un hecho incompatible con la versión de los agentes policíacos de cómo ocurrió esa muerte.* Este dato hubiese significado un *cambio fundamental* en el curso de dicha investigación y posiblemente desvirtuado la versión de los agentes policíacos acerca

de la forma en que ocurrió la muerte de Darío Rosado, que contempló muy probablemente la impregnación de sangre a la máscara al momento de ocasionarse la muerte. *Por tanto, al suprimirse la realización de dicho análisis dejó de efectuarse la búsqueda de un ángulo de vital importancia de dicha investigación.*

*Los Lcdos. Colton y Figueroa advinieron también en conocimiento de las marcas o huellas de impactos en la parte lateral izquierda del vehículo público de Julio Ortiz Molina como resultado del tiroteo.* En vista de la posición en que se encontraba ese vehículo en relación a los portones, el patio y la edificación de Rikavisión al momento de ocurrir el mismo, el análisis de dichos impactos hubiese tenido en relación a la investigación que se realizaba similares efectos a los de los casos anteriormente mencionados de las huellas o marcas en el vehículo Volkswagen y en los tubos del portón de entrada, o sea, presentaba la probabilidad de que se hubiese disparado desde el interior de Rikavisión, hecho absolutamente incompatible con la versión de los cinco agentes policíacos de cómo sucedió dicho incidente. *A pesar de ese conocimiento, los Lcdos. Colton y Figueroa optaron por no gestionar la recuperaci[ó]n de dicho vehículo para llevar a cabo los análisis correspondientes del mismo que determinaría posiblemente la dirección y procedencia de los impactos de bala, el tipo de arma utilizado en relación a esos impactos y los agentes que efectuaron los disparos que los ocasionaron.* El Lcdo. Figueroa descansó su decisión de no llevar a cabo esa gestión en que habiéndose entregado el vehículo a Ortiz Molina él entendía que no era "idóneo" recuperarlo para la realización de dichos análisis; adujo además la hostilidad demostrada por Ortiz Molina y que la determinación a hacerse iba a depender de testimonios y fotografías. (Exh. 6 Figueroa, págs. [147–148]; Exh. 12 FEI, pág. 135). El Lcdo. Colton, por su parte, fundamentó su decisión de no ordenar dicho vehículo a análisis en que la evidencia indicaba que no se había disparado desde el interior de Rikavisión —para esto se descansó esencialmente en la declaración de Marte Ruiz— as[i]mismo, en su opinión que de alguien haber disparado desde el interior, "hubieran acribillado a ese carro de arriba a abajo". (Exh. 65 FEI, pág. 14[5]).

30) *En su investigación practicada de los sucesos del Cerro Maravilla los Lcdos. Colton, Figueroa y Villanueva tuvieron conocimiento de prueba suficiente para profundizar en la misma la posibilidad de que los jóvenes Darío Rosado y Soto Arriví fueran detenidos, desarmados y agredidos físicamente por los*

*agentes policíacos que intervinieron en la ráfaga de disparos o tiroteo que se inició a su llegada a las facilidades de Rikavisión a eso de las 12:30 P.M. del 25 de julio de 1978; tuvieron conocimiento, además, de prueba suficiente para profundizar en dicha investigación la posibilidad adicional que se produjera luego una segunda ráfaga de disparos que les ocasionara la muerte mientras se encontraban detenidos y finalmente que se agrediera físicamente el cadáver de uno de esos jóvenes. Sin embargo, omitieron considerar esa prueba y profundizar su investigación y as[i]mismo consignarla en sus informes rendidos*:

El Lcdo. Colton tuvo conocimiento *directo* de la posibilidad que dichos jóvenes fuer[o]n detenidos y posteriormente agredidos y que se produjera una segunda ráfaga de disparos vinculada a sus muertes, a través de los testimonios de *Ortiz Molina* en la ocasión de la declaración jurada prestada por [é]ste ante el Fiscal Nigaglioni el 31 de julio de 1978 en la cual intervino el Lcdo. Colton; de *Marte Ruiz* en su testimonio de la entrevista de la declaración jurada prestada el 3 de agosto de 1978 en la que también interviniera. *Tuvo información de ambos aspectos* por efecto de la declaración de *Ortiz Molina* ante el Lcdo. Julio Alvarado Ginorio del 28 de julio de 1978 (Exh. 7 FEI). Independientemente, *advino en conocimiento* de la existencia de una segunda ráfaga de disparos de lo que le testificó el [p]olicía Quiñones en la *ocasión de su declaración* del 17 de agosto de 1978 ante el Lcdo. Figueroa, en cuyo interrogatorio el Lcdo. Colton también participó. De la declaración prestada por *Marte Ruiz el 3 de agosto de 1978* el Lcdo. Colton también conoció la versión de [é]ste de haber visto patear el cadáver de uno de los jóvenes. *En adición a la citada prueba testifical, la prueba de las fotos de los cadáveres de dichos jóvenes (Exh. 32(a), (b) y (c) y 70(a) y (b) FEI) le ofrecieron similar información de posibles agresiones físicas a esos jóvenes.*

El Lcdo. Figueroa por su parte *tuvo conocimiento* como parte de la preparación del informe que rindiera conjuntamente con el Lcdo. Colton de la declaración de Ortiz Molina ante el Lcdo. Alvarado Ginorio del 28 de julio de 1978 acerca de la detención de los jóvenes y su posible agresión así como de la posible existencia de una segunda ráfaga de disparos. *Como parte de la preparación del informe de la investigación rendido tuvo también conocimiento de las fotos de los cadáveres y de la posible agresión a dichos jóvenes mientras se encontraban detenidos.* Por efecto de la intervención en las declaraciones juradas mencionadas que prestara Jesús Quiñones

los días 17 y 26 de agosto de 1978, también conoció de la *posibilidad* de una segunda ráfaga de disparos.

En adición, los Lcdos. Colton y Figueroa *conocieron* versiones que establecen la presencia de una segunda ráfaga de disparos a través de los testimonios de Nelson Rivera Torres y Norma I[.] Cintrón de Rivera según las declaraciones prestadas por ellos el 23 de agosto de 1978 ante el Lcdo. William Rodríguez Suárez (Exh. 29(c) y (b) Figueroa[, respectivamente]). Las declaraciones de estas dos personas *no* hacen mención alguna a la ráfaga prolongada y de muchos disparos que surge del contexto general de las declaraciones juradas de los cinco agentes policíacos que declararon haber participado en el tiroteo. (Del contexto general de las declaraciones juradas de los agentes que participaron en el tiroteo surge la ocurrencia de muchos disparos: Ríos Polanco informa haber escuchado alrededor de 20 disparos; los otros se refieren a un "intercambio de disparos" y "tiroteo"[.)] (Exh. 31(a), (b), (c), (d) y (e)). Los esposos Rivera se refieren al hecho de haber escuchado únicamente de cuatro a cinco disparos entre 12:30 a 1:00 P.M. el 25 de julio de 1978 cerca de las facilidades de Rikavisión. Ellos expresaron haber escuchado un grupo de disparos que resulta *compatible únicamente* con la descripción de Ortiz Molina, Jesús Quiñones y Marte Ruiz de la segunda ráfaga de disparos. En vista que de sus declaraciones no surge dato alguno que sugiera razonablemente que de haber existido alguna otra ráfaga de disparos, Nelson Rivera Torres y Norma I. Cintrón de Rivera o alguno de ellos individualmente, la hubiese e[s]cuchado porque se encontraban alrededor de ese lugar cerca de esa hora o por alguna otra razón, sus versiones de haber escuchado cuatro a cinco detonaciones únicamente *representó para los Lcdos. Colton y Figueroa la corroboración a la posible existencia de una segunda ráfaga de disparos . en armonía con las versiones de Ortiz Molina, Quiñones y Marte Ruiz.*

El Lcdo. Villanueva por su parte *recibió información* de la *posible existencia de agresión física* a los jóvenes mientras estaban detenidos a través de lo declarado bajo juramento por Ort[i]z Molina ante él el 21 de octubre de 1980 (Exh. 13 FEI). *Recibió también información* de la posibilidad que ocurriera esa agresión por medio de los testimonios ante él de Jes[ú]s Quiñones del 21 de noviembre de 1980 (Exh. 60 FEI) y Julio César Andrades del 23 de octubre de 1980 (Exh. 23 FEI). As[í]mismo del examen de la declaración de Ortiz Molina ante el Lcdo. Alvarado Ginorio del 28 de julio de 1978 y por la *información de laceraciones y abrasiones compatibles con el recibo de golpes contundentes que surge de las*

*fotos de los cadáveres de Darío Rosado y Soto Arriví (Exh. 32(a),
(b) y (c) y 70(a) y (b) FEI); estas fotos le·brindaron conocimiento
adicional al Lcdo. Villanueva de la posible agresión a los cadáveres
de los jóvenes.*

De la posibilidad que hubiese ocurrido una *segunda ráfaga* de
disparos el Lcdo. Villanueva *vino en conocimiento* por lo declarado
ante él por Ortiz Molina el 21 de octubre de 1980 (Exh. 13 FEI),
Jesús Quiñones el 21 de noviembre de 1980 (Exh. 60 FEI), Julio
César Andrades el 23 de octubre de 1980 (Exh. 23 FEI[)], Adolfo
Flores el 15 de diciembre de 1980 (Exh. 41 FEI) e Ismael Ruiz
Vázquez el 23 de octubre de 1980 (Exh. 62 FEI). El Lcdo.
Villanueva *tuvo además conocimiento* que indicaba la posibilidad
que hubiese ocurrido una *segunda ráfaga* de disparos en el Cerro
Maravilla por vía de la declaración de Ortiz Molina el 28 de julio de
1978 ante el Lcdo. Alvarado Ginorio (Exh. 7 FEI) y las de los
esposos Nelson Rivera Torres y Norma I. Cintrón de Torres ante el
Lcdo. William Rodríguez Suárez el 23 de agosto de 1978 como se ha
explicado (Exh. 29(b) y (c) Figueroa).

31) (Al evaluar la prueba relacionada con la actuación del Lcdo.
Miró para resolver si [é]sta describe, como cuestión de hecho, la
conducta que imputa uno de los cargos contra él sobre la manera
como se alega tomó las declaraciones juradas a los agentes policía-
cos Cartagena Flores, Ríos Santiago, Pérez Casillas y Moreno
Morales el 7 de agosto de 1978, o si describe otro tipo de actuación,
*hemos considerado las circunstancias de otros hechos prevalecien-
tes al momento que esas declaraciones fueron prestadas*: A esa
*fecha estaba cuestionada* la actuación de los agentes que participa-
ron en el Cerro Maravilla el 25 de julio, a tenor con la declaración
de Ortiz Molina que señaló la detención de los jóvenes, la agresión
a [é]stos, y la existencia de una segunda ráfaga de disparos
vinculada a sus muertes y que uno de los jóvenes se encontraba
esposado. Había prestado declaración jurada González Malavé el 31
de julio de 1978. El Lcdo. Miró tenía pleno conocimiento de la
versión de los hechos según la expusieron otros agentes en una
recreación de escena y posterior declaración jurada ante él en el
Cerro Maravilla el 2 de agosto de 1978 y de las circunstancias ya
descritas en que se produjeron; que en su versión estos expresaron
la existencia de un solo tiroteo, y negado el hecho de la detención y
la agresión de los jóvenes con posterioridad al tiroteo. *El Lcdo.
Miró aún ignoraba, por su falta de preparación en el caso, el
contenido de las declaraciones juradas prestadas sobre esos hechos
de Ortiz Molina y González Malavé.* Dentro de este cuadro de

hechos, en la evaluación de esta prueba, hemos concentrado nuestra apreciación en la determinación de la *existencia o inexistencia de una actitud fiscalizadora por parte del Lcdo. Miró en el interrogatorio a esos agentes dirigida a procurar la espontánea expresión de [é]stos al describir sus conocimientos sobre los hechos[.)]*

En su investigación de los hechos el Lcdo. Miró tomó las declaraciones juradas a los agentes de la División de Inteligencia Rafael Moreno Morales, Eugene Ríos Santiago, Miguel Cartagena Flores y al Comandante Pérez Casillas el 7 de agosto de 1978 (Exh. 18 FEI) *demostrando gran superficialidad, insubstancialidad y descuido como medio mediante las mismas para procurar la búsqueda de la verdad acerca de cómo ocurrieron los hechos en los sucesos del Cerro Maravilla.* Esas declaraciones juradas destacan *una intervención altamente sugestiva* por parte del Lcdo. Miró, principalmente en la investigación de si tuvo lugar un solo tiroteo en el Cerro Maravilla, si los jóvenes fueron esposados y si hubo agresión contra [é]stos. Con motivo de ello hay carencia total de *espontaneidad* en esos aspectos por esos agentes; y el desarrollo de un interrogatorio, que por su elevado carácter sugestivo en dichos extremos, claramente propició mantener la versión de los hechos de aquellos otros agentes policíacos que prestaron declaraciones el 2 de agosto de 1978. (Exh. 18 FEI).

*Esta forma de interrogatorios a dichos agentes constituyó además un ejercicio casual e inconsecuente como recurso utilizado por el Lcdo. Miró en la búsqueda de la verdad acerca de lo ocurrido en el Cerro Maravilla.* Así lo demuestra lo que resultó sobre los mismos en la deposición del Lcdo. Miró ante el Fiscal Especial Independiente el 24 de febrero de 1986 (Exh[.] 10 FEI):

"LCDA. RAMOS:

P. [¿]Qué pasa con esa, compañero?

R. No me recuerdo de este señor . . . O sea, el nombre no me es, este . . . probablemente la tomé yo, mire, probablemente la tomé yo, yo no digo que ño la haya tomado, probablemente la tomé yo, pero el nombre, ese nombre, Miguel Cartagena Flores no está en mi memoria como de las personas que yo le tomé declaración jurada, probablemente la tom[é].

P. Y del contenido de la declaración, [¿]usted ha podido verificar si es un contenido que usted recuerde que alguien le declaró a usted?

R. Es que . . . *es que prácticamente el contenido de casi todas estas declaraciones más o menos tiene un . . . más o menos tienen una similitud, si usted se . . .*" (pág. 138)

"P. . . . [¿]Por qué, por qué tiene duda de si la tomó o no la tomó? R. O sea el problema de esto es que el Comandante Pérez Casillas, yo recuerdo haberlo . . . haberlo entrevistado en la División, pero que no tengo claro, claro, bien claro, si la declaración, si yo le tomé declaración el mismo día que sí que lo entrevisté o si no le tomé declaración . . . y . . . pues me lo presentaron como el Comandante Pérez Casillas; tampoco lo conocía el día que me lo presentaron . . . que fecha fue, mire, entre el 2 y el 15 de agosto, 16 de agosto." (pág. 143)

"R. Y . . . Y Rafael Moreno, menos. Es más, mire, yo le voy a decir la verdad. Rafael Moreno, si no me equivoco, éste fue el que alegó en la alegó [sic] en las vistas que era loco, qué sé yo, que estaba recibiendo tratamiento siquiátrico, no sé si es ese; si es ese, la cara de ese señor, yo que sé yo, nunca en mi vida . . . como que nunca lo había visto." (pág. 145)

"R. No, eso no lo podría decir, fíjese. A Eugene Ríos, este . . . yo después de todos estos hechos lo ví en Carolina que estaba uniformado en Carolina, pero hasta donde mi mente me . . . me . . . me es fiel, sé que hablé con él, pero no . . . no recuerdo si verdaderamente esta declaración que está aquí se la tomé yo .[. . .] O sea, no puedo dar fe de que esto es verdad, como tampoco puedo decir que es mentira." (pág. 147)

32) Los Lcdos. Colton y Figueroa concluyeron la investigación que dirigían para las oficinas públicas mencionadas de los sucesos del Cerro Maravilla mediante la rendición de un informe final del 29 de agosto de 1978 al Secretario de Justicia Miguel Giménez Muñoz (Exh. 73 FEI). En dicho informe concluyeron que Darío Rosado y Soto Arriví fallecieron a consecuencia de las heridas recibidas en el intercambio de disparos sostenido con los agentes Colón Berríos, Bruno González, Reverón Martínez y Torres Marrero al llegar al área de las facilidades de Rikavisión el 25 de julio de 1978. Concluyeron además en dicho informe que "en adición a las heridas de bala recibidas *no estaba presente ningún otro tipo de lesiones compatibles con severos traumas corporales recibidos en vida o en muerte*" (pág. 122); *que solamente hubo una serie de disparos en el Cerro Maravilla y que* "[n]o surge evidencia alguna que demuestre que a los jóvenes Arnaldo Darío Rosado y Carlos E. Soto Arriví les hubiesen maltratado o agredido físicamente" (pág. 124); bajo prueba pericial concluyeron además que el "proyectil que le causa la muerte a Carlos E. Soto Arriví fue disparado por el revólver Smith & Wesson, Magnum 357 con número de serie 56445, asignado al agente Rafael Torres" (pág. 125). Por entender que los agentes

expresados actuaron en legítima defensa de sus vidas al contestar los disparos hechos por Darío Rosado y Soto Arriví, *recomendaron en dicho informe el archivo del caso.*

El referido informe de los Lcdos. Colton y Figueroa revela *omisiones o aspectos sin aclarar o profundizar en la investigación de esos sucesos, que vistos en forma conjunta, representan el resultado de una seria deficiencia en la investigación realizada.* Por su relevancia y materialidad en relación a la búsqueda de la verdad que suponía esa investigación, el esfuerzo de ellos para realizarlos o aclararlos era *inexcusable*: la evidencia para sostener dicho informe comenzó a recopilarse, al menos, desde el 16 de agosto del 1978, fecha cuando aún no se habían practicado las segundas autopsias que fue preciso efectuar en los cadáveres de Darío Rosado y Soto Arriví y *se desconocía por tanto la causa de las muertes.* A esa fecha tampoco había prestado declaración el policía Jesús Quiñones cuyo testimonio fue indebidamente intervenido por los Lcdos. Colton y Figueroa el 17 de agosto de 1978, ni los esposos Nelson Rivera Torres y Norma Iris Cintrón de Rivera, quienes lo hicieron el 23 de agosto de 1978 ante el Lcdo. Rodríguez Suárez; el citado informe concluye la inexistencia de lesiones compatibles con severos traumas corporales recibidos por los jóvenes muertos sin que se realizara el examen *anatomopatólogo* señalado por el Dr. José Ramos Rivera en su declaración jurada prestada el 10 de agosto de 1978 en respuesta a una pregunta acerca de la causa específica de las contusiones y laceraciones en el cadáver de Soto Arriví (Exh. 71 FEI)[;] no se ocuparon ni sometieron a análisis todas las armas utilizadas por los agentes policíacos en dichos sucesos (Exh. 65, págs. 152–153)[;] no se verificó en los registros de la Policía de Puerto Rico los agentes que específicamente participaron en los mismos (Exh. 12 FEI, págs. 283–284); no se hizo conclusión alguna de la persona de los agentes participantes que ocasion[aron] la muerte a Darío Rosado (Exh. 65 FEI, pág. 154); no se determinó el arma o armas que origin[aron] las heridas recibidas por Soto Arriví en su codo, rodilla y pierna (Exh. 65 FEI, págs. 102–103); no se sometió a análisis el casquillo de revólver Smith & Wesson, calibre 38 hallado en las facilidades de Rikavisión en el Cerro Maravilla el 2 de agosto de 1978 para la determinación de por cuál arma fue disparado (Exh. 65 FEI, págs. 150–151); *los hallazgos de la autopsia a Darío Rosado indicaron que el proyectil que le ocasionó la herida en el pecho venía en dirección de arriba hacia abajo, no obstante, los agentes que intervinieron en el intercambio de disparos declararon haber disparado contra los jóvenes desde el*

*suelo.* La interrogante planteada por esta circunstancia *no fue aclarada* en el referido informe (Exh. 25, págs, [7]8 y 80[;] Exh. 65, págs. 154–159[;] Exh. 68, págs. 3 y 4 FEI). Se *omitió* realizar análisis en los tubos de los portones en relación a la posibilidad que se hubiese disparado desde el interior de la propiedad de Rikavisión; las versiones de los agentes policíacos que descartaban absolutamente que se disparase desde el interior de dicha propiedad hacía de este análisis *un asunto mandatorio* (Exh. 34(a), (b) y (c) FEI); se omitió llevar a cabo los análisis acerca de los impactos al vehículo Volkswagen estacionado dentro de la propiedad de Rikavisión así como al vehículo público de Julio Ortiz Molina sobre la posibilidad de que se disparase desde el interior de la propiedad de Rikavisión, para igual propósito. *Igualmente dejaron de analizarse pertenencias personales de los jóvenes muertos como los pantalones, uno de los cuales presentaba sucio a la altura de las rodillas, las botas, tenis y su ropa interior; no fue analizada la máscara ocupada en la persona de Darío Rosado para detectar sangre en la misma y la posible relación de esto con la evidencia de lesiones por golpes en su rostro.*

33) Para octubre de 1978 el Lcdo. Villanueva ocupaba el puesto de Fiscal Auxiliar en el Tribunal Superior de Carolina. Tenía alrededor de siete años de experiencia como Fiscal Auxiliar (Exh. 16 FEI, pág. 6). *Para esa fecha fue designado fiscal investigador por el Secretario de Justicia Miguel Giménez Muñoz para que realizase una nueva investigación de los sucesos del Cerro Maravilla. Esa investigación iría dirigida a la búsqueda de la verdad en relación a dichos hechos y se extendería a las actuaciones de los fiscales en las investigaciones ya realizadas.* (Exh. 24 FEI, pág. 1). Comenzó esa investigación alrededor del 10 de octubre de 1980 (Exh. 15 FEI, pág. 115). En la misma tomó declaraciones juradas a varias personas y consideró diversa prueba documental y material; como resultado, vino en conocimiento de hechos relevantes a la investigación. *Tuvo ante sí y examinó el expediente de la investigación previa realizada por el Negociado de Investigaciones Especiales y la División de Investigación y Procesamiento Criminal del Departamento de Justicia.* (Exh. 73 F[EI]; Exh. 16 FEI, pág. 24). Rindió el informe de su investigación el 19 de enero de 1981 (Exh. 24 FEI). *En el mismo endosó completamente el informe de los Lcdos. Colton y Figueroa del 29 de agosto de 1978 a pesar que advirtiera y comprendiera que el mismo contenía serias deficiencias por las grandes interrogantes de sus conclusiones, producto de una investigación superficial que dejó sin esclarecer muchos de sus impor-*

*tantes aspectos; y que fuera objeto de persecusión e intentos de presionarle por quienes investigaba en la Policía.*

(En adición a aquellos hechos específicos que ya hemos formulado de los cuales se desprende *la percepción* que prevalecía en el Lcdo. Villanueva para con algunos de los testigos que habían declarado ante él y de sus versiones, otras instancias de *la prueba admitida señalan su convencimiento acerca de la calidad superficial de la investigación que efectuara originalmente la División de Investigación y Procesamiento Criminal y el Negociado de Investigaciones Especiales del Departamento de Justicia.* Véase las anotaciones que de su puño y letra hizo al margen de diferentes porciones de los hechos que contienen el informe de los Lcdos. Colton y Figueroa: a las páginas 4, 14, 20, 21, 22, 25, 31 y 124 del Exh. 73 del FEI como lo apunta el Fiscal Especial Independiente a las páginas 74 y 75 de su memorial del 13 de abril de 1987 en que discute la prueba. Además los testimonios de admisiones del Lcdo. Villanueva en su comparecencia el 30 de junio de 1983 ante la Comisión de lo Jurídico del Senado en relación a su investigación, al ser interrogado por el Lcdo. Rivera Cruz como sigue:

"LCDO. RIVERA CRUZ: Y la dio por terminada. *Sin haber conclu[i]do en ello una serie de aspectos.*

LCDO. VILLANUEVA: *Definitivamente,* hay aspectos que son grandes interrogantes de la forma y manera que ocurrieron los hechos, aspectos que no se investigaron originalmente, que debieron tener una atención esmerada en el proceso investigativo y a mi entender aspectos que jamás serán esclarecidos." (Exh. 15, pág. 119).

"LCDO. RIVERA CRUZ: Licenciado Villanueva, [¿]usted está de acuerdo y le dice a esta Comisión que lo que ocurrió el 25 de julio del '78 en la investigación, en el Cerro Maravilla, en la escena y lo que ocurrió después que entran los fiscales Colton y Figueroa, todos en conjunto, usted lo entiende como una investigación superficial?

LCDO. VILLANUEVA: *Yo entiendo que sí, . . .*

LCDO. RIVERA CRUZ: Que sí.

LCDO. VILLANUEVA: *. . . debió, pudo haber sido más profunda y mucho más eficiente.*" (Exh. 15, págs. 148–149).

Véase también otro resultado de su testimonio ante dicha Comisión en esa fecha:

"LCDO. RIVERA CRUZ: Le pregunto específicamente, si usted tuvo dentro de su investigación algún tipo de presión por miembros de la Policía de Puerto Rico.

LCDO. VILLANUEVA: Algún tipo de presión, *sí sé que lo hubo* pero no tuvo éxito en mí.

LCDO. RIVERA CRUZ: [¿]De dónde de la Policía de Puerto Rico hubo presión a usted como Investigador en estos hechos?

LCDO. VILLANUEVA: Bueno, yo sé que durante ese tiempo *continuamente se me seguía . . .*

LCDO. RIVERA CRUZ: Se le seguía, se le vigilaba.

LCDO. VILLANUEVA: . . . *se me vigilaba,* yo lo sé porque yo también tenía las personas que me ayudaban a mí, que me protegían, amigos míos y en una *ocasión el teniente Quiles trató y trajo a colación en una conversación el nombre de mi hermana que es miembro del P.S.P.*"(Exh. 15 FEI, pág. 123).

34) El Lcdo. Villanueva obtuvo información relevante de las siguientes declaraciones juradas prestadas ante él. En adelante también, el resultado de su actuación luego de recibirla:

A. El 21 de octubre de 1980 le tomó declaración jurada a Ortiz Molina (Exh. 13 FEI [y] Exh. 11 Villanueva). Como parte de esa declaración Ortiz Molina le llevó al Cerro Maravilla siguiendo toda la ruta de los hechos por los que pasó, mostrándole paso por paso las cosas según su recuerdo. En la citada declaración jurada Ortiz Molina afirmó al Lcdo. Villanueva que observó a los agentes de la Policía agrediendo a los jóvenes; declaró: "le estaban pegando con los pies y con las culatas de los rifles y diciéndoles palabras obscenas . . . entonces ahí le asestaban golpes con las culatas de los rifles y patadas" (Exh. 13 FEI, pág. 6). Le ratificó además haber escuchado una segunda ráfaga de disparos. En relación a esto, al ser confrontado para que explicase lo que el Lcdo. Villanueva entendió que era una contradicción de haberle declarado al Fiscal Nigaglioni de la existencia de un solo tiroteo "[d]esde que se desmontaron las tres personas que le quitaron el carro (a usted) hasta que (usted) salió del lugar específicamente de los hechos", Ortiz Molina respondió: "al hacerme la pregunta, en el momento en que llegaba a la torre hasta que yo salí de esa torre, cuantos tiroteos hubieron yo contesté que uno, porque los segundos disparos que yo oí ya yo estaba en la otra torre. Quiero decir que al momento que yo salí oí uno el otro yo ya estaba en la otra torre". (Exh. 13 FEI, pág. 5).

Ortiz Molina expresó además al Lcdo. Villanueva al efecto de la insinuación de los fiscales Nigaglioni y *Colton* el 31 de julio de 1978 para que "no les dijera que estaban esposados o del segundo tiroteo", *mediante la amenaza de denunciarle por perjurio y con el hecho de haberse ellos molestado por haberlo dicho.* (Exh. 13 FEI, pág. 7).

Como resultado de su examen a Ortiz Molina en relación a la investigación que realizaba, *el Lcdo. Villanueva se mostraba convencido de que dicho testigo le expresaba la verdad de lo ocurrido.*

(Ante la Comisión de lo Jurídico del Senado en su testimonio bajo juramento del 7 de mayo de 1984 el Lcdo. Villanueva declaró que no le mereció crédito el testimonio de Ortiz Molina. (Exh. 16 FEI, pág[s]. 3[6 y 39]). Sin embargo, para noviembre de 1980 requirió la presencia de los periodistas del periódico The San Juan Star como parte de su investigación de esos hechos e hizo a ellos expresión al efecto que Ortiz Molina *le había dicho la verdad de que hubo dos ráfagas de disparos en el Cerro Maravilla y que él era su mejor testigo.* (Exh. [16] FEI, pág[s]. 183). Igualmente, admitió a la Comisión de lo Jurídico del Senado en su comparecencia citada del 7 de mayo de 1984 que *no veía contradicción* entre las declaraciones de Ortiz Molina del 25 de julio de 1978 y la de 28 de julio de 1978 ante el Fiscal Nigaglioni y el Lcdo. Alvarado Ginorio, respectivamente, sobre su versión de la existencia de dos ráfagas de disparos. (Exh. 16 FEI, págs. 3[6]–3[7]). *Al mismo Ortiz Molina el Lcdo. Villanueva le expresó durante el curso de su investigación su convicción que le decía la verdad.*)

A pesar que Ortiz Molina expresó al Lcdo. Villanueva de haber sido presionado por el Lcdo. Colton en la prestación de su declaración jurada el 31 de julio de 1978, [é]ste no realizó ninguna [investigación] al respecto; meramente entendió que este asunto "no merecía investigación". Por tanto, en relación al mismo, no tomó declaraciones juradas al Fiscal Nigaglioni que acompañaba al Lcdo. Colton en el momento de esa declaración; tampoco al propio Lcdo. Colton ni a la taquígrafa del Fiscal Nigaglioni que participó en la misma; ni a persona otra alguna de la Fiscalía de Ponce con el fin de determinar la validez de ese incidente y su alcance o significado en la investigación que realizaba. (Exh. 16 FEI, pág. 94).

No obstante en la rendición de su informe final de la investigación el Lcdo. Villanueva restó credibilidad a Ortiz Molina bajo el fundamento de haber recibido de él "un proyectil" de arma de fuego que [é]ste le entregara como hallado a raíz de los hechos del 25 de julio de 1978. Estimó que producir esa prueba después de dos años y casi cuatro meses y de haber declarado en varios foros sobre esos hechos, representaba "el colmo de la sorpresa". (Exh. 24 FEI, pág[s. 59–60]). En relación con esto Ortiz Molina le mencionó al Lcdo. Villanueva de "unas partículas" que encontró en el baúl de su vehículo al otro día de los hechos y que guardaba en un pote de pastillas en el espaldar de su cama. El Lcdo. Villanueva se mostró

73

muy interesado en ver esa prueba y le requirió que se las localizara; al mostrársela, el Lcdo. Villanueva la retuvo para análisis. Se trató de un pedazo de proyectil que sometió a análisis del laboratorio de la Policía. Ese análisis no relacionó ese pedazo de proyectil con los hechos bajo su investigación. El Lcdo. Villanueva sólo recibió del mismo una llamada telefónica de la persona de dicho laboratorio que le indicó que el mismo no tenía característica comparativa. *No obstante no ser esa la norma de ese procedimiento, en definitiva el Lcdo. Villanueva no verificó ese informe de laboratorio ya que nunca se lo enviaron por escrito ni lo requirió; si en efecto fue emitido, nunca lo tuvo ante sí para su examen; ni siquiera supo más el paradero de esa partícula de proyectil, que estima se quedó en el laboratorio de la Policía.* (Exh. 15 FEI, págs. 172–175).

B. En declaración jurada prestada por el agente Julio César Andrades ante el Lcdo. Villanueva el 23 de octubre de 1980, [é]ste *recibió información diversa* (Exh. 23 FEI): identificó a Ríos Polanco y Luis Reverón Martínez como miembros de la Unidad de Arrestos Especiales que dirigía y la circunstancia de haberle informado uno de estos al llegar la tarde del 25 de julio al lugar de los sucesos, el hecho de haberse agredido a los jóvenes luego de ser detenidos (pág. 37); la presencia de un agente de apellido Montañez en el grupo de personas que se encontraban en el Cerro Maravilla esa tarde (pág. 46) que fue sacado o mantenido fuera de los nombres de las personas que participaron en ese operativo para protegerlo de la represalia de grupos subversivos a petición de éste porque se consideraba que "estaba caliente" con dichos grupos (Exh. 16 FEI, pág[s]. 15[0 y] 152); la admisión que le hiciera uno de los agentes de haberle disparado a Darío Rosado con una escopeta que no estaba inscrita en la Policía de Puerto Rico, y la retención de Andrades de esta escopeta mediante su entrega a un amigo de nombre *Tomás Centeno* para que la guardase en su hogar, lo que hizo [é]ste durante seis meses (págs. 47–49); la manifestación del mismo agente de que "le zumbaron" o le dieron un escopetazo a uno de los jóvenes detenidos después de haber pedido clemencia, muriendo como consecuencia del mismo (Exh. 38 FEI, págs. 79–80); su presencia en parte del interrogatorio de que fuera objeto el [p]olicía Jesús Quiñones por el Lcdo. Colton en la oficina de [é]ste y el hecho de haber escuchado a Quiñones declarar en dich[o] interrogatorio acerca de la existencia de dos ráfagas de disparos y el rechazo del Lcdo. Colton a esa afirmación (págs. 51 y 53); la afirmación que le hiciera el Comandante Pérez Casillas en las horas de la noche del 24 de julio de 1978 en el Cerro Maravilla que a las personas que

esperaban "había que tumbarle la cabeza porque le estaban haciendo mucho daño a Puerto Rico", lo que significó que había que matarlos (Exh. 38 FEI, pág. 72).

De la declaración del agente Andrades expresada, otra prueba que llegó al conocimiento del Lcdo. Villanueva corroboró lo dicho por ese testigo. El hecho de la detención y agresión a los jóvenes así como la segunda serie de disparos pudo corroborarlo por la declaración de la percepción directa que le hiciera Ortiz Molina (Exh. 13 FEI); de la declaración que le prestara Jesús Quiñones el 21 de noviembre de 1980 de haber escuchado de Ortiz Molina sobre las agresiones a los jóvenes poco tiempo después el mismo día de los hechos (Exh. 60 FEI, pág. 15); corroboró además la declaración de Andrades sobre la entrega a un amigo de la escopeta que usara en dicho operativo el agente Reverón Martínez. Se trató de Tomás Centeno a quien el Lcdo. Villanueva le tomó declaración jurada el 30 de octubre de 1980. En dicha declaración *Tomás Centeno* informa al Lcdo. Villanueva haber recibido de Andrades para que le guardase una escopeta Remington, calibre 12, de dos cañones, la que mantuvo guardada durante seis meses aproxim[a]damente hasta que Andrades le procuró su devolución. Tomás Centeno expresó además al Lcdo. Villanueva que a la fecha de su declaración no había experimentado problemas con la justicia y que hacían más de 20 años que se encontraba autorizado a portar armas de fuego. [(Exh. 20 FEI, págs. 2–3)].

*El Lcdo. Villanueva no efectuó gestión alguna para constatar las afirmaciones relativas a la presencia del agente Montañez Ortiz en el Cerro Maravilla ni a la intervención del Lcdo. Colton con Jesús Quiñones, según las hiciera el agente Andrades.*

C. El Lcdo. Villanueva conoció que durante el tiroteo habido Marte se encontraba dentro de la edificación de Rikavisión; también, a través de la declaración jurada que le prestara el 31 de octubre de 1980, el hecho de haber escuchado una sola ronda de disparos de la siguiente manera: "Solamente oí una ronda de disparos, después de ver montar al señor mayor en el carro, no oí ninguna otra serie de disparos. Ahora debo informar que adentro de la casa de los trasmisores de donde yo hacía mi trabajo en Rikavisión hay unos abanicos o 'blowers' que hacen mucho ruido y que son los que extraen el aire caliente de los transmisores hacia afuera[."] (Exh. 47 FEI, pág. 3, segundo párrafo). Sabido lo anterior y que el obstáculo del ruido debió serlo razonablemente igual para cuando Marte escuchó la sola ronda de disparos expresada, su declaración no constituyó una negativa incondicional o que no dejara

de sugerir la posibilidad que ocurriera una segunda ráfaga de disparos. A pesar de ello, no investigó la misma más a fondo.

En otras partes de su declaración Marte informó al Lcdo. Villanueva de los impactos que recibiera el vehículo Volkswagen y los impactos de disparos en el tubo del medio horizontal de cada hoja del portón de entrada de Rikavisión (Exh. 47 FEI, pág.4). El Lcdo. Villanueva *estuvo consciente* [de] que la presencia de esas marcas de impactos en dicho vehículo y portón constituían prueba de que probablemente se disparó desde el interior de Rikavisión. Sin embargo, no llevó a cabo ninguna otra acción para dejar aclarada esta parte de la prueba, con excepción de haber obtenido y requerido para análisis los tubos del portón, *sin resultado conocido que aclarara esa interrogante.* (Exh. 16 FEI, pág. [1]60; Exh. 38 FEI, pág. 20[8]).

En otra parte del testimonio de Marte al Lcdo. Villanueva le expresó que el agente Torres Marrero se *encontraba con él dentro de la estructura de Rikavisión con un arma larga* en el momento de la llegada del vehículo con el rehén; y de la salida hacia afuera del agente Torres Marrero apenas minuto a minuto y medio antes de iniciarse el tiroteo.

De acuerdo con los testimonios de los indicados agentes que informaron ser los únicos participantes del tiroteo iniciado a la llegada del vehículo con el rehén, el *agente Torres Marrero se encontraba fuera de las facilidades de Rikavisión abajo en el camino en unión a Colón Berríos, portando un revólver Magnum 357. Esta situación planteó una seria contradicción en la prueba. El Lcdo. Villanueva no efectuó intento para aclararla o resolverla.* De haberlo hecho posiblemente se hubiese corroborado o desvirtuado la versión de dichos agentes policíacos que descartaban absolutamente la presencia en ese momento del agente Torres Marrero portando un arma larga en el interior de los terrenos de Rikavisión. La aclaración de este punto a su vez hubiese posiblemente sostenido o exclu[i]do el que se disparara desde el interior de dichas facilidades, otr[a] de l[a]s interrogantes presentes en la investigación que se realizaba; *lo que también representaba el crédito o el descrédito de la versión de los referidos agentes policíacos que descartaban absolutamente que se disparara desde el interior de las facilidades de Rikavisión.* El Lcdo. Villanueva tampoco investigó para aclarar el paradero del rifle que de conformidad con la declaración a él de Marte portaba el agente Torres Marrero. (En el examen de la prueba para llegar a la conclusión de este hecho, no hemos desatendido la explicación o justificación de su

omisión que ofreció el Lcdo. Villanueva ante el Lcdo. Héctor Rivera Cruz en su testimonio bajo juramento ante la Comisión de lo Jurídico del Senado del 5 de junio de 1983 (Exh. 38 FEI) al ser confrontado por dicho letrado. En la misma el Lcdo. Villanueva explicó que allí llegaron dos carros sospechosos (incluyendo el vehículo público de Ortiz Molina) en claro intento de sugerir que el agente Torres Marrero posiblemente saliera mucho antes de la estructura en la ocasión de la llegada de un primer carro sospechoso. Explicó también que no había un dato clave por el cual pudiera indicarse el tiempo transcurrido desde que Torres Marrero salió de la estructura hasta que se inició el tiroteo. *Sin embargo, este análisis o racionalización no aparece expuesto en su informe rendido el 19 de enero de 1981* (Exh. 24 FEI). Independientemente, Torres Marrero salió de la estructura con un arma larga al llegar el vehículo público que traía de rehén a Ortiz Molina y no otro vehículo, iniciándose el tiroteo dentro de un espacio de tiempo de un minuto a minuto y medio después de haber salido. En estas circunstancias era altamente cuestionable ubicar al agente Torres Marrero en unión al agente Colón Berríos *fuera de las facilidades abajo en el camino con un revólver Magnum 357.* Otra explicación o justificación de su omisión consistió en haberle reconocido entero crédito a la declaración que le prestara Marte. Pero esta mantiene el interrogante expresado que resulta por el conflicto de esta prueba que ubica al agente Torres Marrero *en forma irreconciliable en dos lugares distintos, portando armas diferentes*[.)]

D. Por medio de la declaración jurada que le prestara Jesús Quiñones al Lcdo. Villanueva el 21 de noviembre de 1980, [é]ste le informó de su conocimiento acerca de hechos relacionados con los sucesos del Cerro Maravilla, específicamente que escuchara una primera serie de disparos; la llegada luego a la torre de la Policía en que se encontraba de Ort[i]z Molina acompañado del agente Cartagena Flores haciéndole una señal para que se mantuviese callado; también del relato a él de Ortiz Molina de la agresión de que eran víctimas los jóvenes que le asaltaron y tuvieron de rehén; el hecho de haber escuchado una segunda ráfaga de disparos varios minutos más tarde. Por esta declaración el Lcdo. Villanueva quedó informado *además* de los incidentes que experimentara Quiñones el 17 de agosto de 1978 en las oficinas de los Lcdos. Colton y Figueroa y de la presión ejercida por ellos para que no declarara que escuchó una segunda ráfaga de disparos. As[i]mismo el incidente de ese día en dicha declaración por el cual el Lcdo. Colton hizo que se le extendiese una solicitud de empleo, el otro incidente que motivó que

tuviera que ser conducido al hospital y los otros que se produjeron con motivo de la aparición en su hogar en la mañana del 26 de agosto de 1978 de los Lcdos. Colton y Figueroa en unión a otros funcionarios. En esa declaración además Jesús Quiñones refirió al Lcdo. Villanueva el incidente descrito de la llamada telefónica que le hiciera el Lcdo. Miró el 10 de agosto de 1978 (Exh. 60 FEI[, pág. 20]).

*Bajo el criterio de no haberle merecido crédito el testimonio que le prestara Quiñones en esa ocasión el Lcdo. Villanueva omitió investigar completamente las imputaciones que comprendieron dicho testimonio contra los Lcdos. Colton y Figueroa* (Exh. 16 FEI, págs. 45–46). Aunque admitió que no constituye la norma de una investigación las circunstancias bajo las cuales se tomó la declaración jurada a Quiñones en *su hogar* el 26 de agosto de 1978, justificó dicha actuación por el hecho que los Lcdos. Colton y Figueroa "querían terminar esa investigación" (Exh. 16 FEI, pág. 47).

El Lcdo. Villanueva consideró que era un dato importante para la investigación que realizaba su examen de la declaración escrita que prestara Quiñones el 17 de agosto de 1978 ante el Lcdo. Figueroa hasta el momento en que quedó suspendida para conducirle al hospital. Estimó que era importante para determinar la responsabilidad, si alguna, que podían tener los Lcdos. Colton y Figueroa en la imputación que le hacía Quiñones de que le estaban coaccionado. *A pesar de eso no realizó gestión alguna para determinar la existencia de dicha declaración ni sobre la veracidad de las imputaciones que hacía Quiñones de haber sido presionado por dichos fiscales el 17 de agosto de 1978.* Meramente no entendió pertinente investigarlas. *Omitió llevar a cabo la toma de declaraciones juradas [sobre este incidente] a las personas que según lo declarado por Quiñones se encontraban presentes mientras era interrogado el 17 de agosto de 1978,* a saber: el Lcdo. W. Rodríguez Suárez, el agente Romo Matienzo, la secretaria Carmen Aledo y los Lcdos. Colton y Figueroa (Exh. 16 FEI, págs. 55–56). La otra persona presente cuando fue interrogado lo era el agente Andrades, de quien ya el Lcdo. Villanueva había recibido su testimonio bajo juramento en el que le expresó haber estado presente en parte de dicho interrogatorio en la mañana del 17 de agosto de 1978 en la oficina del Lcdo. Colton y *afirmado de la coacción imputada ahora por Quiñones* (Exh. 23 FEI, pág. 51).

El Lcdo. Villanueva omitió investigar o intentar localizar la declaración jurada que prestara Quiñones el 17 de agosto de 1978 y que destruyera el Lcdo. Figueroa. *Su omisión la explicó indicando*

*que no le llamó la atención que la misma no estuviese en el expediente.* Tenía la convicción de la pertinencia de esa pieza de evidencia en la determinación de si Quiñones estaba diciendo la verdad en sus imputaciones de lo que señaló provocó que fuera conducido al hospital. No obstante, nada absolutamente hizo al no encontrar en el expediente la referida declaración escrita; su explicación aparece sencillamente expuesta en su testimonio en Sesión Ejecutiva ante la Comisión de lo Jurídico del Senado el 7 de mayo de 1984: "Yo asumí que no estaba porque no estaba en el expediente". (Exh. 16 FEI, pág. 52).

E. Rafael Lugo Torres, supervisor de Marte en Rikavisión, declaró bajo juramento al Lcdo. Villanueva el 9 de diciembre de 1980 el hecho de haberle Marte declarado el 26 de julio de 1978 sobre lo ocurrido en el Cerro Maravilla, *haber visto a uno de los agentes policíacos agredir con la pierna a uno de los jóvenes en el piso estando vivo y de haber escuchado después una segunda ráfaga de disparos.* (Exh. 42 FEI).

Adolfo Flores Monge, gerente de ventas de Rikavisión, declaró bajo juramento al Lcdo. Villanueva el 15 de diciembre de 1980 de la llamada telefónica que le hiciera Marte al mediodía del 25 de julio de 1978 *en que le narró de lo sucedido en el Cerro Maravilla, la ocurrencia de un primer tiroteo y luego de un segundo tiroteo.* (Exh. 41 FEI). En la conducción de este interrogatorio el Lcdo. Villanueva demostró *pobre objetividad investigativa, indicativa de una actitud de mantener la versión de los agentes policíacos que sostenían la ocurrencia de una sola ráfaga de disparos.* (Esto último quedó evidenciado por lo que informa la siguiente parte del interrogatorio del Lcdo. Villanueva a dicho testigo cuando informó que Marte ya le había expresado de un tiroteo unos 15 ó 20 minutos antes:

"F: [¿]Le dijo él que estaba oyendo disparos?

T: Sí, eso me dijo.

F: [¿]Qué le dijo?

T: *[É]l me dijo, lo tengo que dejar porque aparentemente hay otro tiroteo.*

F: Pero fíjese lo que le pregunto si él le dijo o no si estaba escuchando disparos.

T: *[É]l lo que me dijo era que aparentemente había otro tiroteo.*

F: En otras palabras, *que usted no sabe si habían habido disparos o no.*

T: No señor. Yo sólo sé lo que él me dijo: "Lo tengo que dejar. [L]e sigo hablando después porque aparentemente hay otro tiroteo'." (Exh. 41 FEI, [págs. 2–3]).

En realidad, a la pregunta de si Marte le había dicho si estaba oyendo disparos, la contestación del testigo fue afirmativa y lo único que justificaba un apuntamiento por parte del Lcdo. Villanueva lo era el calificativo "aparentemente" que incluyó la referencia de Marte. *Sin embargo, el señalamiento del Lcdo. Villanueva de establecer una equivalencia de que la respuesta dada sobre lo expresado por Marte significaba que el testigo no sabía si había ocurrido disparos o no, carecía de entera relación con la pregunta formulada.* Esa *extraña* forma de interrogatorio indudablemente evidenció el propósito de dejar establecido a través del testimonio de Flores Monge que [é]*ste no sabía si se había producido* o no disparos mediante la introducción por dicho fiscal de una conclusión *non sequitur en forma de respuesta.*

No empece los testimonios de Flores Monge y Lugo Torres expresados, el Lcdo. Villanueva *omitió confrontar a Marte* con el efecto de sus declaraciones o *investigar a fondo con él de la veracidad de esas afirmaciones.*

F. Ismael Ruiz Vázquez testificó bajo juramento ante el Lcdo. Villanueva el 23 de diciembre de 1980 que al estar como visitante en el área de El Merendero en el Cerro Maravilla escuchó alrededor de las 12:30 del día una *primera ronda* de disparos y posteriormente en un espacio de tiempo que lo extiende desde dos hasta cinco minutos, una *segunda ronda* de detonaciones (Exh. 62 FEI[, pág. 2]).

G. Con excepción de la declaración jurada que indican estos hechos que prestara el agente *Reverón Martínez* ante el Lcdo. Villanueva el 15 de diciembre de 1980 (Exh. 1(c) Villanueva), *él no tomó declaración jurada a ningún otro de los cinco agentes informados* como participantes en el referido operativo en las facilidades de Rikavisión. Fundamentó su omisión en su *especulación* de que ellos *repetirían* lo mismo que sus declaraciones originalmente prestadas. (Exh. 38 F[EI], pág. 25).

35) El Lcdo. Villanueva advino en conocimiento durante su investigación de *otros elementos de prueba* que representaron y le plantearon *serios conflictos e interrogantes* cuya investigación e intento de solucionar los mismos eran indispensable en la búsqueda de la verdad de lo ocurrido eran el Cerro Maravilla y en la realización de su encomienda. [*É*]*l omitió efectuar la investigación para esclarecerlos y ello contribuyó a que se mantuviese oculta la*

*verdad de lo realmente ocurrido en el Cerro Maravilla.* A continuación los hechos que conociera y los interrogantes de los mismos:

1) Modesto Delgado ocultó al Lcdo. Villanueva la existencia de evidencia importante en la investigación, por ejemplo la tela metálica ("screen") de la ventana de la propiedad de Rikavisión que rompiera el agente Ríos Polanco con su fusil antes de disparar. (Exh. 88 FEI). [É]l estaba movido por el interés de no involucrar a la empresa de Rikavisión para la cual trabajaba que no deseaba que se le identificara con los hechos bajo investigación. Delgado informó al Lcdo. Villanueva haber encontrado unos quince a veinte casquillos de Rifle AR-15 por el sitio de los hechos. Tres o cuatro de ellos que había encontrado en el interior de las facilidades al lado de la verja lateral izquierda que separa esa propiedad, le informó haberlos hallado en un sitio similar o próximo donde realmente los encontró, pero al otro lado de la verja, bajo la motivación señalada. Los restantes casquillos Delgado informó haberlos hallado donde declaró que realmente los encontró, más abajo, muy cerca de la carretera asfaltada y del lugar donde según la versión de los agentes policíacos que participaron en dichos hechos se encontraba el agente Colón Berríos al momento en que subía el vehículo público con el rehén. (Exh. 86 FEI). Este lugar era muy cerca al que se encontraba el agente Montañez al subir ese vehículo. Tres de dichos casquillos que aún tenía disponible Delgado los hizo llegar al Lcdo. Villanueva. (Exh. 16 FEI, págs. 171–172).

La proximidad y posición del lugar en que Delgado informó haber hallado los tres a cuatro casquillos mencionados con el área del interior de la propiedad de Rikavisión, hacía compatible ese hallazgo con la posibilidad que en el tiroteo habido se hubiese disparado desde dicho *lugar en dirección al sitio en que se encontraba estacionado el vehículo público de Ortiz Molina.* Era igualmente compatible con los impactos de bala del lateral izquierdo de dicho vehículo así como las otras marcas de impactos en los tubos del portón y en el vehículo Volkswagen; en forma análoga a si los disparos se hubiesen originado en el interior de la propiedad de Rikavisión. La versión de los cinco agentes policíacos informados como participantes en dichos hechos, *descarta igualmente de modo total y absoluto el que se hubiese disparado desde este lugar en que Delgado informó haber hallado los tres a cuatro casquillos de rifle AR15.* De otro lado, el lugar del hallazgo de los restantes casquillos era compatible, por su localización, con la posición o el lugar en que según la versión de la Policía se encontraban apostados los agentes Colón Berríos y Torres Marrero; pero incompatible, por el número

de casquillos encontrados, con el hecho que los proyectiles de los mismos fueran disparados por el agente Colón Berríos, *el único que portaba un rifle según la versión de esos agentes y cuyo rifle se trancó al ser disparado, como lo informó el propio Colón Berríos.* Era igualmente incompatible con que fueran disparados por el arma que se informa portaba el agente Torres Marrero [(]revólver Magnum 357[)]. (Exh. [31(a)], (b), (c), (d) y (e) FEI).

La anterior situación *planteó diversos interrogantes que requerían ser investigados,* a saber: la determinación correcta del arma usada para disparar los tres a cuatro casquillos de rifle AR15 informados como hallados muy cerca de la verja lateral y el interior de la propiedad de Rikavisión; el rifle que disparara los restantes casquillos hallados más abajo muy cerca del camino asfaltado y del sitio en que se informa se encontraban los agentes Colón Berríos y Torres Marrero; así como la determinación de las personas que portaban esas armas. En el caso de los casquillos encontrados muy cerca de la verja lateral y del interior de Rikavisión, los hallazgos de esa investigación hubiesen demostrado el uso de otras armas en el tiroteo, lo que habría posiblemente significado la presencia de otras personas disparando, en abierta contradicción con la versión de los agentes policíacos indicados que lo descartaban absolutamente. *En el caso de los casquillos encontrados muy cerca del camino asfaltado, hubiese posiblemente permitido concluir la presencia de un número mayor de agentes apostados en ese lugar, o si los mismos, con armas diferentes a las informadas, en abierto conflicto a la versión que los agentes policíacos estaban ofreciendo.*

El Lcdo. Villanueva no realizó con relación a los referidos casquillos ningún tipo de prueba para aclarar los interrogantes expresados. Le reconoció credibilidad a Delgado en relación a la entrega y la información que le dio de haber encontrado esos casquillos y estaba consciente que eran compatibles con un rifle AR15 pero omitió efectuar prueba tanto de tipo objetivo, mediante el examen de las armas informadas como utilizadas en todo el operativo del Cerro Maravilla como el examen oral a los testigos mediante el interrogatorio a los agentes participantes. (Exh. 38 FEI, págs. 178–179). *A ninguno de ellos les interrogó sobre estos aspectos y por tanto dejó sin aclararlos en su informe rendido.* (Exh. 24 FEI[;] Exh. 38 FEI, pág. 180).

2) El Lcdo. Villanueva conoció del hallazgo y entrega al Lcdo. Rodríguez Suárez el 2 de agosto de 1978 en la primera investigación, de *un casquillo de revólver calibre 38 Special* que en la misma no se analizó ni esclareció. *Conoció, además, por la versión de los*

*cinco agentes policíacos indicados que ninguno de ellos disparó un revólver calibre 38 Special* (Exh. 38 FEI, págs. 2–3; Exh. 31(a), (b), (c), (d) y (e) FEI); que según la conclusión del informe de los Lcdos. Colton y Figueroa, Soto Arriví portaba un revólver S & W calibre 38 que fue disparado *una vez* y Darío Rosado un S & W calibre 38 disparado *dos veces, ambas armas encontradas con los casquillos de esos proyectiles.* (Exh. 73 FEI, págs. 63–73). En adición que con dicho casquillo fueron entregados para análisis de laboratorio otros cuatro casquillos de pistola cuyo resultado dio positivo que fueron disparados por la pistola que portaba González Malavé; que otra arma que portaba González Malavé no fue disparada. (Exh. 73 FEI, pág. 64). Ese examen de laboratorio no produjo ninguna conclusión en relación a qué arma de fuego disparó el casquillo calibre 38 Special y la sola determinación hecha por el examinador del laboratorio de la Policía, a quien se le sometió dicho casquillo para análisis, es que no fue disparado por el arma que se le sometió para la prueba [(]la pistola[)].

El Lcdo. Villanueva no hizo intento alguno para determinar *qué arma de fuego disparó el casquillo de revólver calibre 38 expresado.* Su informe dejó sin concluir *qué arma de fuego* disparó el proyectil del mismo. (Exh. 38 FEI, 5, 6 y 7). De esta manera la verificación de la existencia de un revólver calibre 38 que lo hubiese disparado, *habría confligido con la versión de esos agentes policíacos que excluía absolutamente el uso de otras armas de fuego que las que portaban. Esto hubiese significado la presencia de otras personas en adición a ellos haciendo disparos durante esos hechos o el que los referidos agentes hubiesen disparado desde distinto lugar y mediante otras armas distintas a las que informan en sus declaraciones juradas prestadas.* (Exh. 31(a), (b), (c), (d) [y] (e) FEI).

3) *El Lcdo. Villanueva examinó mediante su investigación las fotografías de los cadáveres de Darío Rosado y Soto Arriví (Exh. 32(a), (b) [y] (c)[;] Exh. 70 FEI) y se percató que ambos demostraban la presencia de golpes en sus rostros. Tenía conocimiento también de las afirmaciones de Ort[i]z Molina al efecto que antes de salir de las escena de los hechos dejó vivos a los jóvenes y que la Policía los agredía físicamente. (Exh. 15 FEI, pág[s]. 141–142). Consideró que era muy importante en su investigación explicar c[ó]mo se ocasionaron dichos golpes. Omitió* investigar de alguna manera esa prueba para determinar y explicar cómo se ocasionaron los mismos. En el informe de su investigación que rindiera el 19 de

enero de 1981 *tampoco expuso explicación acerca de esto*. (Exh. 15 FEI, pág. 138).

(En el testimonio bajo juramento prestado por el Lcdo. Villanueva ante la Comisión de lo Jurídico del Senado el 30 de junio de 1983, [é]ste hace *admisiones* en respuesta al Lcdo. Rivera Cruz las que hemos considerado al formular el hecho anterior. Consignan el esfuerzo del Lcdo. Rivera Cruz para que explicase la razón de su inacción mediante la confrontación con las afirmaciones de Ortiz Molina:

"LCDO. RIVERA CRUZ: Y mire a ver si es o no cierto, que de acuerdo a su investigación, usted tenía un testigo llamado Julio Ortiz Molina, que declaró en un momento después del 25 de julio, pero que declaró que vio cuando le daban unos golpes a esos jóvenes, [¿]cierto?

LCDO. VILLANUEVA: Creo que [é]l declaró en algunas ocasiones eso.

LCDO. RIVERA CRUZ: Y declaró. [¿]Y no estaba corroborada esa afirmación por don Julio Ortiz Molina, *de lo que usted veía en la foto?*

LCDO. VILLANUEVA: No.

LCDO. RIVERA CRUZ: [¿]Por qué?

LCDO. VILLANUEVA: Porque, don Julio no especificaba, a mi entender, a quién le habían golpeado, cuándo lo habían golpeado.

LCDO. RIVERA CRUZ: *No se refería a los dos individuos* que les habían llevado en el carro público secuestrado con Arnaldo, con Alejandro González Malavé.

LCDO. VILLANUEVA: Eran tres (3).

LCDO. RIVERA CRUZ: Eran tres (3). Usted dice que don Julio *no se refería a estos dos sujetos.*

LCDO. VILLANUEVA: *Posiblemente se referiría,* pero como un detalle de corroboración, estrictamente hablando, creo que no.

LCDO. RIVERA CRUZ: Usted entiende que si don Julio declaraba que a los dos (2) jóvenes que murieron allí, Soto Arriví y Arnaldo Darío Rosado, antes de él salir de la escena los dejó vivos *y la Policía les deba cantazos, y usted observa en una fotografía después que los jóvenes tienen cantazos, golpes en el rostro; que la fotografía no es corroboración de lo que don Julio Ortiz Molina le había dicho.*

LCDO. VILLANUEVA: *Posiblemente lo sea,* pero el detalle en particular en relación a la investigación, en todos los detalles podría corroborar esa información de él.

LCDO. RIVERA CRUZ: La podría corroborar.

LCDO. VILLANUEVA: *La podría corroborar como podría corroborar otros hallazgos también de la investigación."* (Exh. 15 FEI, pág[s]. 141–143).

4) El Lcdo. Villanueva conoció de la información que le señaló la admisión del agente Reverón al agente Andrades de que portaba una escopeta no inscrita el 25 de julio de 1978 en el Cerro Maravilla, *corroborada en parte por la que le ofreció la declaración jurada de Tomás Centeno de haber recibido dicha arma para guardarla en su hogar y retenídola por unos seis meses; esto último a su vez corroboró esa parte del testimonio del agente Andrades.*

Estaba *consciente además* de la información surgida del registro de armas de la Policía de Puerto Rico demostrativo de que la escopeta calibre 12 asignada al agente Reverón el 24 de julio de 1978 *fue devuelta* a la Policía ese mismo día 24 de julio y registrada su entrada en el mismo; y que el agente Reverón llegó al Cerro Maravilla el 24 de julio pernoctando hasta el día siguiente de los hechos (Exh. 1(c) Villanueva). De dicho registro no aparecía ninguna escopeta que se hubiese sacado por algún agente de la Policía el 24 de julio de 1978 y entregado el 25 de julio de 1978. (Exh. 15 FEI, pág. 194). Esto planteó una *situación de conflicto en la prueba* que el Lcdo. Villanueva consideró importante investigar para determinar el arma que realmente portaba Reverón en dicho operativo (Exh. 15 FEI, pág. 198). No obstante, no procuró profundizar en la investigación para resolver este conflicto y *terminó la misma sin determinar el arma que portaba el agente Reverón el 25 de julio de 1978 en el Cerro Maravilla* (Exh. 15 FEI, pág. 189).

5) Advino *consciente* que los impactos en los tubos del portón de entrada de Rikavisión eran compatibles de haber sido causados por arma de fuego. (Exh. 15 FEI, pág. 168). Conocía que como parte de su investigación era *importante determinar* y resolver de qué forma y manera fue impactado dicho portón. Estaba *consciente* además que la evidencia ante él demostraba la posible ocurrencia de disparos hechos *por personas que no eran los cinco agentes mencionados que se informaba* participaron en el tiroteo al llegar el vehículo con el rehén que pudo haber disparos hechos desde el interior de la propiedad de Rikavisión hacia afuera. (Exh. 38 FEI, pág. 20[8]; Exh. 16 FEI, pág. 160). *Aun así, el Lcdo. Villanueva no procuró hacer la determinación o resolver el interrogante de qué forma y manera fue impactado dicho portón.* Tampoco, cómo se produjeron los impactos en el vehículo Volkswagen de cuya presencia en el interior de dichas facilidades estaba también percatado

(Exh. 15 FEI, pág. 164). En la fecha en que efectuaba los trabajos de su encomienda ese vehículo se encontraba en posesión de Modesto Delgado y *estaba disponible para su examen*. El Lcdo. Villanueva nunca lo requirió ni ocupó. La determinación de ambos aspectos tenía relación con la posibilidad que se disparara *desde el interior de la propiedad de Rikavisión y su realización en caso de encontrarse esto último, hubiese negado y desvirtuado la versión de los agentes policíacos de cómo ocurrieron los hechos.*

6) Conoció de la existencia de una perforación de entrada de proyectil en la parte trasera del vehículo Chevrolet de Ortiz Molina, con dirección de atrás hacia adelante y de abajo hacia arriba, que le hizo *estar consciente que hubo algún disparo desde la parte de atrás de dicho vehículo*. (Exhs. 4 y 5 FEI). Reconoció la importancia de determinar quién disparó apostado desde ese lado (Exh. 15 FEI, pág. 178–[1]80). Esa determinación hubiese corroborado o desvirtuado la versión de los policías participantes en dicho tiroteo acerca de cómo ocurrieron ya que las mismas excluían absolutamente que se disparara desde atrás del vehículo de Ortiz Molina. (Exh. 31(a), (b), (c), (d) y (e) FEI). *Sin embargo el Lcdo. Villanueva no investigó ese ángulo del caso y el mismo quedó como un interrogante sin resolver.*

7) El Lcdo. Villanueva tuvo *ante sí* las piezas de evidencia ocupadas en la investigación consistentes de un *pantalón que mostraba sucio a nivel de las rodillas y de la máscara que llevaba Darío Rosado, para determinar la presencia de sangre*. [É]l consideró de importancia en su investigación la realización de las pruebas de laboratorio de esa evidencia. Ambos asuntos estaban estrechamente relacionados con la parte de la investigación que debía hacer para aclarar las afirmaciones de que los jóvenes *fueron detenidos y agredidos físicamente*. No obstante, al igual que en la primera investigaci[ó]n el Lcdo. Villanueva *tampoco ordenó el análisis de esas piezas de evidencia* (Exh. 24 FEI). El hallazgo de ese análisis hubiese posiblemente contribu[i]do a sostener o desvirtuar la versión de los agentes policíacos de cómo ocurrieron los hechos.

8) De conformidad con la declaración jurada prestada ante el Lcdo. Villanueva por Jesús Quiñones el 21 de noviembre de 1980 el agente Cartagena Flores condujo a Ortiz Molina a la torre de la Policía poco después de ocurrir la primera ráfaga de disparos (Exh. 60 FEI). El Lcdo. Villanueva tenía ante sí otra versión de que fue el Comandante Pérez Casillas quien llevara a Ortiz Molina hasta ese lugar (Exh. 18 FEI, declaración jurada de Pérez Casillas ante el

Lcdo. Miró del 7 de agosto de 1978). Consideró que era importante dentro de su investigación determinar cuál fue el agente que verdaderamente condujo a Ortiz Molina a la torre de la Policía (Exh. 38 FEI, pág. 152). Esa determinación podía fortalecer o debilitar la versión de lós agentes policíacos acerca de cómo ocurrieron los hechos en vista del testimonio bajo juramento de Jesús Quiñones prestado ante el Lcdo. Villanueva de que al ser llevado a la torre de la Policía, Ortiz Molina le relató ante la presencia del agente Cartagena Flores de haber observado a los agentes policíacos agrediendo a los dos jóvenes detenidos, en adición, por su declara- ción de haber escuchado el propio Quiñones una segunda ráfaga de disparos luego de unos 5 a 15 minutos después de haber escuchado una primera ráfaga de disparos. (Exh. 60 FEI). *El Lcdo. Villanueva no realizó esfuerzo alguno para determinar y resolver este conflicto en la prueba ante él.*

9) Era de *conocimiento* para el Lcdo. Villanueva la conclusión de la autopsia efectuada al cadáver de Darío Rosado al efecto que la herida en su pecho indicaba una trayectoria del proyectil que le *dio muerte en dirección de arriba hacia abajo.* (Exh. 68 FEI; Exh. 16 FEI, págs. 146 [y] 147). De la misma manera la versión de los agentes policíacos que intervinieron en el tiroteo al llegar al vehículo, la que le era incompatible, *de haber disparado a los jóvenes desde el suelo, o sea, en dirección de abajo hacia arriba.* Estaba consciente que esta situación representaba un *conflicto en la prueba* que no fue investigado ni aclarado en la primera investigación (Exh. 16 FEI, pág. 147; Exh. 73 FEI). *El Lcdo. Villanueva tampoco investigó, analizó ni resolvió este conflicto en la prueba.* (Exh. 16 FEI, pág. 147; Exh. 24 FEI).

10) Del bolsillo de la camisa de González Malavé se ocupó cinco fósforos, uno de ellos utilizado (Exh. 81 FEI). De acuerdo a la versión de los agentes policíacos participantes en dicho operativo, ellos darían vigilancia a esa propiedad én el Cerro Maravilla en vista de una confidencia que habían recibido de que se cometería en la misma actos de terrorismo.mediante asalto, destrucción o volando las torres de dichas facilidades (Exh. 18 y 31 FEI). Sin embargo, de la evidencia ocupada no surge material explosivo o capaz de producir la destrucción de dichas torres. (Exh. 73 FEI, págs. 71–77). A juicio del Lcdo. Villanueva las personas que llegaron allí con el rehén "no llegaron a destruir nada" (Exh. 38 FEI, pág. 171). De otro lado, en vista de las circunstancias de la participación descrita del agente encubierto González Malavé en los grupos mencionados en los que se infiltrara como tal (Exh. 19, 20 y 21), la

naturaleza de la que tuvo particularmente en la del asalto a las facilidades de Rikavisión *demostró su liderato en dicho grupo como agente incitador*. Esta prueba ocupada en la persona de González Malavé fortalecía claramente el carácter descrito de su participación en dicho asalto, asunto que fue tratado *con relevancia* en el informe de los Lcdo[s]. Colton y Figueroa el que concluyó no haberse encontrado evidencia demostrativa "que la Policía de Puerto Rico o el agente encubierto González Malavé hubiese instigado a los jóvenes Carlos E. Soto Arriví y Arnaldo Darío Rosado a cometer delito alguno". (Exh. 73 FEI, págs. 125–128). El Lcdo. Villanueva *guardó completo silencio* en su informe rendido el 19 de enero de 1981 de que ocupara la referida evidencia, la que no mencionó de modo alguno (Exh. 24 FEI). *Esto tuvo el efecto de evitar que dicho informe revelase un dato que habría arrojado serias y fundadas sospechas acerca de las motivaciones y legitimidad de la Policía en relación a su participación e intervención por medio del citado agente encubierto en dicho asalto a las facilidades de Rikavisión.*

11) La presencia del agente Torres Marrero fuera de las facilidades de Rikavisión, en unión al agente Colón Berríos portando un revólver Magnum 357 constituyó *una contradicción irreconciliable con la declaración de Marte que lo ubicó en el mismo momento dentro de la edificación o saliendo de ella con un arma larga*. De esa contradicción en la prueba *estaba advertido* el Lcdo. Villanueva. (Exhs. 31 FEI y 47 FEI). As[i]mismo, de la importancia de determinar la ubicación precisa de Torres Marrero por la importancia de ese dato para saber si se disparó desde el interior de Rikavisión. (Exh. 15 FEI, pág. 167). Esta determinación corroboraría la otra prueba de la existencia de impactos en los *tubos del portón de entrada* y en los vehículos Volkswagen y el Chevrolet de Ort[i]z Molina que *sugerían fuertemente que se disparara desde adentro de dichas facilidades*. Esa corroboración hubiese significado la *negación de la versión* de los agentes policíacos de c[ó]mo ocurrieron los hechos que descartaban disparos desde el interior de esa propiedad. A pesar de la importancia de la determinación de la ubicación precisa del agente Torres Marrero en relación a esos otros aspectos de la investigación, el Lcdo. Villanueva *no investigó el mismo y ese asunto quedó sin ser resuelto al rendir su informe. De igual forma dejó de investigar y quedó sin resolverse el conflicto asociado al mismo de cuál arma realmente portaba el agente Torres Marrero.* (Exh. 24 FEI).

12) El Lcdo. Villanueva *fue advertido de la posible presencia del agente Montañez Ortiz en el Cerro Maravilla.* (Exh. 23 FEI). La investigación de esto era muy importante en vista de la versión de los agentes policíacos que no informaba en ese lugar al momento de los hechos que causaron la muerte de los jóvenes más agentes que los cinco mencionados, que excluía a Montañez. *El Lcdo. Villanueva no investigó para esclarecer este asunto y el mismo quedó sin ser resuelto a la rendición de su informe.* (Exh. 24 FEI; Exh. 16 FEI, pág. 153).

13) La investigación realizada por el Lcdo. Villanueva *no incluyó la determinación* de qué agente ocasionó la muerte de Darío Rosado al igual que la primera realizada por los Lcdos. Colton y Figueroa. (Exhs. 73 FEI y 38 FEI, pág. 117). De otro lado, el informe rendido por los Lcdos. Colton y [F]igueroa concluyó al efecto que el proyectil que causó la muerte a Soto Arriví fue disparado por el re[v]ólver Smith & Wesson, Magnum 357, asignado al agente Torres Marrero. (Exh. 73 FEI). En vista del conflicto en la prueba por el que no se resolvió la ubicación *precisa del agente* Torres Marrero y el arma que [é]ste portaba al momento de suceder los disparos, prevaleció *sin ser esclarecido qué agente causó la muerte a Soto Arriví.* El Lcdo. Villanueva no llevó a cabo gestión de clase alguna para intentar resolver esta interrogante en la investigación que realizara; *se limitó a recoger la conclusión de la primera investigación.* (Exh. 24 FEI).

36) *Durante su labor investigativa el Lcdo. Villanueva fue víctima de la acción represiva por parte de la Policía de Puerto Rico: miembros de [é]sta le seguían y vigilaban y ejercieron presión sobre él con el propósito de amedrentarlo (Exh. 38 FEI, págs. 127, [215 y] 216). [É]l incluso llegó a temer por su vida y a tomar medidas para su seguridad personal. Específicamente ejerció presión sobre él el Teniente Quiles.* (Exh. [38] FEI, pág[s]. 126–127). *[É]l*no tomó otra acción en relación a esto que no fuera la *presentación de su renuncia como Fiscal al someter su informe final de investigación.* (Exh. 15 FEI, pág[s]. 115 [y] 116).

37) El Lcdo. Villanueva consideró que la investigación que produjo el informe de los Lcdos. Colton y Figueroa del 29 de agosto de 1978 (Exh. 73 FEI) *fue superficial.* Sin embargo, bajo el fundamento de no haber encontrado ninguna *teoría creíble* en contra de la defensa propia que comprendió la versión de los agentes policíacos participantes en el Cerro Maravilla, *concluyó que no podía descartarla* (Exh. 38 FEI, pág[.] 119) *y aceptó todas las conclusio-*

nes del referido informe del 29 de agosto de 1978 (Exh. 38 FEI, pág. 41).

*En realidad, el Lcdo. Villanueva se comprometió con la teoría de la defensa propia propuesta por los agentes policíacos en su versión de cómo sucedieron los hechos. Por su omisión de investigar y efectuar la búsqueda o el esclarecimiento de lo ocurrido en el Cerro Maravilla mediante el examen y utilización de los diversos elementos de prueba y recursos de que disponía, mantuvo esa teoría de defensa de dichos agentes.*

(En el proceso de pesar la prueba que nos ha llevado a la conclusión de hecho del párrafo procedente[,] anotamos la parte de la prueba que explica *el alcance del compromiso que ató la investigación del Lcdo. Villanueva con la versión policíaca de los hechos.* El Lcdo. Villanueva se hizo y formuló a sí mismo en su informe de su investigación rendido la proposición y conclusión siguiente:

"Un estudio detallado y minucioso, fresca aún la escena de los hechos, hubiese probablemente añadido algunos detalles [más] . . . específic[os] de lo acontecido allí el 25 de julio de 1978. Sin embargo, en ausencia de evidencia que con el transcurso del tiempo ha desaparecido, no nos es dable especular sobre el posible valor probatorio de la misma. *De todas maneras entendemos que de haber estado disponible dicha prueba, la misma no hubiese cambiado las conclusiones del informe original que hemos adoptado como nuestras.* Esta misma conclusión se extiende a hallazgos no explicados como lo son los disparos en el portón de entrada a la repetidora de Rikavisión y a los casquillos de armas de fuego allí encontrados por el señor Modesto Delgado García". (Exh. 24 FEI, págs. 123–124).

Es decir, el Lcdo. Villanueva se refiere a evidencia que estima desapareció de la naturaleza que hubiese explicado los disparos en el portón de entrada de Rikavisión y el hallazgo de casquillos de armas de fuego encontrados en su interior, *cuyo valor probatorio ignoraba;* pero que a pesar de ignorar dicho valor probatorio, *entendió que de haber estado disponible no hubiese cambiado las conclusiones del informe de los Lcdos. Colton y Figueroa. Interpretamos que con esta prueba él afirma incuestionablemente el compromiso al que hemos aludido. La explicación o justificación para dicho compromiso* aparece expuesta de su testimonio ante la Comisión de lo Jurídico del Senado el 5 de julio [d]e 1983 al responder a preguntas del Presidente de dicha comisión Lcdo. Aponte Pérez de por qué habiéndose referido en su informe a la

presencia de prueba conflictiva, en lugar de pasar sobre la credibilidad de la misma no optó por hacer una recomendación *para que los hechos fuesen sometidos ante un magistrado para que hiciese las determinaciones de credibilidad y la de si existía o no causa probable.* El Lcdo. Villanueva, luego de exponer su opinión que como ministerio público no *estaba facultado u obligado a someter el caso ante un magistrado* expresó:

"Hay otras consideraciones que hay que tomar en cuenta. El hecho de someter un caso a un Magistrado, puede conllevar enormes, diría, daños a la reputación de varias personas, a la reputación, a la misma tranquilidad de la misma Policía, y yo *creo que hay que enfrentarse valientemente a lo que la evidencia arroja y tomar las decisiones*". (Exh. 38 FEI, pág. 199).

La expresión que propone enfrentarse en forma valiente "a lo que la evidencia arroja" que formula el Lcdo. Villanueva en esa respuesta, se encuentra *fuera de contexto* en su explicación de las consideraciones que expresa hay que tomar en cuenta como la de evitar cuestionar la reputación de personas y la r[ep]utación de la propia Policía. *Esto es así porque en las decisiones que deben ser tomadas a base de lo que la evidencia arroja no es preciso tomar en cuenta esas otras consideraciones por él señaladas. Por tanto, interpretamos dentro de su propio sentido la admisión que hace el Lcdo. Villanueva en la proposición citada.*

38) La designación del Lcdo. Villanueva como Fiscal Investigador de los sucesos del Cerro Maravilla *fue consecuencia de las manifestaciones del agente Julio César Andrades aparecidas en los periódicos del país en la primera parte de octubre de 1980.* El agente Andrades en sus manifestaciones imputó al Lcdo. Colton la *realización de encubrimiento de los sucesos del Cerro Maravilla mediante la acción de preparar y coordinar las declaraciones juradas de los policías que participaron en el operativo del Cerro Maravilla* (Exhs. 49, 50, 51, 52, 53, 54 y 55 FEI). En vista de ello el Lcdo. Villanueva tomó la declaración jurada del 23 de octubre de 1980 al agente Andrades (Exh. 23 FEI) *confiriéndole inmunidad por cualquier delito que hubiese cometido en relación a dichos sucesos* (Exh. 24 FEI, pág. 101). En dicho interrogatorio al agente Andrades el Lcdo. Villanueva *no intentó investigar las actuaciones del Lcdo. Colton al omitir formularle preguntas acerca de las imputaciones que surgían del hecho de lo levantado por dicho agente en sus manifestaciones expresadas.* Con excepción de la declaración jurada que tomó al Lcdo. Miró el 9 de diciembre de 1980 (Exh. 27 FEI) él omitió llevar a cabo la investigación para aclarar

las citadas imputaciones. *No le tomó declaración jurada a los fiscales Colton, Figueroa ni Brunet, participantes de la primera investigación aludida,* para investigar la validez de esas imputaciones como a ninguno de los agentes policíacos participantes del operativo del Cerro Maravilla que prestaron declaración jurada de su investigación. (Exh. 24 FEI).

La información entonces ante el Lcdo. Villanueva le indicó que en la primera investigación el Lcdo. Miró fue el fiscal que tomó las declaraciones juradas a todos los agentes policíacos participantes en el operativo del Cerro Maravilla, con excepción del agente González Malavé cuya declaración fue tomada por el Lcdo. Brunet (Exhs. 18, 19, 20, 30, 31, 72 y 85 FEI). En el interrogatorio al Lcdo. Miró el Lcdo. Villanueva no verificó con éste el hecho que fuera él *quien efectivamente tomara las declaraciones juradas a los agentes policíacos que se informaban como que habían prestado declaración jurada ante él.* Por el contrario, puso a su disposición los documentos que consignan dichas declaraciones juradas para su examen y comprobación que informaban las declaraciones juradas de los referidos agentes. *Tampoco investigó o indagó las circunstancias en que fueran tomadas dichas declaraciones para así poder constatar la validez de las imputaciones hechas de que el Lcdo. Colton había coordinado y preparado las mismas.* (Exh. 37 FEI). *De esta manera las referidas imputaciones al Lcdo. Colton no quedaron aclaradas en forma alguna.*

39) Después de haber rendido el informe de su investigación el 19 de enero de 1981 el Lcdo. Villanueva *intervino en una conferencia de prensa que llevó a cabo el 27 de enero de 1981 como único participante en la que divulgó y dio gran publicidad a muchos detalles de su informe por los medios noticiosos del país. En la misma tachó de mentiras las declaraciones de algunos de los testigos de la investigación.* (Exhs. 75, 76, 77, 78 y 79 FEI; Exh. 16 FEI, págs. 133–135).

40) (El Comisionado Especial recibió en evidencia prueba de la reputación profesional de que han gozado los querellados con excepción del querellado, Lcdo. Figueroa.)

Sin considerar las conclusiones que se derivan de los hechos de este caso, los Lcdos. Miró, Brunet, Villanueva y Colton han gozado de buena reputación en la comunidad profesional en la que han ejercido de fiscales y abogados; habiéndose desempeñado con responsabilidad y como profesionales serios, respetuosos, laboriosos y mantenido una hoja limpia de servicios". (Énfasis suplido.)

Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, págs. 33–95.

## V

*Planteamientos*

Frente a estos hechos, el F.E.I. nos pide que consideremos ciertos cargos que el Comisionado Especial, Juez Limardo, no encontró probados. Por su parte, los querellados nos exponen diversos argumentos en contrario y razones por las cuales no deben ser disciplinados.

Concentremos primero en los señalamientos del F.E.I.

Cuestiona que el Comisionado Especial, Juez Limardo, no concluyera que el querellado Figueroa Vivas, conjuntamente con Colton Fontán, sugiriera insistentemente al testigo Marte Ruiz el 3 de agosto de 1978, que declarara —contrario a lo que éste aseveraba— que nadie había disparado desde el interior de las facilidades de Rikavisión.

También impugna que no hubiera determinado que el 2 de agosto de 1978 Colton Fontán indujera a la taquígrafa a que "alterara sus notas taquigráficas a los fines de que no hiciera constar una[s] manifestaci[ones] del testigo [agente de la Policía] que Colton Fontán entend[ió] que 'perjudicaba[n] a la policía'. Caso Núm. CE-86-666, Parte II, Querella sobre Conducta Profesional, Vol. 1, Cap. 2, pág. 2. Notamos que este hecho es el fundamento *común* para los cargos Núm. 2 contra Colton Fontán y Miró Carrión, y Núm. 4 contra Brunet Justiniano.

Por último, se queja de que no concluyera que Miró Carrión mintió al negar ante la Comisión de lo Jurídico del Senado que durante el interrogatorio individual a los cinco (5) agentes de la Policía efectuado en Rikavisión el 2 de agosto de 1978 "los otros cuatro se encontraban fuera de la estructura, cuando lo cierto es que los cinco agentes se encontraban adentro". Caso Núm. CE-86-666, Parte II, Querella sobre Conducta Profesional, Vol. I, Cap. II, pág. 12.

Hemos examinado detenidamente estos señalamientos. Excepto la determinación que precede, relativa al testimonio de Miró

Carrión ante la Comisión de lo Jurídico del Senado en cuanto a la ubicación de los policías dentro de Rikavisión, sostenemos la negativa del Comisionado Especial, Juez Limardo. *Su informe y sus conclusiones revelan un análisis serio y reflexivo.* Ante las dudas legítimas planteadas por la prueba —incluso aquella manifestada por el testigo Marte Ruiz indicativa de una inseguridad sobre la verdadera identidad del "otro" Fiscal— optamos por respetar sus determinaciones y no encontrar probados esos otros dos hechos.

En cuanto al cargo Núm. 11 contra Miró Carrión, a saber, que mintió al Senado en torno a la presencia de los policías dentro de Rikavisión, valga aclarar que más que una determinación en la que esté presente un elemento de credibilidad, estamos ante un error de forma, dimanante de la inadvertencia del Comisionado Especial, Juez Limardo, de consignar un hecho debidamente probado.

Adjudicadas las alegaciones del F.E.I. sobre errores en la apreciación de la prueba, examinemos los correspondientes cuestionamientos de los querellados.

Tres (3) aclaraciones son necesarias. *Primero*, de manera expresa o implícita, con mayor o menor vehemencia, todos los querellados nos proponen la tesis de que ellos no pudieron encontrar la verdad de los hechos de los incidentes del Cerro Maravilla porque la Policía y ciertos testigos les mintieron durante sus investigaciones. Las comparecencias de Colton Fontán y Figueroa Vivas nos dejan la impresión de que todavía ellos cuestionan la credibilidad de ciertos testigos que contribuyeron a sacar a la superficie la verdad de lo ocurrido.

Rechazamos semejante proposición. No podemos reducir la solución del caso a una ecuación tan simple y superficial. Según hemos visto, desde el comienzo mucha de la prueba directa o circunstancial estuvo ante sus ojos o accesible con un razonable esfuerzo profesional. Por negligencia *crasa* (acciones u omisiones) ignoraron y en ocasiones tergiversaron u ocultaron dicha prueba. En los casos de Colton Fontán y Figueroa Vivas, medió la coacción

e intimidación directa de testigos. La conclusión que aflora es que a partir del 25 de julio de 1978 inexplicablemente todos, de una forma u otra, se solidarizaron *a priori* con la teoría de defensa propia expuesta por los agentes policíacos. Optaron por conscientemente intervenir e "investigar" con la idea prematura y preconcebida de apoyar y oficializar esa teoría. Mediante esa conducta cometieron no sólo un grave error profesional, sino ético. Véase H. Gross, *Criminal Investigation*, Toronto, The Carswell Co., 1962, págs. 10–15.

Hubiese bastado un simple examen de las fotografías de los cadáveres de Darío Rosado y Soto Arriví, *sin ánimo prevenido*, para poner de inmediato en duda la teoría de defensa propia. Sin dificultad hemos podido constatar las *"fotografías del cadáver de Darío Rosado, boca arriba tirado en el piso. (Exhibit 32(a), (b) y (c) FEI). Estas muestran el pecho completamente ensangrentado y la presencia de mucha sangre en las áreas de la nariz y la boca. Su rostro evidencia en forma claramente visible marcas de traumas, laceraciones, abrasiones múltiples y partes inflamadas. Se observan esas marcas sobre la parte alta de la frente, sobre la ceja derecha cubriendo parte del párpado; sobre el pómulo izquierdo y el labio superior derecho.* El cadáver de Soto Arriví también fue fotografiado mientras permanecía en el Hospital de Jayuya. (Exhibit 70(a) y (b) FEI). *Estas fotos evidencian de igual manera la presencia de efecto de traumas y laceraciones múltiples en diferentes partes del rostro, con edema —debajo de la ceja derecha, muy cerca del párpado; en ambos pómulos, debajo de la ceja izquierda, sobre la barbilla y en la parte inferior de ésta, el área del pecho y el brazo izquierdo. Todas las marcas descritas en los rostros y cuerpos de Darío Rosado y Soto Arriví son claramente compatibles con golpes contundentes recibidos".* (Énfasis suplido.) Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, pág. 18.

 Es evidente que esas fotografías "perpetuaron de manera certera, eficiente y confiable —más allá de la capacidad normal de los sentidos humanos— la conducta incriminatoria" de

los policías. *Pueblo v. Luzón*, 113 D.P.R. 315, 326 (1982). Como dijimos en *Pueblo v. Lebrón González*, 113 D.P.R. 81, 101 n.4 (1982), la "fidelidad y contemporaneidad de las fotografías reflejan datos suficientes, inclusive las manchas de sangre . . .". Y es que "una fotografía es una reproducción fiel y exacta de la persona, sitio o cosa . . .". *Pueblo v. Márquez*, 67 D.P.R. 326, 335 (1947). Pueden "considerarse como supletorias al informe de autopsia". C.E. O'Hara, *Fundamentals of Criminal Investigation*, Illinois, C.C. Thomas, 1956, pág. 54. Aquí, la autopsia al cadáver de Darío Rosado revelaba que la herida en su pecho indicaba una trayectoria del proyectil normal *de arriba hacia abajo* (*Exhs.* 16 y 68 F.E.I.), lo cual era incompatible con la posición física que supuestamente asumieron los policías al disparar.

No debieron, pues, los querellados hacer caso omiso o subestimar el valor de esas fotografías. Como regla general, en términos de nuestros sentidos y agudeza mental, comprendemos mejor lo que vemos que lo que oímos. Una foto estimula nuestro sentido visual. Su valor intrínseco radica en la capacidad de perpetuar, objetivamente, múltiples detalles. Por su naturaleza tangible, las fotografías describen mejor que las palabras. Distinto al testimonio oral de un testigo, no son confusas ni descansan en una "memoria pobre o falible".

En innumerables ocasiones hemos sostenido el inmenso valor probatorio de las fotografías, para fines de ilustrar hechos esenciales sobre lo declarado por los testigos —*Pueblo v. López Rodríguez*, 118 D.P.R. 515, 543 (1987); *Pueblo v. Ortiz González*, 111 D.P.R. 408, 414 (1981); *Pueblo v. González Colón*, 110 D.P.R. 812, 820 (1981); *Pueblo v. Calviño Cereijo*, 110 D.P.R. 691, 696–697 (1981); *Pueblo v. Ortiz Rodríguez*, 103 D.P.R. 368, 372 (1975); *Pueblo v. Torres*, 75 D.P.R. 231, 235 (1953)— para demostrar las lesiones producidas —*Pueblo v. Rodríguez Colón*, 95 D.P.R. 614, 617–618 (1967); *Pueblo v. Pacheco Stevenson*, 83 D.P.R. 842, 848 (1961); *Pueblo v. Rivera*, 69 D.P.R. 538, 541 (1949); *Pueblo v. Zayas Ortiz*, 65 D.P.R. 538, 541 (1946); *Pueblo v. Márquez*, 67 D.P.R. 326, 335 (1947)— sobre las características físicas del lugar

del crimen, sitio desde donde observó un testigo y el lugar donde cayó la víctima —*Pueblo v. Lebrón González*, supra— y para comprobar la veracidad de lo declarado en cuanto a la localización geográfica de un edificio, "la escena del crimen y áreas suscepti- bles de percepción visual por el supuesto testigo . . .". *Pueblo v. Pagán Díaz*, 111 D.P.R. 608, 618 (1981); *Illanas v. González*, 51 D.P.R. 803, 807–808 (1937).

*Segundo*, no es correcto el planteamiento de que el Comisio- nado Especial, Juez Limardo, admitió *erróneamente* declaracio- nes juradas escritas de personas que no testificaron en las vistas. Del examen de la transcripción —incidentes sobre el particular— surge meridianamente claro que tales declaraciones fueron ofre- cidas solamente contra aquel querellado que las tomó, o que advino en conocimiento de su contenido, y ello con el único propósito de establecer lo que conoció a través de esa declaración. No se discute su pertinencia, a saber, ante la información obte- nida, evaluar el curso de acción, si alguno, que siguió el querellado concernido. Es que esas declaraciones constituían la prueba más precisa y exacta de lo que la persona declaró, contemporáneo en las investigaciones conducidas por los propios querellados. No cabe duda de que esa era la mejor evidencia directa de lo que el F.E.I. se proponía probar. *Regla 10(H) de Evidencia*, 32 L.P.R.A. Ap. IV.

*Tercero*, ninguno de los querellados declaró en las vistas ante el Comisionado Especial, Juez Limardo. Optaron por sólo presen- tar a su favor cierta prueba documental y el testimonio de varios testigos, mayormente para establecer su buena reputación. Por esta razón —sin estar bajo juramento ni sujetos al contrainterro- gatorio— no podemos en esta etapa considerar como *"prueba"* algunas de las expresiones justificativas de una conducta que a título de testimonio escrito nos hacen directamente y que no desfiló ante el Comisionado Especial, Juez Limardo. Tomamos esas expresiones como parte de sus argumentos y no como prueba.

*A tono con estos parámetros, atendamos específicamente
aquellos planteamientos de importancia que nos formulan indi-
vidualmente los querellados.*

## VI

*Brunet Justiniano* (6)

Primeramente, Brunet Justiniano cuestiona que el Comisio-
nado Especial, Juez Limardo, haya estimado probado que única-
mente le recomendó al Teniente Quiles "quemar" al agente
encubierto González Malavé desde el 12 de julio de 1978. Aduce
que esa "conclusión refleja los hechos parcialmente en cuanto a
este extremo" y que la prueba demuestra que hizo esa misma
recomendación a su superior inmediato y jefe de fiscales en el
Departamento de Justicia, el Lcdo. Colton Fontán. Se apoya en el
*Exh.* 22 F.E.I, págs. 201, 217 y 232, a saber, parte de su testimonio
ante la Comisión de lo Jurídico del Senado. Para fines
argumentativos asumiremos ese hecho, sin tomarlo en cuenta al
evaluar la conducta de Colton Fontán.

Convenimos con Brunet Justiniano en que no tenía facultad ni
autoridad *expresa en ley* para intervenir en los procedimientos
internos de la División de Inteligencia de la Policía e imponer su
recomendación. Como fiscal, únicamente podía asesorar a dicho
cuerpo. La Policía era la que adoptaba la decisión de cuándo
"quemar" a sus agentes encubiertos por lo difícil que resultaba su
reclutamiento e infiltración (T.E. 24 de Sebastián Ortiz Lorenzo de
marzo de 1987, págs. 21–23; T.E. del Lcdo. Aponte Lebrón, íd.,
pág. 48).

Ante esta circunstancia, a lo sumo, sólo podemos recriminar
su conducta por no haber insistido en su recomendación. De su
faz, la situación así lo ameritaba. Advino en conocimiento directo
de las actividades incitadoras del agente encubierto González

---

(6) Además de prueba documental, *Brunet Justiniano* ofreció los testimonios del
Lcdo. William Rodríguez Suárez y Miguel A. Cartagena Flores —renunciados por el Fiscal
Especial Independiente (F.E.I.)— el del Comandante de la Policía Sebastián Ortiz
Lorenzo, el Capitán Domingo Álvarez Díaz y los Lcdos. José C. Aponte Lebrón y Héctor
Reichard De Cardona.

Malavé en los dos (2) grupos (Fuerzas Anti-Imperialistas y Movimiento Revolucionario Armado), a saber: (1) la colocación de una bomba en el correo de la Ave. 65 de Infantería; (2) el tiroteo a la residencia del ex gobernador Muñoz Marín; (3) el asalto al cuartel de la guardia universitaria, y (4) los actos de sabotaje contra propiedades de la A.F.F. mediante lanzamientos de cadenas y cocteles molotov a una planta eléctrica de Hato Rey y a líneas eléctricas. Conoció además del propuesto secuestro del hijo de la Juez Blanca I. Bonilla y la compra ilegal de una escopeta.

A base de su experiencia previa como Fiscal, Brunet Justiniano también debió haber dejado constancia escrita de su posición antes de comenzar sus vacaciones el 14 de julio de 1978. Tales omisiones, sin embargo, no pueden ser motivo, *per se*, para atribuirle todas las consecuencias de los sucesos de Cerro Maravilla. Es obvio que en la División de Investigación de la Policía había agentes decididos a llevar a cabo el operativo hasta su última conclusión.

Igualmente estamos contestes en que demostró que de ordinario los fiscales seguían la práctica de utilizar los taquígrafos de la Policía para tomar las declaraciones juradas de los agentes encubiertos, las cuales, por razones de seguridad, en la mayoría de los casos se tomaban fuera de las facilidades principales del Departamento de la Policía y del Departamento de Justicia.

*Ahora bien, como profesional del derecho, su responsabilidad ética cambió diametralmente una vez ocurrieron las muertes de Darío Rosado y Soto Arriví.*

Consciente de ello, Brunet Justiniano impugna la conclusión del Comisionado Especial, Juez Limardo, en el sentido de que, al arribar al Cuartel General de la Policía la tarde del 25 de julio de 1978, se encontró con el agente Montañez Ortiz mientras éste trasladaba tres armas largas de un furgón y "percibió que en efecto venía del operativo del Cerro Maravilla". Se basa en que durante el contrainterrogatorio, Montañez Ortiz expresó que sólo hubo un breve saludo y "admitió que su propósito (el del testigo Montañez) era ocultar su participación en el operativo del Cerro Maravilla". *No tiene razón.* Si bien Montañez Ortiz atestó que ese

fue su propósito —ocultarle que venía del Cerro Maravilla— evidentemente no tuvo éxito. El propio Brunet Justiniano declaró ante la Comisión de lo Jurídico del Senado que *"entendi[ó]"* que presumiblemente dicho agente venía del Cerro Maravilla. *Exh.* 21 F.E.I., pág. 77.

No es excusa válida su predicamento de que al tomar la declaración jurada al agente González Malavé en el Hospital Industrial el 31 de julio de 1978, lo hizo "en las mismas circunstancias y condiciones que tomó las . . . [d]el 20 y 27 de junio y 12 de julio de 1978". Caso Núm. CE-86-666, Parte IV, Comentarios y objeciones a la relación del caso y conclusiones de hecho, pág. 7. A tales efectos nos dice que "[i]nexplicablemente el Honorable Comisionado no señala que en la toma de estas últimas el querellado no obtuviera el debido trasfondo y preparación". Íd. *El argumento pierde de vista que para esa fecha —31 de julio— ya habían ocurrido las muertes y Brunet Justiniano conocía por la prensa que la versión de la Policía estaba en entredicho. Obviamente no actuó con la debida suspicacia que la situación requería ni se preparó adecuadamente antes de tomar esa declaración jurada.* No fue al lugar de los hechos ni vio las fotos de los cadáveres de Darío Rosado y Soto Arriví; tampoco examinó los protocolos de autopsia.

*Por esa misma razón, fue muy negligente Brunet Justiniano al continuar en esa ocasión la rutina o práctica administrativa de usar taquígrafos de la Policía en las declaraciones juradas de los agentes encubiertos.* Precisamente se trataba de González Malavé. Para Brunet Justiniano no era un extraño, sino el agente encubierto cuyas *actividades y liderato* ya conocía, al extremo que dos (2) semanas antes había recomendado que fuera "quemado". Actuó imprudente y negligentemente al tomar esa declaración en presencia del teniente Quiles. Más aún, usar en esa estapa a la taquígrafa de las Policía conllevó que ella se llevara los signos taquigráficos, único récord de lo declarado. Como expuso el Comisionado Especial, Juez Limardo, de ese modo la División de Inteligencia de la Policía advino en conocimiento directo de la versión del agente encubierto, testigo presencial, aun cuando

todavía ninguno de los policías que intervinieron en el Cerro Maravilla había prestado declaración; en particular, en una fecha en que la actuación de esos agentes era cuestionada públicamente.

Aun cuando aceptáramos la tesis de Brunet Justiniano de que para el 25 de julio y días posteriores no apareció como dato importante que el agente Montañez bajara armas del operativo del Cerro Maravilla, ciertamente ello cobró una dimensión distinta y vital cuando Villanueva Díaz fue asignado a reinvestigar el caso. *Constándole personalmente ese hecho, no lo transmitió entonces a Villanueva Díaz.* Tampoco tomó acción en relación con el inexplicable conflicto que surgía sobre la versión de los policías en la "recreación" de la escena el 2 de agosto y la declaración jurada que le tomó el 31 de julio a González Malavé con respecto a: (1) que escuchó un "alto" proveniente del *interior* de las facilidades de Rikavisión, y (2) que dicho agente aludió a que antes de iniciarse los disparos, Soto Arriví identificó una persona "*allí dentro*". Tales omisiones fueron inadmisibles, máxime ante el conocimiento que obtuvo Brunet Justiniano el 2 de agosto de 1978 de la presencia de unas marcas de impacto en el lado interior de los tubos del portón de la entrada de Rikavisión.

Ante estas circunstancias, su sentir posterior de que los hechos ocurridos en el Cerro Maravilla "debieron haber sido sometidos a la consideración de los tribunales" (Caso Núm. CE-86-666, Parte IV, Comentarios y objeciones a la relación del caso y conclusiones de hecho, pág. 10), no le releva de responsabilidad profesional y ética.

### VII

*Miró Carrión*(7)

En su defensa *Miró Carrión* alude constantemente a su falta de experiencia y estado de subordinado (obediencia jerárquica)

---

(7) Aparte de la prueba documental, declararon a su favor los Lcdos. Charles Figueroa, Ramón A. Llovet García y Reynaldo Arroyo. Como prueba acumulativa presentó el de los Lcdos. Max Pérez Preston, Carlos Coll Carpintero, Emilio Duprey, Miguel Valcourt y Manuel Lugo.

frente al querellado Colton Fontán. De un lado expone que su viaje, presencia y participación el 2 de agosto de 1978 en el Cerro Maravilla para "recrearse la escena con la policía" fue a su propia iniciativa, para entonces aducir como excusa que la tarea que le asignaron fue limitada y que los fiscales realmente a cargo de la investigación fueron Colton Fontán y Figueroa Vivas. Sus argumentos no nos convencen.

La prueba revela que Miró Carrión tomó parte activa en la "investigación". Ante él, el 2 de agosto de 1978 se prestaron cinco (5) declaraciones juradas correspondientes a los agentes Ríos Polanco, Colón Berríos, Reverón Martínez, Bruno González y Torres Marrero en el tiempo "récord" de media (1/2) hora. La prueba también refleja que en esa gestión siguió un sistema que no propició un ambiente que garantizara, en lo posible, que aflorara la verdad. Dichos agentes le ofrecieron, claro está, la versión que ya todos conocían como resultado de la recreación o simulación previa minutos antes. Concluimos que su gestión fue más bien de carácter pro forma con miras a llenar un expediente y darle un *imprimatur* oficial a la teoría de defensa propia policial.

■ Quedó probado hasta la saciedad su falta *grave* de diligencia y competencia al "investigar" sin un trasfondo adecuado ni examinar la evidencia real, documental y testifical disponible.

De una lectura de las declaraciones juradas que tomó el 7 de agosto de 1978 a los agentes Cartagena Flores, Ríos Martínez, Pérez Casillas y Moreno Morales surge que éstas fueron superficiales. Coincidimos con el Comisionado Especial, Juez Limardo, en que las mismas exhiben un "interrogatorio, que por su elevado *carácter sugestivo* . . . claramente propició mantener la versión de los hechos de aquellos otros agentes policíacos que prestaron declaraciones el 2 de agosto de 1978". (Énfasis suplido.) Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, pág. 64.

Además, Miró Carrión *mintió* al declarar: (1) que cuando tomó las declaraciones el 2 de agosto no estaban presentes Colton Fontán y Figueroa Vivas; (2) que no vio allí al Teniente Quiles

Hernández; (3) que los policías permanecieron fuera de la estructura de Rikavisión, mientras él les tomaba individualmente las declaraciones; (4) que se utilizó una maquinilla para preparar esas declaraciones juradas, sabiendo que fueron signos taquigráficos, y (5) que el doctor Ramos Rivera le había declarado que el cadáver de Soto Arriví no presentaba golpes causados por instrumentos o puños, cuando lo cierto fue que dicho galeno sólo le indicó que ello era un asunto a ser establecido por un anatomopatólogo.

Incurrió, además, en conducta altamente censurable e impropia cuando el 30 de junio de 1983, luego de haber prestado testimonio ante la Comisión de lo Jurídico del Senado, llamó a la taquígrafa Cintrón Lema para pedirle que declarara falsamente sobre el método seguido en la preparación de los testimonios de los cinco agentes el 2 de agosto de 1978.

No obstante, tiene razón en que no se le imputó expresamente, como cargo, que hiciera caso omiso al señalamiento de Delgado García sobre los impactos de bala en el portón de la verja de Rikavisión. Tampoco se le formuló cargo relativo a que tratara de presionar al policía Quiñones Quiñones para que declarara "a favor" de la versión de los policías.

## VIII

*Colton Fontán*(8) y *Figueroa Vivas*(9)

En sus respectivos escritos, los querellados Colton Fontán y Figueroa Vivas nos plantean, como denominador común, que la Ley Núm. 1 de 18 de enero de 1985 (3 L.P.R.A. sec. 90n.) —que creó el cargo de Fiscal Especial Independiente— es inconstitucional por aplicarse *ex post facto*, por privarnos del poder inherente de disciplinar a los abogados y por representar una delegación indebida que viola la doctrina de separación de poderes. Además, Colton Fontán aduce que fue exonerado por una comisión designada por el Secretario de Justicia en un procedi-

---

(8) Presentó los testimonios de Teresita García, Tomás De Jesús Mangual y el de los Lcdos. José E. Vela Barnes, Fernando Vizcarrondo y José M. Aponte Jiménez.

(9) No presentó prueba testifical.

miento administrativo interno seguido en virtud de la Ley Núm. 145 de 20 de julio de 1979 (3 L.P.R.A. sec. 93a *et seq.*), que rige la suspensión o destitución de fiscales. Por último, Figueroa Vivas expone que las múltiples reseñas periodísticas, de radio y de televisión en torno a los sucesos del Cerro Maravilla, las investigaciones y demás publicidad, han provocado sobre su persona y familia desasosiego, intranquilidad y presión, de tal magnitud que la presente querella constituye un "castigo cruel e inusitado". Caso Núm. CE-86-666, Parte IV, Moción sobre cuestiones constitucionales, pág. 4.

Examinemos los méritos de estos señalamientos de derecho y, luego, aquellos relativos a la prueba.

A. *Señalamientos de derecho*

En el primero sostienen que la Ley Núm. 1, *supra,* adolece del vicio constitucional de ser *ex post facto.* No tienen razón.

Este estatuto no alteró ni hizo más oneroso, como se alega, los derechos procesales y sustantivos que siempre hemos reconocido en acciones disciplinarias de abogados. Véase *Pueblo v. Lebrón González,* supra, pág. 96. No creó un procedimiento nuevo; simplemente trasladó de la Oficina del Procurador General a la del F.E.I. la encomienda investigativa y, de proceder, la presentación y el procesamiento de la querella.

Distinto de lo que se intima, el procedimiento seguido en esta querella estuvo rodeado de escrupulosas garantías procesales y de un reconocimiento de derechos a veces mayor que lo dispuesto en la Regla 13j de nuestro Reglamento, 4 L.P.R.A. Ap. I-A. No era necesario ni procedían vistas separadas. Expongamos en detalle esas garantías.

En lo *relativo al descubrimiento de prueba,* se puso a disposición de los querellados para su examen o copia toda la documentación del F.E.I. en custodia de la Secretaría del Tribunal Superior; se le requirió al F.E.I. que anunciara y especificara cada testigo que declararía sobre cada cargo en particular, y se le ordenó la entrega de copia de todos los documentos (deposiciones, interrogatorios, etc.) que tuviesen una manifestación bajo jura-

mento de los testigos anunciados ante cualquier foro y la entrega de cualquier material exculpatorio.

*Durante el desfile de la prueba del F.E.I.*, el Comisionado Especial, Juez Limardo, le permitió a *todos* los querellados contrainterrogar a los testigos aun cuando no declararan en su contra ni fueran afectados por sus testimonios. Ordenó al F.E.I. a que entregara para su inspección una declaración de un testigo, cuyo testimonio se eliminó a petición del F.E.I., pero sobre la cual los querellados alegaban que contenía material exculpatorio ocultado. Eventualmente el Comisionado Especial determinó que la alegación de los querellados era infundada. Además, eliminó *totalmente* el testimonio del Sr. Manny Suárez, por razón del privilegio de periodista, al invocar el querellado Villanueva Díaz el derecho al contrainterrogatorio. Ordenó el desistimiento, *sin perjuicio*, de los cargos administrativos formulados por el F.E.I. contra la testigo Celia Cintrón Lema y *prohibió* que se iniciara cualquier acción contra cualquier otro testigo anunciado por los querellados, ello con el propósito de protegerles el derecho a producirlos a su favor.

*En ocasión del desfile de prueba de los querellados*, el Juez Limardo decretó un receso de los procedimientos de dos días y medio para que tuvieran la oportunidad de evaluar la prueba presentada por el F.E.I. y organizar la suya. Les permitió eliminar un número sustancial de los testigos anunciados sin que operaran los efectos negativos de la Regla 16(5) de Evidencia, 32 L.P.R.A. Ap. IV, bajo el fundamento de que tal acción era un esfuerzo tendente a acelerar los procedimientos; no autorizó al F.E.I. que entrevistase a esos testigos; permitió cambiar el orden de la prueba de los querellados; que se sustituyeran testigos anunciados en la lista, y que uno de los querellados utilizara un testigo anunciado por otro.

Por último, ante nos tuvieron amplia oportunidad de exponer sus argumentos con el beneficio de la transcripción de toda la evidencia oral, la cual autorizamos a pesar de la objeción del F.E.I.

No es correcta la tesis sobre *delegación indebida*. Conforme su Exposición de Motivos, la Ley Núm. 1, *supra*, respondió a la

necesidad de realizar una investigación completa e imparcial de los sucesos del Cerro Maravilla. Debido a que en los mismos pudieron estar involucrados algunos funcionarios que realizaron investigaciones criminales (policías, fiscales, etc.), fue necesario eliminar todo conflicto de intereses entre los investigadores e investigados. El método adoptado fue la creación del F.E.I., en vez de seguir la alternativa de los organismos tradicionales de investigación.

Los querellados no nos señalan disposición constitucional que impida ese esquema y delegación de poderes. Por el contrario, hemos reconocido su validez, con sus limitaciones, si existe la necesidad y conveniencia de que intervenga un funcionario autónomo. Véanse: *Pueblo v. Pérez Casillas*, 126 D.P.R. 702 (1990); *López v. Junta de Planificación*, 80 D.P.R. 646 (1958).

La "exoneración administrativa" y la aceptación de su renuncia como Fiscal por el Primer Ejecutivo en diciembre de 1981, que como defensa aduce el querellado Colton Fontán, es inmeritoria. Ese trámite no era impedimento para este proceso disciplinario ético. Véanse: *In re Gómez Morales*, 124 D.P.R. 383 (1989); *In re Rodríguez Caraballo*, 106 D.P.R. 792, 799 (1978).

Figueroa Vivas fundamenta su argumento sobre *separación de poderes* en que el estatuto priva a este Foro "del poder inherente para reglamentar todo lo concerniente al ejercicio de la abogacía, incluyendo la juri[s]dicción disciplinaria . . .". Caso Núm. CE-86-666, Parte IV, Informe Comisionado Especial, Vol. I, Cap. I, pág. 64. Colton Fontán arguye que el "Poder Legislativo no puede en nuestro sistema de ley otorgar poderes judiciales a Fiscales Especiales". Caso Núm. CE-86-666, Parte IV, Moción sobre cuestiones constitucionales, pág. 1.

Nos resulta difícil entender ambos argumentos y detectar de qué forma se ha violado el principio de separación de poderes. La preeminencia de la acción judicial es manifiesta. Sólo es menester recordar que el ámbito y ejercicio de nuestra jurisdicción disciplinaria no ha variado; *la mejor prueba es la presente adjudicación*.

Por último, el reclamo de Figueroa Vivas sobre castigo cruel e inusitado no tiene mérito. La presentación y dilucidación de esta querella disciplinaria no encaja en las prácticas que la Constitución proscribió. Véase *Pueblo v. Jaimán Torres*, 86 D.P.R. 700, 701–702 (1962).

Al así resolver somos conscientes de que este tipo de proceso genera angustia y desasosiego. La acción en sí, al igual que el transcurso del tiempo —fácil es suponerlo— deben haber vulnerado emocionalmente la deseada tranquilidad que todos añoramos. *Por lamentable que sea esa realidad, la misma es consecuencia del rigor mínimo de un sistema de justicia orientado hacia la búsqueda de la verdad y el imperativo de fijar responsabilidades.*

Ciertamente, a la postre, este cuadro es más doloroso para quien incumple sus deberes como funcionario público. Todo ese estado anímico es inevitable; consecuencia lógica de conducta ilegal y antiética de cualquier persona, bien corresponda a un ciudadano particular o a un abogado o funcionario público.

B. *Señalamientos sobre la prueba*

A lo largo de todos sus escritos los querellados Colton Fontán y Figueroa Vivas cuestionan las determinaciones en su contra adoptadas por el Comisionado Especial, Juez Limardo, a base de la poca credibilidad que debieron merecer algunos testigos. En múltiples ocasiones sus argumentos descansan en una extracción selectiva de frases aisladas tomadas de la declaración de un testigo.

Ese enfoque es incorrecto. *Reiteramos la norma de que para aquilatar credibilidad es menester el análisis integral del testimonio y, si existe, su evaluación conjunta con otros testimonios y con la evidencia documental.* La dificultad del argumento de estos dos querellados es que ninguno puede negarnos que desde el comienzo hubo suficiente evidencia objetiva tendente a corroborar la versión del chofer Ortiz Molina y la del policía Quiñones Quiñones, a saber, las fotografías de los cuerpos de Darío Rosado y Soto Arriví, los impactos de bala en el portón de

WRIK-TV, los impactos de bala en el Volkswagen de la empresa, etc.

*No albergamos dudas de que los querellados Colton Fontán y Figueroa Vivas incurrieron, individual y concertadamente, en conducta tendente a orientar la investigación hacia la teoría de defensa propia de la Policía.* En esa tarea tuvieron éxito por tiempo limitado. Para alcanzarla intervinieron impropiamente con varios testigos y lograron que estos cambiaran sus testimonios. Sus conductas atentaron contra principios deontológicos básicos. No sólo merecen nuestro repudio y censura, sino también la imposición de las más severas sanciones disciplinarias.

En síntesis, contra *Colton Fontán* quedaron probados los cargos relativos a su intervención y presión indebida el 31 de julio de 1978 con el testigo Ortiz Molina; que el 3 de agosto le sugirió al testigo Marte Ruiz que, contrario a lo que éste le informaba, declarara que nadie había disparado desde el interior de las facilidades de la WRIK-TV y que sólo había escuchado una ráfaga de disparos; y que creó sobre ese mismo testigo un grave temor al pedirle que le identificara la persona que le preguntaba sobre los hechos con el propósito de "sacarlo fuera de circulación".

Además, dio instrucciones específicas a la taquígrafa Cintrón Lema para que en la certificación de la declaración jurada de Marte Ruiz no lo incluyera como el Fiscal ante quien se había prestado. De ese modo ordenó *alterar* intencionalmente un importante documento correspondiente al proceso investigativo.

En cuanto a *Figueroa Vivas*, es obvio que el 17 de agosto de 1978 *coaccionó* al policía Quiñones Quiñones y ejerció presión indebida sobre él para que alterara su declaración sobre las dos ráfagas de disparos, hecho que era incompatible con la versión de defensa propia de la Policía. Sin explicación, destruyó además parte de la declaración jurada inicial que ese testigo le ofreció en esa fecha.

Además, *Colton Fontán y Figueroa Vivas*, en su desempeño como fiscales independientes y actuando combinadamente, el 17 de agosto de 1978 le ofrecieron empleo al testigo Quiñones Quiñones, y el 26 de julio de 1978, sin previo aviso, se personaron

a su residencia en Ponce y lo amenazaron con formularle acusaciones por varios delitos si no alteraba su declaración.

Quedó probado que los dos efectuaron una investigación plagada de múltiples omisiones y deficiencias respecto a: (1) la evidencia real y objetiva en la escena (impactos en el portón, Volkswagen y vehículo público de Ortiz Molina, casquillos de armas largas, pantalón lleno de sangre y sucio a nivel de las rodillas con arena y tierra, máscara, botas, ropa interior y zapatos); (2) los análisis periciales de esos objetos; (3) la evidencia de agresión policíaca que surgía de los cadáveres de las víctimas Darío Rosado y Soto Arriví (fotografías y autopsia del primero), y (4) en torno a los testimonios perpetuados durante la investigación (origen del "alto" descrito por González Malavé el 31 de julio de 1978).

Ante esta realidad nos sorprenden los argumentos de Colton Fontán en el sentido de que frente a la autopsia las fotografías eran "prueba secundaria". Lo mismo ocurre con su aserto de que "[e]s doctrina establecida científicamente que la trayectoria de un proyectil a través del cuerpo, al establecer anatómicamente los resultados del orificio no puede ser indicio de la posición en que se encontraba dicho cuerpo al momento de recibir los disparos". Caso Núm. CE-86-666, Parte IV, Comentarios y objeciones a la relación del caso y conclusiones de hecho, pág. 17.

Tampoco le dieron importancia al testimonio de Delgado García relacionado con los impactos que aparecían en el portón de la emisora WRIK-TV, a pesar de que esa información era altamente relevante en la búsqueda de la verdad y, además, omitieron tomarle una declaración jurada para perpetuar su testimonio.

Finalmente, publicaron los resultados de su investigación en un informe y lo dieron a la luz pública en una conferencia de prensa celebrada el 29 de agosto de 1978. En el mismo perpetuaron el primer engaño público respecto a lo ocurrido en el Cerro Maravilla. En esa conferencia, Colton Fontán fue enfático en que la "investigación revela que no hubo masacre, golpizas ni agresiones". *Exh.* 74 F.E.I. Caso Núm. CE-86-666, Parte IV, Comentarios y Recomendaciones, pág. 24.

IX

*Villanueva Díaz*(10)

Por su parte, Villanueva Díaz enfatiza el hecho de que los testigos Delgado, Marte Ruiz y Cartagena Flores le mintieron; que no tuvo ante sí toda la evidencia material "que no fuera alguna que otra fotografía"; que nunca tachó de superficial el informe Colton-Figueroa; que tampoco le manifestó a dos (2) periodistas del San Juan Star su sentir de que el chofer Ortiz Molina le había dicho la verdad sobre las dos (2) ráfagas de disparos y "era su mejor testigo", y que la declaración del agente Andrades estaba "colmada de mentiras".

Bastaría examinar el *Exhibit* 15, F.E.I. para recordar que Villanueva Díaz *admitió que vio* las fotografías de los rostros golpeados de Soto Arriví y Darío Rosado (íd., págs. 137–138); que por lo menos vio once (11) de esas fotos durante su investigación (íd., pág. 141); que aceptó que hubo "aspectos que no se investigaron ampliamente, que debieron tener una atención esmerada en el proceso investigativo . . ." (íd., pág. 119), y que apreció el informe Colton-Figueroa como el producto de una investigación superficial que "debió, pudo haber sido más profunda y eficiente". Íd., págs. 148–149.

La conducta de Villanueva Díaz —caracterizada correctamente por el Comisionado Especial, Juez Limardo, como resultado de una "racionalización", "pobre objetividad investigativa", "extraña forma de interrogatorio" y "especulativa", Caso Núm. CE-86-666, Parte II, Informe Comisionado Especial, Vol. I, Cap. I, págs. 73-95— ciertamente es *incomprensible*. Cuando intervino en los hechos del Cerro Maravilla tenía a su haber quince (15) años en la profesión y siete (7) de experiencia como fiscal. No puede negar que su designación especial respondió a un clamor de insatisfacción pública sobre el Informe Colton-Figueroa. Al final,

---

(10) Presentó los testimonios de David Borrero Fuentes, José R. Maldonado, Santiago Rullán Rivera, Mariano Maesso Ganzález y, renunciados por el F.E.I., el del Lcdo. W. Rodríguez Suárez y Miguel A. Cartagena Flores.

su gestión e Informe fueron peores, pues ratificó todas las deficiencias del anterior (Colton-Figueroa).

Lo más absurdo de la conducta de Villanueva Díaz es que, aun cuando tenía la encomienda de investigar cabalmente la forma en que los sucesos del Cerro Maravilla habían sido investigados previamente por otros fiscales y altos funcionarios del Departamento de Justicia, no la cumplió. Frente a fuertes indicadores —testimonios, documentos y otros objetos reales— sugerentes de que Colton Fontán, Figueroa Vivas, Brunet Justiniano y otros habían incurrido en negligencia profesional y conducta contraria a las normas de ética profesional, ni siquiera les tomó declaraciones juradas ni hizo gestiones tendentes a corroborar, desvirtuar o clarificar las imputaciones o datos que señalaban la comisión de tales actos.

Conoció e ignoró evidencia testifical y objetiva que levantaba serias interrogantes sobre la versión oficial del informe Colton-Figueroa. No pueden servir de excusa las alegadas versiones contradictorias de algunos de los testigos y sus mentiras. Si bien no le podemos atribuir al querellado Villanueva Díaz el don de clarividente, sufrió en su propia carne unas experiencias que debieron servirle de guía para redoblar sus esfuerzos en el esclarecimiento de la verdad. ¿Cómo si la Policía lo siguió, vigiló y trató de amedrentarlo no lo comunicó al Secretario de Justicia? ¿No debieron esas circunstancias, por sí solas, hacerle sospechar del interés inusitado de los agentes de la Policía involucrados? ¿No le preocupó que fuera una advertencia? Si la Policía estaba vigilándolo, ¿no se planteó la posibilidad de que igual tratamiento y presión se estuviera ejerciendo sobre otros testigos? Finalmente, ¿por qué no lo hizo constar en el informe?

La conducta de Villanueva Díaz culminó con la presentación de su Informe el 19 de enero de 1981 y, *simultáneamente, su renuncia.* Sin embargo, inexplicablemente el 27 de enero celebró una conferencia de prensa. Aunque fue el único participante, no sabe por instrucciones de quién la celebró. Con su informe y esa conferencia de prensa endosó la investigación de Colton-Figueroa a pesar de sus graves defectos. Más aún, en dicho informe calificó

de mentirosos a los testigos claves Ortiz Molina y Quiñones Quiñones, quienes impugnaban la versión oficial de la Policía.

En resumen, estamos convencidos de que el querellado Villanueva Díaz actuó en contra de su propia convicción, se prestó a un engaño en cuanto a la verdad de los hechos y falló tristemente a la encomienda especial recibida.

## X

*Conclusiones y sanciones disciplinarias*

Nuestro análisis separado e independiente nos mueve a sostener, en lo fundamental, las determinaciones de hecho del Comisionado Especial, Juez Limardo. Las mismas están ampliamente sostenidas por la prueba testifical y documental. No hay el más mínimo indicio de que el Juez Limardo haya actuado con prejuicio o parcialidad ni que hubiera cometido error manifiesto al apreciar la prueba.

■ Esta prueba refleja que *todos* los querellados —unos en menor y otros en mayor grado— violaron el Canon 18 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, esto es, incurrieron en *negligencia profesional crasa.* Se solidarizaron con la versión de defensa propia de la Policía. Como consecuencia, realizaron individual o concertadamente unas intervenciones investigativas de *pobre calidad.*

■ En sus gestiones, fueron muy poco diligentes. No estamos, pues, castigando errores cometidos de buena fe (*bona fide*) en los que no media negligencia o incompetencia profesional crasa. Todos incurrieron en *grave* conducta profesional antiética permeada, en ciertos momentos, por un extraño interés de que no aflorara completa la verdad. "Pues no debemos olvidar que toda deontología profesional es una emanación directa del espíritu de las leyes, con la tamización precisa para su refuerzo por la lógica del oficio, en este caso, el oficio de los juristas, *dentro de cuyos supuestos lo que sería meramente aceptado como omisiones*

*involuntarias al ciudadano común no podría ser así catalogado frente al profesional.* Función de la deontología, pues, y especial caracterización de la misma es el *quantum* de *refuerzo de lo que en derecho común se conoce como la diligencia propia de un buen padre de familia*: la deontología establece la exigencia genérica de tal principio, frente a lo que sería un mero deber frente al ciudadano común. *Esta consideración de lo deontológico, a modo de una carga específica de responsabilidad y refuerzo de la personalidad profesional, entendemos constituye el alma de todo sistema deontológico."* (Énfasis suplido.) P.M. Casado Coca, *Abogacía y deontología de la indefensión,* 523 Rev. Gen. Der. 1679, 1682–1683 (1988).

■ En *particular,* los querellados Colton Fontán y Figueroa Vivas, más que un celo profesional legítimo, aquí exhibieron animosidad desproporcionada y persecución impermisible contra unos testigos y participaron en una acción concertada conspiratoria. Cánones 5, 15 y 35 del Código de Ética Profesional, *supra.* Ignoran factores vitales en cuanto a la confiabilidad de los testimonios y de ese modo evadieron llegar, con razonable certeza, a la entraña de la verdad.

■ Ambos violaron el sagrado deber de buscar la verdad y de abstenerse de sugerir a testigos que declararan falsamente. "La instigación a perjurio por parte de un abogado es una de las más serias violaciones de los cánones de ética profesional." *In re Pagán Colón,* 100 D.P.R. 223, 227 (1971). "No podría ser de otra manera, puesto que *la verdad y la justicia están necesariamente juntas: por lo que sería intrínsecamente contradictorio administrar la justicia o reclamar su actuación, sin respetar la verdad.* . . . No cumple, por tanto, su propia misión, y la traiciona, el que en defensa de una causa se sirve de sofismas o de pruebas falsas para hacer prevalecer una tesis dada en menoscabo de la verdad y, por consiguiente, de la justicia." (Énfasis suplido.) G. Del Vecchio, *La obligación jurídica de la verdad,* 11 Rev. Fac. Der. y Ciencias Sociales de Montevideo 13, 25 (1960).

■ Incurrieron Colton Fontán y Figueroa Vivas en serios actos de negligencia crasa. *Por las posiciones jerárquicas que ocupaban, sus conductas obstaculizaron y contribuyeron a retrasar por años el descubrimiento de lo realmente sucedido en el Cerro Maravilla. Mancharon la imagen del Ministerio Fiscal y debilitaron la efectividad del importante rol que desempeña en el sistema de justicia criminal. Canon 38 del Código de Ética Profesional,* supra. *A la violencia física ilegal de la Policía añadieron la violación ética.*

■ Réstanos determinar las sanciones individuales. "Para un abogado sometido a una querella disciplinaria, su caso es único, personal e insustituible. Representa la esperanza o fracaso profesional inmediato de un ser humano, lo que de por sí exige una profunda reflexión por el juzgador de todos los elementos presentes. En consecuencia, entre los asuntos más difíciles de evaluar están los relativos al problema de la conducta profesional en el ámbito de la norma ética y de la disciplina o corrección." *In re Lavastida, et al.,* 109 D.P.R. 45, 87 (1979), opinión concurrente y disidente.

Indudablemente los querellados —quienes hasta que ocurrieron estos hechos gozaban de una ganada buena reputación— transgredieron varios principios éticos de suma importancia y deben ser disciplinados. Sin embargo, no podemos imponerles a todos una misma sanción. A la luz de los cargos probados y su gravedad, es menester tomar en cuenta sus conductas individuales, efectos acumulativos y así graduar justicieramente las sanciones.

Aquilatada la conducta y las violaciones éticas a base de las diferencias resultantes antes expuestas —de menor a mayor severidad— decretamos la *suspensión provisional* de la profesión de abogado del querellado Brunet Justiniano por tres (3) años; de Miró Carrión por cinco (5) años; la *suspensión indefinida* de Villlanueva Díaz, y la *separación permanente* de Colton Fontán y Figueroa Vivas.

*Se dictará la correspondiente sentencia.*

114

El Juez Asociado Señor Rebollo López no intervino. La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Andréu García se inhibieron.